ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 5 2004

CENTRAL DISTRICT OF CALIFORNIA
BY ⎯ DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ENTERED
CLERK, U.S. DISTRICT COURT

NOV 1 5 2004

CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Long Beach Area Peace Network, *et al.*,<br><br>                    Plaintiffs,<br><br>         v.<br><br>City of Long Beach,<br><br><br><br>                    Defendant. | NO. CV 04-8510 SJO (SSx)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiffs Long Beach Area Peace Network (the "Peace Network"), and Diana Mann (collectively "Plaintiffs") filed a Complaint on October 14, 2004, challenging the constitutionality of Long Beach Municipal Code §§ 5.60 *et seq.*  The matter now before the court is a Motion for Preliminary Injunction filed by Plaintiffs.  The Motion came before the court for a regularly scheduled hearing on Monday, November 8, 2004.  Having thoroughly considered all the pleadings, facts and arguments submitted by counsel for both parties, the court hereby issues its ruling.  Plaintiffs' Motion is hereby GRANTED.

I.    BACKGROUND

        A.    ORIGIN OF THE CONTROVERSY

        Plaintiffs are challenging the City of Long Beach's parade, assembly and "special event" permit scheme codified as LBMC §§ 5.60 *et seq.* (Plaintiffs' Mem. of P. & A., hereinafter "P.&A.,"

/4

1   at 1:2-4.)  The Peace Network is an unincorporated, loosely organized group of peace activists

2   without an office, organizational phone, organizational email or insurance. (Ruyle Decl. ¶ 10.)

3   On February 15, 2003, the Peace Network sponsored an anti-war rally.  (*Id.* ¶ 4.)  The

4   February 15, 2003 rally included a march down public streets, along a path suggested by the City

5   of Long Beach (the "City"). (*Id.*)  City Council member Dan Baker and State Assembly member

6   Alan Lowenthal participated in the rally.  (*Id.*)  The City waived all fees and costs for the

7   February 15th rally. (*Id.*)

8          On or about March 20, 2003, the United States military launched "Operation Iraqi

9   Freedom," and commenced an aerial assault on Baghdad. The Peace Network responded to this

10  event by organizing another anti-war rally and scheduled it for March 22, 2003.    The

11  demonstration was put together to protest events in Iraq.  The subject matter of the rally is

12  important in only two respects.  First, it is obviously political speech; and second, the Peace

13  Network organized the rally to respond as quickly as possible to the onset of war.  As with the

14  previous rally, Peace Network member Eugene Ruyle submitted similar paperwork to the City

15  requesting a permit for the rally, as well as a waiver of any fees for the event.  (*Id.* ¶¶ 4 & 5; *see*

16  *also id.*, Ex. 4, Request for Fee Waiver.)  In a letter dated March 21, 2003, the City replied to the

17  Peace Network's application. (*See* Ruyle Decl., Ex. 2.)  In that letter, the City granted permission

18  for the Peace Network to conduct a march on city streets and hold a rally at Bixby Park.  (*Id.*)  The

19  letter described the route for the march through the city streets and included a bill for services

20  amounting to just over seven thousand dollars.[1]  (*Id.*)  The bill included a charge of $2,348 for

21  police and $2,396 for "public works."  (*Id.*)  The letter stated "[p]ayment of fees will be in four equal

22  installments of $1,760.24 to be paid in full within one year of the date of this letter."  (*Id.*)  The

23  Peace Network decided to accept the conditions imposed by the City because the rally was

24  scheduled for the next day. (Ruyle Decl. ¶ 5.)  The person who signed the letter on behalf of the

25  Peace Network noted that "the signers reserve the right to challenge the total, but they will pay

26

27

28
---
[1]  The record indicates the Peace Network and the City discussed alternate routes for the march with varying, but similar costs. (*See* Ruyle Decl., Ex. 5.)

1   first designated installment by [illegible] a.m. 3/22/04." (*Id.*; *see also* Ruyle Decl., Ex. 2.) The first

2   installment was paid by personal check drawn on the account of Eugene Ruyle.[2] (Ruyle Decl.,

3   Ex. 7.) Plaintiff Mann was not present at the meeting at which the permit was signed, nor did she

4   agree to the costs at any other time. (Mann Decl. ¶ 4.)

5        Approximately 1,000 people participated in a peaceful demonstration on March 22, 2003.

6   (Ruyle Decl. ¶¶ 4 & 7.) The City commended the Peace Network for peaceful and orderly success

7   of the rally.   (*Id.*, Ex. 6.)   As part of the event an organization calling itself the "Surfrider

8   Foundation" placed surfboards on the sand in the shape of the peace symbol. (Mann Decl. ¶ 3.)

9   The intention of the Surfrider Foundation was to have the symbol visible to any person looking

10  down on the beach. (*Id.*) The display coincided with the march and rally organized by the Peace

11  Network that was taking place at a nearby park. (*Id.*) The surfboard display was limited entirely

12  to the beach and at no time did anyone block pedestrian or vehicular traffic on a street or sidewalk

13  or otherwise interfere with ordinary traffic regulations. (*Id.*) The surfboards were removed at the

14  end of the event and there was no damage to the beach. (*Id.*)

15       On February 20, 2004, the City sent a letter to Plaintiff Mann and other participants in the

16  rally requesting payment of the fees for the event plus a $1,500 fee for the surfboard display on

17  the beach. (Mann Decl. ¶ 5; Ruyle Decl., Ex. 9, Memo of Decision at 3:8-18.) The participants

18  ignored the City's demand for payment.  The City subsequently initiated a Small Claims action

19  against the individuals named on the permit as well as Co-Plaintiff in the instant suit, Diana Mann.

20  (*See generally* Ruyle Decl., Ex. 9, Memo of Decision.) The Small Claims Court held the $1,500

21  fine for the surfboard display was an unconstitutional restraint on freedom of expression. (Ruyle

22  Decl., Ex. 9, Memo of Decision at 3:8-18.) The other individuals named in the Small Claims action

23  lost their case and appealed to the county superior court.   (Ruyle Decl. ¶ 11.)   Since

24  March 22, 2003, the Peace Network has not held any marches or rallies because it fears it will

25  face burdensome costs and extensive personal liability. (Ruyle Decl. ¶ 7.)

26

27

28  [2] The City apparently lost the check and requested a replacement from Sharon Cotrell of the Peace Network. (Ruyle Decl. ¶ 5; and Ex. 6.)

3

B.   THE STATUTORY SCHEME

The LBMC requires applicants for an event permit to sign a "hold-harmless agreement" giving the City quite broad protection.  Indeed, the entire statutory framework is quite broad as to what conduct is prohibited, the amount of discretion invested in the City official reviewing applications, and the burdens placed on applicants in terms of indemnification, insurance and costs that may be assessed by the City.  For example, section 5.60.020 of the LBMC includes an expansive proscription on "special events":

> no person shall conduct or cause to be conducted, participate or engage in, hold, manage, permit or allow another to conduct a special event, in, on or upon any city street, sidewalk, alley, park, way, pier, public place, public property or public right-of-way which is owned or controlled by the city without first having obtained a written permit from the city manager.

LBMC § 5.60.020.  The term "special event" is defined as follows:

> 1.  Any organized formation, parade, procession, demonstration or assembly which may include persons, animals, vehicles, or any combination thereof, which is to assemble or travel in unison on any street, sidewalk or other public right-of-way owned or controlled by the city which does not comply with applicable traffic regulations, laws or controls; or
>
> 2.  Any organized assemblage of seventy five (75) or more persons at any public place, property or facility which is to gather for a common purpose under the direction or control of a person; or
>
> 3.  Any other organized activity involving seventy five (75) or more persons conducted by a person for a common or collective use, purpose or benefit which involves the use of, or has an impact on, public property or facilities and which may require the provision of city public services in response thereto.
>
> 4.  Examples of special events include, but are not limited to, concerts, parades, circuses, fairs, festivals, block parties, street fairs, community events, on the water activities (such as boat races), mass participation sports (such as marathons and other running events), athletic or sporting events, and community celebrations and observances conducted on public property or public rights of way.

LBMC § 5.60.010(I).  The Code defines an "event" as a "special event or a demonstration." LBMC § 5.60.010(F).  The term "expressive activity" is defined by the LBMC as any "conduct, the sole or principal object of which is the expression, dissemination or communication by verbal, visual, literary or auditory means of opinion, views or ideas."  LBMC § 5.60.010(D).  The Code

1    goes on to state "[e]xpressive activity includes, but is not limited to, public oratory and the

2    distribution of literature." *Id.*

3       The Municipal Code invests virtually unrestricted discretion in "the city manager" to issue

4    special permits pursuant to §§ 5.60.010 *et seq.* LBMC § 5.60.020(C). The LBMC states the "city

5    manager may condition any permit issued pursuant to this chapter with reasonable requirements

6    concerning the time, place, or manner of holding such even as is necessary to coordinate multiple

7    uses of public property, assure preservation of public property and public places .... and to control

8    vehicular and pedestrian traffic in and around the venue, provided that such requirements shall

9    not be imposed in a manner that will unreasonably restrict expressive or other activity protected

10    by the California or United States constitutions." LBMC § 5.60.020(D). The Municipal Code then

11    goes on to delineate a non-exhaustive list of possible conditions. *Id.*

12       The Municipal Code is structured to contain exceptions to the special event permit

13    requirement. LBMC § 5.60.030. For example, there is an exception for "[f]uneral processions by

14    a licensed mortuary or funeral home." LBMC § 5.60.030(1). There is also an exception for

15    "[s]pontaneous parades, assemblies or demonstrations involving expressive activity and which

16    are occasioned by news or affairs coming into public knowledge within five (5) days of such

17    parade, assembly or demonstration, provided that the organizers thereof give written notice to the

18    city manager at least twenty four (24) hours prior to such parade or assembly." LBMC §

19    5.60.030(5). Organizers of "spontaneous demonstrations" are required to give their name,

20    address and telephone number to the city manager and, *inter alia,* estimate the approximate

21    number of persons who will be participating; and the location and date of the proposed assembly.

22    LBMC § 5.60.030(5)(a)-(g).

23       The provisions governing spontaneous demonstrations also provide "[t]he city manager

24    may impose reasonable, time, place and manner restrictions on spontaneous parades,

25    assemblies or demonstrations governed by this section whether or not said activities are governed

26    by the permit requirements set forth in this chapter." LBMC § 5.60.030(B). Moreover, the "city

27    manager may deny permission to conduct a spontaneous parade, assembly or demonstration if

28    the city manager makes a finding requiring denial pursuant to section 5.60.070."

1    LBMC § 5.60.070 governs the denial of permits for spontaneous demonstrations and

2  special events. It provides, *inter alia,* a permit may be denied if the "applicant fails to comply with

3  all the terms of this chapter including failure to remit all fees and deposits, or provide proof of

4  insurance and/or an indemnification agreement as required." LBMC § 5.60.070(A)(7).  Finally,

5  section 5.60.080 of the LBMC allows a city official to waive the insurance requirement, set the

6  insurance requirement at any level or amount, and allows the City to require applicants to

7  completely indemnify the City for any event that may occur, including actions by third parties, or

8  even the actions of City officials themselves.

9    II.    STANDARD

10    "No preliminary injunction shall be issued without notice to the adverse party." Fed. R. Civ.

11  P. 65(a)(1).  "A temporary restraining order may be granted without written or oral notice to the

12  adverse party . . . only if (1) it clearly appears from specific facts shown by affidavit or by the

13  verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant

14  before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's

15  attorney certifies to the court in writing the efforts, if any, which have been made to give the notice

16  and the reasons supporting the claim that notice should not be required." Fed. R. Civ. P. 65(b).

17  In the instant case, the Defendant City has adequate notice.

18    A party seeking preliminary injunctive relief must meet one of two tests: "either a likelihood

19  of success on the merits and the possibility of irreparable injury, or that serious questions going

20  to the merits were raised and the balance of hardships tips sharply in its favor." *Immigrant*

21  *Assistance Project of the Los Angeles County Federation of Labor v. Immigration and*

22  *Naturalization Service,* 306 F.3d 842, 873 (9th Cir. 2002).  The Ninth Circuit explained that "these

23  two alternatives represent 'extremes of a single continuum,' rather than two separate tests." *Id.*

24  (*citing Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir. 1999)).  The

25  greater the relative hardship to the moving party, the less it has to show the probability of success.

26  *Id.*  However, even if the balance of hardships tips decidedly in favor of a party moving for

27  preliminary injunction, it must be shown as an irreducible minimum that there is a fair chance of

28  success on the merits. *Id.; see also Stanley v. University of Southern California,* 13 F.3d 1313,

1    1319 (9th Cir. 1994) (*quoting Martin v. International Olympic Committee,* 740 F.2d 670, 674-75

2    (9th Cir. 1984). On the other end of the continuum, a preliminary injunction may also be granted

3    even though the harm factor favors the defendant, provided that there is a strong likelihood of

4    success on the merits. *Id.; see also Immigrant Assistance Project of the Los Angeles County*

5    *Federation of Labor, supra,* 306 F.3d at 873.

6        There is also a distinction to be made between a mandatory preliminary injunction and a

7    prohibitory preliminary injunction. *See Stanley, supra,* 13 F.3d at 1319-20. A prohibitory

8    injunction preserves the status quo. *Id.* at 1320 (*citing Johnson v. Kay,* 860 F.2d 529, 541 (2d Cir.

9    1988)). Whereas, a mandatory injunction "goes well beyond simply maintaining the status quo

10   *pendente lite* [and] is particularly disfavored." *Id.* (*quoting Anderson v. United States,* 612 F.2d

11   1112, 1114 (9th Cir. 1979)). Accordingly, when the court is considering a request for mandatory

12   preliminary relief that goes well beyond maintaining the status quo *pendente lite,* the Ninth Circuit

13   instructs that "courts should be extremely cautious about issuing a preliminary injunction." *Martin,*

14   *supra,* 740 F.2d at 675. In the instant case, Plaintiffs are challenging a municipal ordinance.

15   Because the salient facts at issue are undisputed, and the court is dealing with a pure question

16   of law. An expeditious resolution of the instant dispute through motion practice is particularly

17   appropriate and highly desirable. Both parties have been given adequate time to brief the issue

18   in depth. Accordingly, there is no reason why mandatory preliminary relief should not issue in the

19   instant case if it is warranted.

20       III.   DISCUSSION

21       Each party presented concise and well-argued pleadings, framing the following issues for

22   the court: (1) whether the court should abstain from the instant suit based on the principles first

23   articulated by the Supreme Court in *Younger v. Harris,* 401 U.S. 37 (1971); and (2) whether the

24   LBMC ordinance is unconstitutional because it is (a) a content based restriction, (b) not narrowly

25   tailored, or (c) an impermissible restriction on free speech and assembly due to the requirement

26   for event organizers to indemnify the City. (*Compare* P.&A. at 1-18; *and* Opp'n at 2-10.) The

27   court will discuss these issues in turn.

28

## A.  YOUNGER ABSTENTION

The decision in *Younger* was based on considerations of federalism, equity and comity. *See Younger, supra,* 401 U.S. at 44 & 54. Essentially, the *Younger* doctrine instructs federal courts to avoid interfering with important state interests. *See id.* Because *Younger* itself was a § 1983 suit, the *Younger* Abstention doctrine plainly applies to cases brought under § 1983. At one time, abstention was only exercised under extraordinary and narrow circumstances. *See Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813 (1976). But the doctrine has been greatly expanded over the years. *See New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 367-68 (1989).

The holding in *Younger* itself directed federal courts to abstain from interfering with state criminal proceedings. *Younger,* 401 U.S. at 44. There are only a handful of exceptions to this rule, including an exception for prosecutions brought in bad faith. *See, e.g., Allee v. Medrano,* 416 U.S. 802, 838 (1974). For example, the doctrine does not apply to a state criminal proceeding brought solely for harassment and not conviction, as in *Dombrowski v. Pfister,* 380 U.S. 479 (1965). *Younger,* 401 U.S. at 48.[3] Another exception may exist for petitioners seeking an injunction in federal court against patently unconstitutional laws. *Younger,* 401 U.S. at 53-54; *contra Trainor v. Hernandez,* 431 U.S. 434, 463 (1977). A third exception to the *Younger* Abstention doctrine exists if there is no adequate state forum available, *Gibson v. Berryhill,* 422 U.S. 564 (1973). Finally, the parties may waive *Younger* Abstention by failing to timely object to federal jurisdiction. *Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 480 (1977).

The *Younger* Abstention doctrine now extends beyond the realm of criminal prosecutions to civil proceedings. In *Huffman v. Pursue, Ltd.,* 420 U.S. 592 (1975), the Supreme Court expanded the doctrine by holding a federal court should have abstained from interfering with a

---

[3] In *Dombrowski,* plaintiffs alleged "the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana." *Younger,* 401 U.S. at 44 (*quoting Dombrowski,* 380 U.S. at 482.)

1   nuisance proceeding brought in state court against an adult movie theater. *Huffman, supra,* 420

2   U.S. at 604. The Court reasoned a nuisance proceeding was similar to a criminal prosecution.

3   In *Trainor v. Hernandez,* 431 U.S. 434, 444 (1977) the Supreme Court extended the doctrine to

4   all civil proceedings to which a state is a party. The *Trainor* Court justified the decision on the

5   grounds the state "was vindicat[ing] important state policies." *See also Moore v. Sims,* 442 U.S.

6   415, 423 (1979). In *Trainor,* the doctrine was applied to a civil fraud case brought by the state in

7   a situation where the state could also have instituted criminal proceedings. *See Trainor, supra,*

8   431 U.S. at 444.

9         In *Juidice v. Vail,* 431 U.S. 327 (1977), the *Younger* doctrine was again extended to apply

10   to civil proceedings where a state was not a party. *Juidice, supra,* 431 U.S. at 336 [doctrine

11   applied to state court contempt proceedings]. The doctrine was once more employed in the civil

12   context in *Pennzoil Co. v. Texaco Inc.,* 581 U.S. 1, 10 (1987), where *Younger* Abstention was

13   applied to a case brought in federal court by a plaintiff contesting the requirement of posting bond

14   in state court to appeal a large damage award.

15         In *Middlesex County Ethics Comm. v. Garden State Bar Ass'n.,* 457 U.S. 423, 432 (1982),

16   the doctrine was expanded to apply to pending state administrative proceedings. In *Middlesex*

17   *County,* a New Jersey attorney was facing a disciplinary proceeding before the state bar

18   association. *Middlesex County, supra,* 457 U.S. at 427-28. The Supreme Court upheld the trial

19   court's decision to dismiss the case in deference to pending state proceedings. *Id.* at 432. The

20   Court held "[t]he policies underlying *Younger* are fully applicable to noncriminal judicial

21   proceedings when important state interests are involved. *Id.* (*citing Moore, supra,* 442 U.S. at

22   423; *and Huffman,* 420 U.S. at 604-05.) "Where vital state interests are involved, a federal court

23   should abstain 'unless state law clearly bars the interposition of the constitutional claims.'" *Id.*

24   (*quoting Moore,* 442 U.S. at 426.) The Middlesex County Court laid out a three-part test to

25   determine whether abstention is appropriate: *first,* is there an underling action that could

26   constitute an "ongoing state judicial proceeding; *second,* do the proceedings implicate important

27   state interests; and *third,* is there an adequate opportunity in the state proceedings to raise

28   constitutional challenges." *Id.; see also Ohio Civil Rights Commission v. Dayton Christian*

1  *Schools, Inc.*, 477 U.S. 619, 627 (1986) (*holding* the district court should have abstained from

2  interfering with proceedings conducted by the Ohio Civil Rights Commission where allegations of

3  discriminatory conduct were brought against a school.) As it must do, the court now turns to apply

4  the three part test described in *Middlesex County* to facts in the instant case.

5        As a preliminary matter, the court is also guided by the admonition of Justice Scalia, writing

6  for the Supreme Court in *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350,

7  367-68 (1989):

8      Although our concern for comity and federalism has led us to expand the protection of

9      *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, ... it has

    never been suggested that *Younger* requires abstention in deference to a state judicial

10      proceeding reviewing legislative or executive action. *Such a broad abstention requirement*

11      *would make a mockery of the rule that only exceptional circumstances justify a federal*

    *court's refusal to decide a case in deference to the States.*

12

13  *New Orleans Pub. Serv., supra* , 491 U.S. at 367-68 (1989)(emphasis added).  The Supreme

14  Court has also commented "we do not remotely suggest 'that every pending proceeding between

15  a state and a federal plaintiff justifies abstention unless one of the exceptions to *Younger*

16  applies.'" *Moore v. Sims*, 442 U.S. 415, 423 n.8 (1979).

17        Turning to the first prong enunciated in *Middlesex County,* it is apparent there is an ongoing

18  state proceeding. *See Middlesex County,* 457 U.S. at 432.  Because Plaintiffs filed an appeal of

19  the Small Claims decision, the parties are presently before a state trial court. (*See, e.g.,* Fudge

20  Decl., Ex. A.)  The second prong of the *Middlesex County* test probes whether the state

21  proceedings implicate important state interests. *See Middlesex County,* 457 U.S. at 432.  In the

22  instant case, it would be hyperbole to say a Small Claims Court proceeding implicates "important

23  state interests" as that term is used in the context of Supreme Court jurisprudence.  If a Small

24  Claims court proceeding necessitates abstention, then it would be difficult to imagine a proceeding

25  in which any local government is involved where *Younger* Abstention would not apply. As already

26  noted, such a broad abstention requirement would, as Justice Scalia put it, "make a mockery of

27  the rule that only exceptional circumstances justify a federal court's refusal to decide a case in

28  deference to the States." *New Orleans Pub. Serv.,* 491 U.S. at 367-68.

1    Plaintiffs contend abstention would also be improper because the instant suit is brought

2    to enjoin future conduct, inasmuch as it is a suit brought to contest the action taken by the City

3    in Small Claims Court. (*See* Reply at 3:7-14.) In a case cited by Plaintiffs, *Agriesti v. MGM Grand*

4    *Hotels, Inc.*, 53 F.3d 1000 (9th Cir. 1995), the plaintiff was arrested and charged with

5    misdemeanor violations. *Agriesti, supra,* 53 F.3d at 1001. The court found there were no ongoing

6    prosecutions against the plaintiff in *Agriesti,* and the plaintiff brought suit to enjoin future state

7    action. *Id.* The Ninth Circuit overturned the trial court's decision to abstain from the case on the

8    grounds there were (1) no ongoing state court proceedings; and (2) *Younger* Abstention is

9    inappropriate when suit is brought to bar future prosecutions. *Id.* As in *Agriesti,* in the instant

10   case, it would be inappropriate to deny Plaintiffs a chance to litigate their constitutional claims in

11   federal court when they fear they will fall victim in the future to unconstitutional action taken by the

12   City.

13       Finally, turning to the third prong of the *Middlesex County* test, Plaintiffs in the

14   instant case -the Peace Network and Co-Plaintiff Diana Mann - are not properly part of the state

15   court action.[4] (Reply at 2-3.) There is no question Peace Network is not named in the underlying

16   state court action. Some of its members may be implicated. However, as an organization, the

17   Peace Network's interests are not necessarily represented in the state court action. There is

18   some confusion as to whether Co-Plaintiff Mann is a party to the state court action. Her name is

19   on the signature page promising to pay the City $7,041.00. (Ruyle Decl., Ex. 7.) However Ms.

20   Mann swears she "did not sign any permits for the March 22, 2003 events and was not present

21   when individuals from the [Peace Network] met with the City officials just prior to the event."

22   (Mann Decl. ¶ 4.) It also appears Ms. Mann may have been voluntarily dismissed from the state

23

24

---

25   [4] While that might normally lead the court to conclude these Plaintiffs do not have standing,
     there is an exception to the traditional justiciability requirements when a plaintiff is challenging a

26   statute on the grounds it is allegedly over-broad. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

27   750, 755-56 (1988) ("when a licensing statute allegedly vests unbridled discretion in a government
     official over whether to permit or deny expressive activity, one who is subject to the law may

28   challenge it facially without the necessity of first applying for, and being denied, a license.")

1  court action by the City Attorney.  (Mann Decl. ¶ 5.)  Accordingly, *Younger* Abstention is

2  inappropriate because Plaintiffs are not formally a part of the state court proceeding.

3        Finally, Plaintiff Mann is also seeking monetary damages in the instant case.  It is not

4  immediately clear whether *Younger* applies to cases where the plaintiff is seeking monetary relief,

5  as opposed to equitable or injunctive relief.  *See, e.g., Deakins v. Monaghan,* 484 U.S. 193, 202

6  (1988)(commenting "[w]e need not decide the extent to which the *Younger* doctrine applies to a

7  federal action seeking monetary relief").  It appears this question has yet to be settled by the Ninth

8  Circuit and is presently under review by the appellate court sitting *en banc.  Am. Consumer Publ.*

9  *Ass'n v. Margosian,* 349 F.3d 1122, 1129 (9th Cir. 2003), *vacated by, rehearing en banc, Am.*

10 *Consumer Publ. Ass'n v. Margosian,* 366 F.3d 788 (9th Cir. 2004).  Regardless, the court hereby

11 finds *Younger* does not apply to the case at bar.

12        B.    First Amendment

13        Public property is divided into three broad categories for First Amendment purposes.  The

14 first category comprises traditional public fora:  places which "have immemorially been held in

15 trust for the use of the public and, time out of mind, have been used for purposes of assembly,

16 communicating thoughts between citizens, and discussing public questions." *Hague v. Committee*

17 *for Indus. Org.,* 307 U.S. 496, 515-16 (1939).  A traditional public forum has as "a principal

18 purpose . . . the free exchange of ideas." *International Soc'y for Krishna Consciousness, Inc. v.*

19 *Lee,* 505 U.S. 672, 679 (1992).  Sidewalks, streets, and parks have been recognized as traditional

20 public fora, which have by long tradition been devoted to assembly and debate. *ACORN,* 798

21 F.2d at 1264.  The government's ability to restrict speech in such places is severely limited. *See*

22 *United States v. Grace,* 461 U.S. 171, 177 (1983).

23        The court need not address the other two categories inasmuch as they are irrelevant for

24 the purposes of the instant motion.

25        1.    Prior Restraint

26        A municipal regulation or "law subjecting the exercise of First Amendment freedoms to the

27 prior restraint of a license, without narrow, objective, and definite standards to guide the licensing

28 authority, is unconstitutional." *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150-151 (1969)(citing

*Lovell* v. *Griffin*, 303 U.S. 444 (1938); *Hague v. C. I. O.*, 307 U.S. 496 (1939); *Schneider v. State*, 308 U.S. 147, 163-65 (1939); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *and Largent v. Texas*, 318 U.S. 418 (1943)). The Supreme Court unambiguously described licensing schemes similar to the one at issue in the instant case as "prior restraints" on First Amendment rights. *Id.* The court wrote:

> It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969) (*quoting Staub v. Baxley*, 355 U.S. 313, 322 (1958)). In addition, the Ninth Circuit also made it clear that a prior restraint on the exercise of First Amendment rights, such as the ordinance at issue here, requiring citizens to apply in advance for an "event licence," bears a heavy presumption against constitutional validity. *Grossman v. City of Portland*, 33 F.3d 1200, 1204 (9th Cir. 1994) (citing *Vance v. Universal Amusement Co., Inc.* 445 U.S. 308, 317 (1980)).

That being said, "[p]rior restraints are not unconstitutional *per se.*" *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975). But any system of prior restraint comes "bearing a heavy presumption against its constitutional validity." *Id.* Reasonable time, place and manner restrictions may qualify as exceptions to the general prohibition against prior restraint of free speech. *United States v. Kistner*, 68 F.3d 218, 221 (8th Cir. 1995). "[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

## 2.   TIME, PLACE AND MANNER RESTRICTION

In assessing the constitutionality of a regulation that limits the time, place or manner of speech in a public forum, a court must first determine whether the statute is content-neutral or content-based. *See Tollis, Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th Cir. 1987). If it is content-based, the court applies strict scrutiny to determine whether the statute is tailored to "serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster, Inc. v. New York Crime Victims Bd.,* 502 U.S. 105, 118 (1991) (quotation omitted). However, if the statute is content-neutral, the government may enforce its rules provided that they (1) are narrowly tailored to serve a significant governmental interest, and (2) leave open ample alternative channels for communicating the information. *ACORN,* 798 F.2d at 1267.

### (a)   CONTENT BASED OR CONTENT NEUTRAL

"A time, place, or manner regulation is content neutral if the government can justify the restriction without reference to the content of the regulated activity." *United States v. Kistner,* 68 F.3d 218, 221 (8th Cir. 1995). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward, supra,* 491 U.S. at 791 (1989). "The government's purpose is the controlling consideration." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* Relying on *Ward,* the Eighth Circuit court of appeals added "[i]n addition to being facially neutral, a regulation must not place unbridled discretion in the hands of the government officials who enforce it." *Kistner,* 68 F.3d at 221.

Plaintiff argues the Long Beach Municipal Code is facially invalid, and content based, because it is overly-broad. (P.&A. at 10-13.) There seems to be confusion in case law as to whether the "over-breadth" doctrine is properly included in the discussion of whether a statute is content based, or content neutral. *Compare Kistner,* 68 F.3d at 221; *and United States v. Linick,* 195 F.3d 538, 542 (9th Cir. 1992); *see also Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130 (1992). The Ninth Circuit and the Supreme Court treat the over-breadth doctrine as a

separate issue, and a fundamentally different sort of challenge to a statutory licensing scheme. *United States v. Linick,* 195 F.3d 538, 542 (9th Cir. 1992); *see also Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130 (1992).

Both parties cite *Mardi Gras of San Luis Obispo v. City of San Luis Obispo,* 189 F. Supp. 2d 1018 (C.D. Cal. 2002), to support their respective arguments on the question of whether the LBMC is content based. The statutory scheme at issue in *Mardi Gras of San Luis Obispo* was found unconstitutional because it vested too much discretion in the hands of local officials and was therefore over-broad. *Mardi Gras of San Luis Obispo, supra,* 189 F. Supp. 2d at 1032. The question of whether a statute is over-broad, is closely related to the question of whether the statute is "narrowly drawn and represent[s] a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma,* 413 U.S. 601, 611-612 (1973)(summarizing Supreme Court jurisprudence on the over-breadth doctrine). Accordingly, this court will address the over-breadth doctrine separately and prior to the analysis of whether the LBMC is narrowly tailored to meet a compelling government interest.[5] *See id.*

Plaintiff also argues the statutory scheme is formally content based. (P.&A. at pp. 9-11.) In order to eliminate any possible confusion, this court will first tackle the question of whether the Municipal Code is content based; before proceeding to the issue of over-breadth. Plaintiff maintains the instant statutory scheme is content based because the Municipal Code purports to regulate "parades and special events," core First Amendment activity, while LBMC 5.60 contains a second set of terms for a narrow subset of associational and expressive activity that is to be deemed "expressive" and "protected by the Constitution" at the discretion of the City.[6] (P.&A. at

---

[5] In *Mardi Gras of San Luis Obispo,* the court found the San Luis Obispo Municipal Code was "content based"; and failed to pass the test for "the least restrictive means to further a compelling interest." 189 F. Supp. 2d at 1032.

[6] Plaintiff also argues the same code section is "content based" because the terms "common purpose" and "organized" are not adequately defined, so that "police officers on the street are free to conclude that 75 people [assembled for the purpose of viewing an] appearance of President Bush in the City are "organized" and there for a "common purpose." (P.&A. at 10:8-12.) This argument is best addressed under the rubric of the over-breadth doctrine, *infra.*

10:3-7.)  It would appear Plaintiffs are referring to LBMC § 5.60.010(I) and LBMC § 5.60.020(D) in making this argument.

Once again, the LBMC includes the following provisions.  LBMC § 5.60.010 defines a "special event" as follows:

> 1.  Any organized formation, parade, procession, demonstration or assembly which may include persons, animals, vehicles, or any combination thereof, which is to assemble or travel in unison on any street, sidewalk or other public right-of-way owned or controlled by the city which does not comply with applicable traffic regulations, laws or controls; or
>
> 2.  Any organized assemblage of seventy five (75) or more persons at any public place, property or facility which is to gather for a common purpose under the direction or control of a person; or
>
> 3.  Any other organized activity involving seventy five (75) or more persons conducted by a person for a common or collective use, purpose or benefit which involves the use of, or has an impact on, public property or facilities and which may require the provision of city public services in response thereto.
>
> 4.  Examples of special events include, but are not limited to, concerts, parades, circuses, fairs, festivals, block parties, street fairs, community events, on the water activities (such as boat races), mass participation sports (such as marathons and other running events), athletic or sporting events, and community celebrations and observances conducted on public property or public rights of way.

LBMC § 5.60.010(I).  Whereas LBMC 5.60.020(D) provides:

> The city manager may condition any permit issued pursuant to this chapter with reasonable requirements concerning the time, place, or manner of holding such even as is necessary to coordinate multiple uses of public property, assure preservation of public property and public places .... and to control vehicular and pedestrian traffic in and around the venue, provided that such requirements shall not be imposed in a manner that will unreasonably restrict expressive or other activity protected by the California or United States constitutions.

LBMC § 5.60.020(D).

In *Colacurcio v. City of Kent,* 163 F.3d 545, 551 (9th Cir.1998) (citing *Tollis,* 827 F.2d at 1332), the Ninth Circuit stated "[i]n determining whether an ordinance is content-neutral, our principal inquiry is 'whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" *Colacurcio, supra,* 163 F.3d at 551 (quoting *Ward,* 491 U.S. at 791).  Moreover, "[t]he content-neutrality requirement is met if the involved ordinance

1   is 'aimed to control secondary effects resulting from the protected expression,' rather than at

2   inhibiting the protected expression itself.'" *Id.* (citations omitted.)  Finally, the *Colacurcio* court

3   observed:

4       If the ordinance is predominantly aimed at the suppression of First Amendment rights, then

5       it is content-based and presumptively violates the First Amendment.  If, on the other hand,

    the predominant purpose of the ordinance is the amelioration of secondary effects, then the

6       ordinance is content-neutral and the court must then determine whether the ordinance

7       passes constitutional muster as a content-neutral time, place, and manner regulation.

8   *Id.* at 551 (citing *Tollis,* 827 F.2d at 1332).

9       In the instant case, there is no language on the face of the statute showing the City is

10  targeting a certain type of speech.  Indeed, the ordinance is so broad, it seems to encompass and

11  regulate nearly every type of gathering imaginable, from block parties to any "community

12  celebration" or "observance" conducted on public property.  *See* LBMC § 5.60.010.  The City is

13  not targeting a particular type of expression.  But the key question is whether the LBMC is "aimed

14  at the suppression of first amendment rights"; or meant to inhibit protected expression itself.

15  *Colacurcio, supra,* 163 F.3d at 551  Rather, the City is regulating all types of expression and

16  assembly.  While the LBMC evidences a desire to manage crowds, traffic and the attendant

17  circumstances of large public gatherings (*i.e.*, trash collection), the primary goal of the relevant

18  code section is to regulate all expressive activity and gatherings. *See generally* LBMC § 5.60.010.

19  Accordingly, it appears the LBMC is "content-based" as that term is defined by the Ninth Circuit

20  in *Colacurcio* because the Municipal Code is principally concerned with regulating public

21  expression and assembly - two fundamental rights protected under the First Amendment.  *See*

22  *Colacurcio,* 163 F.3d at 551.  However, the question of whether the LBMC is unconstitutional is

23  best analyzed under the over-breadth doctrine.

24                  (b)    THE LBMC IS OVERLY BROAD

25      In *United States v. Linick*, 195 F.3d 538, 542 (9th Cir. 1999), the Ninth Circuit invalidated

26  a federal park regulation on the grounds it vested unbridled discretion with the Forest Service to

27  deny expressive activity and was therefore overbroad on its face.  In *Ward*, 491 U.S. at 794, on

28  the other hand, the Supreme Court upheld a municipal guideline that required band-shell

1    performers in New York City's Central Park to use sound-amplification equipment and sound

2    technicians provided by the city. "To the extent that the city had discretion in *Ward*, such

3    discretion took the limited form of the city sound technician's ability to vary sound quality and

4    sound volume to avoid excessive noise." *Linick*, 195 F.3d at 542 (describing *Ward*, 491 U.S. at

5    794-95). However, the Ninth Circuit in *Linick* found that a statutory guideline akin to the one at

6    issue in the instant case was invalid because, *inter alia,* a government official could use the

7    statute "to attach conditions to the use of a public forum in advance of actual expression." *See*

8    *id.* The portion of the LBMC at issue in the instant case is more akin to the statutory framework

9    in *Linick,* than the rules described by the Court in *Ward*.

10       The overbreadth doctrine prevents the government from vesting unbridled discretion in the

11    hands of government officials. *Id.* Plaintiffs challenging a statute on the grounds of alleged over-

12    breadth automatically satisfy the requirements for standing. *Id.* "[I]n the area of free expression

13    a licensing statute placing unbridled discretion in the hands of a government official or agency

14    constitutes a prior restraint and may result in censorship." *Lakewood v. Plain Dealer Pub. Co.*,

15    486 U.S. 750, 757 (1988). "In the prior restraint context, the Supreme Court has recognized that

16    'the mere existence of the licensor's unfettered discretion, coupled with the power of prior

17    restraint,' can threaten First Amendment values even if such discretion and power are never

18    actually abused." *Linick,* 195 F.3d at 542 (citations omitted). Such a statutory scheme threatens

19    First Amendment values because it encourages people to exercise self-censorship rather than

20    free expression. *Id.* Simply put, it is not acceptable that citizens are discouraged from expressing

21    themselves out of fear of excessive cost, restrictions, liability or due to other roadblocks to free

22    expression. *See id.*

23       In *Lakewood,* the statute in question addressed the placement of news racks on public

24    property. The ordinance allowed the city to attach to the permit any "terms and conditions

25    deemed necessary and reasonable." *Lakewood, supra,* 486 U.S. at 754. The Supreme Court

26    found the ordinance unconstitutional because the city was vested with an impermissible degree

27    of discretion to deny expressive activity. *See id.* at 769.

28

1      Relying on the Supreme Court's holding in *Lakewood,* the Ninth Circuit found a federal

2 regulation to be unconstitutionally overbroad in *Linick,* 195 F.3d at 542. In *Linick,* the regulation

3 in question authorized Forest Service officers with an impermissible level of discretion because

4 it allowed an officer to attach "terms and conditions" to a permit. *Id.* Specifically, the federal

5 regulation at issue in *Linick* "state[d] that a special use permit may contain such "terms and

6 conditions as the authorized officer deems necessary to . . . otherwise protect the public interest."

7 *Id.* (quoting 36 C.F.R. § 251.56(a)(2)(vii)). The Ninth Circuit found such broad language "can be

8 abused in a manner that could limit the use of public land by parties who hold political views that

9 are disfavored by the Forest Service." *Id.*

10      In the instant case, Plaintiffs contend the statutory scheme at issue is overly broad for

11 several reasons. First Plaintiffs argue it confers unbridled discretion in the hands of government

12 officials reviewing applications for special event permits. (P.&A. at pp. 10-11.) More specifically,

13 Plaintiffs contend subsection "B" of LBMC § 5.60.080 authorizes City officials to set the amount

14 of liability insurance required for an event without reference to any objective standards. (*Id.*)

15 Plaintiff also argues the same code section is "content based" because the terms "common

16 purpose" and "organized" are not adequately defined, so that "police officers on the street are free

17 to conclude that 75 people [assembled for the purpose of viewing an] appearance of

18 President Bush in the City are "organized" and there for a "common purpose." (P.&A. at 10:8-12.)

19 To support their argument, Plaintiffs rely on *Mardi Gras of San Luis Obispo, supra,* 189 F. Supp.

20 2d 1018.

21      Defendant attempts to distinguish *Mardi Gras of San Luis Obispo,* on the grounds that the

22 San Luis Obispo Municipal Code allegedly made a distinction between different types of speech.

23 In reality, *Mardi Gras of San Luis Obispo,* is very close to the point. As in the instant case, the

24 San Luis Obispo Municipal Code included a clause providing that city officials attach conditions

25 "in a careful and consistent manner and that events which enjoy First Amendment protection

26 under the United States Constitution are lawfully regulated. ... the city must assure that the

27 community does not assume a disproportionate share of the costs of parades and special events."

28 *Mardi Gras of San Luis Obispo,* 189 F. Supp. 2d at 1031 n. 13. The San Luis Obispo Municipal

1  Code also contained a provision requiring insurance or indemnification from applicants requesting

2  an event permit.[7]  *Id.*  The court held "Defendant has not shown that the liability insurance

3  requirement or the departmental service charge requirement are the least restrictive means to

4  further the governmental interests advanced by Defendant." *Id.* at 1032.

5        Moreover, the Supreme Court in *Lakewood* provided an additional rational for invalidating

6  a similar regulatory framework as the one at issue in the case at bar:

7         the absence of express standards makes it difficult to distinguish, "as applied," between a
8         licensor's legitimate denial of a permit and its illegitimate abuse of censorial power.
         Standards provide the guideposts that check the licensor and allow courts quickly and
9         easily to determine whether the licensor is discriminating against disfavored speech.
10        Without these guideposts, *post hoc* rationalizations by the licensing official and the use of
11        shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in
         any particular case whether the licensor is permitting favorable, and suppressing
12        unfavorable, expression.

13  *Lakewood*, 486 U.S. at 758.[8]

14       In the instant case, LBMC § 5.60.020 authorizes City officials to attach any condition on

15  a use permit provided the conditions are not attached "in a manner that will unreasonably restrict

16  ─────────────────────

17       [7]  Specifically, the San Luis Obispo Municipal Code contained the following provisions:
              the permitee shall procure and maintain full force and effect during the term
18            of the permit a policy of insurance covering general liability and property
              damage in an amount to be determined by the risk manager, which policy
19            includes the city, its boards, officers, agents and employees as named
              insureds . . .
20  *Mardi Gras of San Luis Obispo,* 189 F. Supp. at 1029 (quoting SLOMC § 5.76.090(B)).  The
21  section further provides that "nothing in this section shall be construed to apply to parades or local
    special events . . . which enjoy First Amendment protection." SLOMC § 5.76.090(C).  *Id.*  For
22  events protected by the First Amendment, the applicant in *Mardi Gras of San Luis Obispo* "was
    given the choice of either providing insurance coverage, agreeing to indemnify the City for
23  damages arising out of the sponsor's own acts or omissions or agreeing to redesign the event to
    respond to dangers to the public health and safety identified by the city administrative officer."
24  *Id.*  While the San Luis Obispo Municipal Code attempted to distinguish between two different
25  types of speech or conduct, the provisions described in *Mardi Gras of San Luis Obispo* are not
    materially different from the relevant provisions of the LBMC at issue in the instant case.
26
         [8]  In *Lakewood,* the Court invalidated an ordinance governing the licensing of news stands on
27  the grounds, *inter alia,* it could allow the Mayor to attach conditions to the placement or location
    of the newsstands; or facilitate *post hoc* rationalization of decision made essentially on basis of
28  what was being sold at the newsstands.  *Lakewood,* 486 U.S. at 758-59.

1 expressive or other activity protected by the California or United States Constitutions." LBMC §

2 5.60.020(D). As in *Mardi Gras of San Luis Obispo,* the clause imploring City officials to obey the

3 constitution is not enough to save the statute. *See Mardi Gras of San Luis Obispo,* 189 F. Supp.

4 2d at 1031 n. 13. In the instant case, the LBMC includes a non-exhaustive list of conditions that

5 may be attached, including the inspection and approval by City officials of all structures and items

6 to be displayed at the event. *See* LBMC § 5.60.020(D). This kind of regulation easily lends itself

7 to abuse. Furthermore, there is no express limit on what conditions the City may apply. *Id.*

8       Furthermore, LBMC § 5.60.070 permits a City official to deny an application if the "applicant

9 fails to comply with all terms of this chapter including failure to remit all fees and deposits, or fails

10 to provide proof of insurance and/or an indemnification agreement as required by this chapter."

11 LBMC § 5.60.070(7). Part of the problem with this provision is there is no limit to the amount an

12 official may charge in terms of a fee, or require in terms of insurance or indemnification. *See*

13 LBMC §§ 5.60.080 & 5.60.090. There is clear evidence this provision has been abused in the

14 instant case. For example, a "fee" or fine was assessed in the amount of $1,500 against a group

15 of individuals who did nothing more than place their surfboards in the sand. Moreover, section

16 5.60.070 has already been struck down in the past by a California Appellate court. *Long Beach*

17 *Lesbian & Gay Pride, Inc. v. City of Long Beach*, 14 Cal. App. 4th 312, 342 (1993). "Courts that

18 have reviewed parade insurance requirements have uniformly found them to overreach, in view

19 of the overlapping utility and availability of other means of protection as referred to above, and the

20 concomitant absence of a history of claims and hence need for expensive, high-limit coverage."

21 *Id.* In *Long Beach Lesbian & Gay Pride, supra,* 14 Cal. App. 4th at 342, the court held "where the

22 cost of the insurance has closely threatened (until preliminarily enjoined) to prevent plaintiffs'

23 protected activity yet that coverage has never had to be called upon, section 5.60.070(B)'s

24 insurance requirement appears to be a relatively gratuitous burden, 'substantially broader than

25 necessary to achieve the government's interest.'" *Id.* (citing *Ward v. Rock Against Racism, supra,*

26 491 U.S. at p. 800).

27       The LBMC provisions authorizing City officials to calculate and assess an indeterminate

28 fee for the use and expense of City property and, *inter alia,* police or security costs, is factually

1  similar to the statute described in *Forsyth County, Georgia v. The Nationalist Movement,* 505 U.S.

2  123, 134 (1992). In *Forsyth,* the county was assessed fees on the basis of the number of police

3  that would be required; and measured the number of police that would be required for a given

4  event by gauging the relative hostility or explosiveness of the message to be conveyed at the

5  gathering. *Id.*[9] In the instant case, the City officials are able to provide virtually any justification

6  for the fee to be assessed. Accordingly, the statute at issue in the instant case is actually more

7  broad than the statute struck by the Supreme Court in *Forsyth.  See id.*

8          Defendant retorts the LBMC provides adequate limits on the discretion of City officials in

9  calculating the fee to be charged to applicants. The Defendant City also notes that according to

10  LBMC § 5.60.10(C) it is impermissible to assess any costs incurred by the City to provide police

11  protection. (Opp'n at 6-7.) In view of the facts on record in the instant case, this argument is

12  overly nuanced. As a point of fact, Plaintiffs were assessed $2,348.00 in charges related to police

13  services for "traffic and pedestrian control," on March 22, 2003; but assessed nothing on

14  February 17, 2003 for a nearly identical event. (Ruyle Decl., Exs. 2 & 5.) It would be easy for an

15  official, in a *post hoc* fashion, to characterize any police involvement in an event as "pedestrian

16  or traffic control." At the very least, City officials are applying code provisions in an arbitrary and

17  capricious manner. The City approved the request for a waiver of insurance, but the individuals

18  organizing the rally were required to sign a note indemnifying the City for any damages incurred

19  during the rally. (*See id.*) As a matter of law, the discretion invested in City officials affording

20  them the ability to waive or impose an insurance requirement lends itself to abuse. *See Mardi*

21  *Gras of San Luis Obispo,* 189 F. Supp. 2d at 1030. "The fact that the City can determine the

22  amount of insurance required indicates that the official may look to the content of the speech,

23  including an element of anticipated hostility to make his or her determination." *Id.* In the instant

24  case, as in *Mardi Gras of San Luis Obispo,* the city manager is invested with unbridled discretion

25  to impose any insurance requirement on applicants. LBMC § 5.60.080(B). Moreover, the

26  

27      [9] The LBMC requires that in "determining whether to approve a permit application for an event involving expressive activity, no consideration may be given to the message of the event, the
28  content of the speech...." LBMC § 5.60.040(K).

1  indemnification clause is so broad it requires an applicant to indemnify the City for actions taken

2  by third parties, and to defend the City against any claim filed versus the City, its officers, agents

3  or employees. LBMC § 5.60.080. Presumably, that could put the Peace Network in the position

4  of paying to defend a lawsuit brought against City officials by some of its own members for, *inter*

5  *alia,* unlawful detention or some other cause of action that routinely arises during a political rally.

6  This clause violates the First Amendment because it discourages applicants from organizing

7  events by imposing the fear of onerous liability.  *See Linick,* 195 F.3d at 542.  As a result,

8  applicants may be prone to self-censorship.  *See id.*

9              C.    NOT NARROWLY TAILORED

10         The sole government interest identified by the Defendant City is the "government interest

11  in regulating its parks, streets and other public areas." (Opp'n at 7:12-13.) The Defendant cites

12  *Frisby v. Schultz,* 487 U.S. 474, 484 (1988) for the principle that "[a] statute is narrowly tailored

13  if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." (Opp'n.

14  at 7:16-18.)  One problem with Defendant's argument is that the only "evil" identified, or sought

15  to be remedied by LBMC is "expressive activity" or the assembly of 75 or more people.  For the

16  reasons described above, as in *Mardi Gras of San Luis Obispo,* the requirements of insurance

17  and indemnification in the LBMC cannot not be characterized as "narrowly tailored" to address the

18  government interest.  *See id.*

19         The LBMC does not provide standards or guideposts that would allow the court to

20  determine whether the City is assessing fees and conditions in an objective manner, or

21  discriminating against disfavored speech. "Without these guideposts, *post hoc* rationalizations

22  by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it

23  difficult for courts to determine in any particular case whether the licensor is permitting favorable,

24  and suppressing unfavorable, expression." *Lakewood,* 486 U.S. at 758. In the instant case, the

25  Peace Network organized a rally on similar subject matter on two occasions, separated by roughly

26  one month in time.  However, the City inexplicably assessed widely divergent fees and costs on

27  the participants of each rally.  This point alone lends itself to a finding that the City is engaged in

28  *post hoc* rationalization of its licensing decisions.  *See id.*

1        D.   ALTERNATE CHANNELS FOR COMMUNICATION

2       Because the court already determined the LBMC is an unconstitutionally overbroad prior

3 restraint on free speech and assembly, it not necessary to address this issue.  *See, e.g., Mardi*

4 *Gras of San Luis Obispo,* 189 F. Supp. at 1035.  In passing, however, the court makes the

5 following observations.  It is well-established that "the burden of proving alternative avenues of

6 communication rests on" the government.  *Seung Chun Lim v. City of Long Beach,* 217 F.3d

7 1050, 1054 (9th Cir. 2000).  Here, the City must make a reasonable and good faith showing that

8 its proffered alternative avenues of communication provide a reasonable opportunity for Plaintiffs

9 to convey their messages within the City.  *See id.*  Implicit in this court's discussion, *supra,* is the

10 conclusion that the LBMC encompasses nearly every form of expression, and thereby leaves the

11 First Amendment rights of the citizens of Long Beach vulnerable to the caprice of City

12 administrators.  It cannot be said that a reasonable alternative avenue of expression exists in the

13 City of Long Beach when peaceful protestors are fined for marking images in the sand.

14        E.   IRREPARABLE HARM

15       "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

16 constitutes irreparable injury.'"  *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1148 (9th Cir.

17 1998).  Because Plaintiffs have demonstrated probable success on the merits of its claim that the

18 LBMC is overbroad, the court finds that Plaintiffs would suffer irreparable injury as a result of the

19 threatened and continued enforcement of the Ordinance *pendente lite.*

20       IV.   RULING

21       For all the reasons stated above, Plaintiffs have shown a likelihood to succeed on the

22 merits.  Plaintiffs' Motion for a Preliminary Injunction is hereby GRANTED.  Defendant City of

23 Long Beach is enjoined from enforcing Long Beach Municipal Code Chapter 5.60.  Plaintiff is

24 excused from posting bond under Fed. R. Civ. P. 65(c) under the authority of *Barahona-Gomez*

25 *v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).

26 Dated this ___ day of November, 2004.

27

28                         S. JAMES OTERO
                        UNITED STATES DISTRICT JUDGE