1  CAROL A. SOBEL, State Bar No. 84483
   LAW OFFICES OF CAROL A. SOBEL
2  429 Santa Monica Boulevard, Suite 550
   Santa Monica, California 90401
3  (310) 393-3055; FAX 393-3605

4  REBECCA F. THORNTON, State Bar No. 231128
   LAW OFFICE OF REBECCA F. THORNTON
5  429 Santa Monica Boulevard, Suite 550
   Santa Monica, California 90401
6  (310) 393-3055; FAX 393-3605

7  Attorneys for Plaintiffs

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  LONG BEACH AREA PEACE          )   CASE NO. cv 04-8510 SJO (SSx)
    NETWORK, and DIANA MANN,       )
13                                 )
                                   )
14              Plaintiffs,        )   DECLARATIONS AND EXHIBITS IN
                                   )   SUPPORT OF PLAINTIFFS' MOTION
15     vs.                         )   FOR AN ORDER AWARDING
                                   )   ATTORNEY FEES AND COSTS
16                                 )
    CITY OF LONG BEACH, a municipal )
17  corporation,                   )   DATE:  May 10, 2010
                                   )   TIME:  9:00 a.m.
18              Defendant.         )   CTRM:  1
                                   )
19  _____ )

20

21  Dated: April 15, 2010              Respectfully submitted,

22                                     LAW OFFICES OF CAROL A. SOBEL
                                       LAW OFFICE OF REBECCA F. THORNTON
23

24                                           /s/

25                                     _____
                                       By: CAROL A. SOBEL
26                                         Attorneys for Plaintiffs

27

28

                                    1

**EXHIBIT 1**

# CAROL A. SOBEL

*429 Santa Monica Boulevard, Suite 550 • Santa Monica, CA 90401-3439 •*
*Tel. 310 393-3055 • Fax. 310 393-3605 • Email carolsobel@aol.com*

## Employment:

| | |
|---|---|
| LAW OFFICE OF CAROL A. SOBEL<br>Solo civil rights law firm. | APRIL, 1997 TO PRESENT |

SENIOR STAFF COUNSEL                                           1990 TO APRIL, 1997
*ACLU Foundation of Southern California*

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California; supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

STAFF ATTORNEY                                                    1985 TO 1990
*ACLU Foundation of Southern Califonria*

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other First Amendment rights.

ASSOCIATE DIRECTOR                                             1979 TO 1985
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Under the direction of the Executive Director, responsible for administration of two non-profit organizations, including working with Boards of Directors on development of policy on civil liberties issues. Engaged in litigation and assisted Legal Director in coordination and supervision of pro bono attorneys.

DEVELOPMENT DIRECTOR                                         1977 TO 1979
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a 501(c)(3) and a 501(c)(4).

ADMINISTRATIVE ASSISTANT                                      1971 TO 1976
*Stanley K. Sheinbaum*

Administrative assistant to an individual active as an economist, political activist and philanthropist. Responsible for all office support, organizing various fundraising events, involved in fundraising and speaker scheduling for the Pentagon Papers trial on behalf of Daniel Ellsberg.

## Admitted to Practice:

| | |
|---|---|
| California Supreme Court | November, 1978 |
| United States Supreme Court | September, 1991 |
| Ninth Circuit Court of Appeals | August, 1986 |
| U.S.D.C. Central District of California | February, 1986 |
| U.S.D.C. Eastern District of California | June, 1990 |

## Litigation Experience:

### Federal courts:   (Partial listing of published opinions and significant cases)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008)

Upholidng and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia*, advance-notice requirements  police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance. (Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)

Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003. (Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles,*
444 F.3d 1118 (9th Cir. 2006)

Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when their was no available adequate shelter. (Lead counsel in district court, lead co-counsel on appeal)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)

Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately decided by that Court to uphold the catalyst fee doctrine under California law. *(*Argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)

Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD). The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime. (Lead counsel)

Khademi v. South Orange County Community College District
194 F.Supp.2d 1011 (C.D. CA 2002)

First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus.  (Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)

Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)

First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel.  The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence.  The polices were declared unconstitutional as applied to the professor's speech.

Page 2

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)

Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated in settlement following certification of the injunctive relief class. (Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)

Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction. (Lead counsel in district court; Co-counsel on appeal)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)

Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.

*United States v. Wunsch*
*54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)*

First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
*65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)*

First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The en banc decision was unanimous.

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*National Abortion Federation v. Operation Rescue*
*8 F.3d 680 (9th Cir. 1993)*

Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim. (Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*
*940 F.2d 1561 (9th Cir. 1991)*

Establishment Clause challenge to Christian theme park, Desert Christ Park, owned and operated by San Bernardino County. Ninth Circuit held County ownership and operation of the park violated the Establishment Clause. (Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*
*831 F.2d 1525 (9ᵗʰ Cir. 1986)*

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious

Page 3

headbands in the dining facilities for purported health reasons. (Argued and briefed on appeal)
*Burbridge v. Sampson*
*74 F.Supp.2d 940 (C.D. Ca. 1999)*

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*
*823 F.Supp. 709 (C.D. Ca. 1993)*

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities. Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds. (Lead counsel)

## State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code of Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law. Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties. (Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*
22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution
(co-counsel)

*Williams v. Garcetti*
5 Cal.4th 561 (1993)
*Williams v. Reiner*
13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty on parents of minor children engaged in or at risk of delinquent conduct.
(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*
53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)
225 Cal.App.3d 1385 (1989)

Establishment Clause challenge to practice of holding prayers at public high-school graduations.
(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*
47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child. (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*
129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.
(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*
111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retainer against garment worker advocates must be granted as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims. Garment worker

Page 4

advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.
(lead counsel at all stages)

*Gonzalez v. Superior Court*
33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment. "After-acquired evidence" rule applied to require disclosure.
(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*
28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP § 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.
(Lead counsel throughout litigation)

*Rudnick v. McMillan*
25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden. Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*
224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.
(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*
208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.
(Argued and briefed on appeal)

*McCarthy v. Fletcher*
207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections. Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.
(Argued and brief on appeal)

*Fiske v. Gillespie*
200 Cal.App.3d 130 (1988)
Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.
(Argued on appeal)

# Publications:
# (Partial listing)

*Catalyst Fees After Buckhannon*
Civil Rights Litigation and Attorney Fees Annual Handbook
(January 2006)

*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*
CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS
Institute of Industrial Relations - UC Berkeley

June 1999  No. 136

*Defeating Employer Defenses to Supervisor Liability
After* Ellerth *and* Faragher
ADVOCATE, October 1998

*Student Expression Under California Law*
UCLA Journal of Education
Volume 3, pp. 127-137 (1989)

*Should Attorneys Be Disciplined For Gender Bias*
Point/Counterpoint ABA Journal   August, 1995

*Fight Illegal Police Practices in State Court*
Los Angeles Daily Journal
March 6, 1992

*Judicial Oversight Limited by Supreme Court*
Los Angeles Daily Journal
May 6, 1991

*Jury Nullification is Conscience of Community*
Los Angeles Daily Journal
August 31, 1990

*A Basic Right Merits Shield From The Mob*
Los Angeles Times
August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes
deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988   II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D.  May, 1978 |
| Douglass College For Women, Rutgers University | B.A.  June, 1968 |

Page 6

## Professional and Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>"Civil Rights Advocacy" Seminar | 2007-2008 |
| Blue Ribbon Panel on Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| National Police Accountability Project<br>Member, Advisory Board | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-present |
| NLG National Mass Defense Committee, Co-chair | 2003-present |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-present |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2008 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |
| National Lawyers Guild - Ernie Goodman Award | 2007 |
| Angel Award - California Lawyer Magazine Award for pro bono work | 2007 |
| CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine | 2008 |
| Top 75 Women Litigators in California - Daily Journal | 2008 |

**EXHIBIT 2**

# REBECCA F. THORNTON

429 Santa Monica Boulevard, Suite 550, Santa Monica, California 90401
Phone 310-393-3055 Fax 866.499.5162 rebecca@humanrightsesq.com

## EXPERIENCE

**LAW OFFICE OF REBECCA F. THORNTON**, Santa Monica, CA
Sole Practitioner, June 2004 – Present

* Member of the Bar of the States of New York and California;
* Specializing in Civil Rights and Housing Law.

**CALIFORNIA APPELLATE PROJECT**, Los Angeles, CA
Indigent Defense Panelist, July 2005 – September 2008

* Represented indigent parties in criminal cases in the Court of Appeal, Second Appellate District.

**EVICTION DEFENSE NETWORK,** Los Angeles, CA
Contract Attorney, October 2004 – January 2007

* Represented low-income tenants in Unlawful Detainer eviction trials, including settlement negotiations and appearances for motion hearings.

**LAW OFFICE OF CAROL A. SOBEL**, Santa Monica, CA
Contract Legal Researcher, October 2003 – June 2004

* Conducted legal research and writing for civil rights litigation.

**HUMAN RIGHTS FIRST (FORMERLY LAWYERS COMMITTEE FOR HUMAN RIGHTS)**, New York, NY
Equal Justice Works Fellow (Formerly NAPIL), September 2001 – September 2003
U.S. Law & Security Program

* Researched and analyzed legislative and administrative counter-terrorism measures and the implications for immigrants' rights under constitutional and international law;
* Drafted content for three reports on civil liberties post-September 11, 2001: *A Year of Loss, Imbalance of Powers,* and *Assessing the New Normal;*
* Drafted advocacy materials such as talking points, briefing papers, congressional testimony, letters to government officials, requests under the Freedom of Information Act;
* Chaired and coordinated meetings for a coalition of advocates and practitioners to monitor the progress of the Department of Justice Office of Inspector General investigation of detentions of non-citizens post-September 11, 2001;
* Managed and coordinated a project designed to respond to the Department of State Annual Country Reports on Human Rights Practices for 2002, resulting in the publication of a report entitled *Holding the Line;*
* Made public speaking appearances, including radio and television interviews, testimony before the U.S. Commission on Civil Rights, New York Advisory Committee, and responses to press inquiries.

**AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,** San Francisco, CA
Legal Intern, January 2001 – May 2001

* Researched and prepared legal memoranda on the constitutional implications of mandatory DNA testing of criminal suspects and students under the Fourth Amendment; principal's power to censor a student newspaper under the First Amendment; misdemeanor liability for filing false complaints of police misconduct;
* Conducted intake interviews.

Rebecca F. Thornton
Page 2

**HOMELESS ADVOCACY PROJECT**, San Francisco, CA
Volunteer, December 2000 – April 2001

* Conducted intake of homeless and low-income residents of San Francisco during free legal clinics;
* Represented a tenant in an eviction proceeding and successfully secured her Section 8 housing benefits;
* Assisted a homeless woman with an application for SSI benefits based on disability; benefits were granted.

**LAWYERS COMMITTEE FOR HUMAN RIGHTS**, New York, NY
Everett Intern, June 2000 – August 2000

* Researched the problem of racial profiling in domestic police practices and police accountability standards at the domestic and international levels;
* Prepared a survey of national efforts to end racial profiling in terms of state legislation and local voluntary data collection measures;
* Assisted in the development of a model brief on international criminal law to aid Serbian lawyers in defending against unwarranted detentions of Kosovar Albanians in Serbia;
* Researched and analyzed the potential for progress in incorporating respect for human rights into business practices presented by the United Nations "Global Compact."

**HUMAN RIGHTS ADVOCATES, INC.,** USF Human Rights Clinic, San Francisco, CA
Frank C. Newman Intern, January 2000 – May 2000

* Researched and analyzed United Nations documents and factual data on the Right to Development and the human rights implications of environmental destruction;
* Drafted a written statement for submission to the U.N. Commission on Human Rights;
* Presented oral intervention at the 56th Session of the Commission on Human Rights in Geneva;
* Lobbied country delegates on behalf of Human Rights Advocates about the need for a Special Rapporteur on Human Rights and the Environment.

**SAN FRANCISCO NEIGHBORHOOD LEGAL ASSISTANCE FOUNDATION**, San Francisco, CA
Volunteer, August 1997 – December 1997

* Analyzed welfare reform laws at the federal, state, and local levels;
* Prepared educational materials for the general public explaining changes in welfare law;
* Assisted clients in hearings on Social Security and AFDC matters.

EDUCATION

**UNIVERSITY OF SAN FRANCISCO SCHOOL OF LAW**, San Francisco, CA
J.D. May 2001, Public Interest Law Scholar
Student Bar Association Award, Class of 2001
Best Oral Argument – Moot Court 1999
President – USF Chapter of the National Lawyer's Guild
Articles Editor – Journal of Law and Social Challenges 2000-2001

**SAN FRANCISCO STATE UNIVERSITY**, San Francisco, CA
Bachelor of Arts, Philosophy, May 1998

MEMBERSHIPS
Co-President, National Lawyers Guild – Los Angeles Chapter
Regional Vice President, National Lawyers Guild
Member: American Bar Association; Los Angeles County Bar Association; Santa Monica Bar Association

**EXHIBIT 3**

1  MARK D. ROSENBAUM, SBN 59940
   mrosenbaum@aclu-sc.org
2  PETER J. ELIASBERG, SBN 189110
   ACLU FOUNDATION OF
3    SOUTHERN CALIFORNIA
   1313 W. 8th Street
4  Los Angeles, CA 90017
   Telephone: (213) 977-9500 x 224
5  Facsimile: (213) 977-5297

6  CAROL A. SOBEL, SBN 84483
   carolsobel@aol.com
7  LAW OFFICES OF CAROL A. SOBEL
   429 Santa Monica Blvd., Suite 550
8  Santa Monica, CA 90401
   Telephone: (310) 393-3055
9  Facsimile: (310) 393-3605

10 Attorneys for Plaintiffs

11

12                    UNITED STATES DISTRICT COURT

13            FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15 EDWARD JONES, et al.,                    )  Case No. CV 03-1142 R (RNBx)
                                            )
16                                          )
                   Plaintiffs,              )  [PROPOSED] ORDER GRANTING
17         vs.                              )  PLAINTIFFS' NOTICE OF MOTION
                                            )  AND MOTION FOR ATTORNEYS'
18 CITY OF LOS ANGELES, et al.,             )  FEES AND COSTS
                                            )
19                 Defendants.              )  Date: December 8, 2008
                                            )  Time: 10:00 a.m.
20 _____        )  Ctrm: 8

21

22

23

24

25

26

27

28

1    This Court has read Plaintiffs' motion for attorneys fees, Defendants'

2    opposition, and heard argument on the matter on December 8, 2008. The Court

3    concludes that Plaintiffs are the prevailing party under both California Code of

4    Civil Procedure § 1021.5 and 42 U.S.C. § 1988. The Court further concludes that

5    Plaintiffs satisfy the three other elements of CCP § 1021.5 and that both the rates

6    and hours sought by Plaintiffs' counsel are reasonable. The Court further

7    concludes that Plaintiffs have satisfied the test for a multiplier under both state and

8    federal law because of the contingent nature of the representation, the novelty and

9    difficulty of the issues presented, the skill demonstrated by Plaintiffs' attorneys,

10   and the exceptional success Plaintiffs achieved.

11   Accordingly, the Court hereby ORDERS that Defendants pay to Plaintiffs

12   $ 697,413.00 in attorneys' fees for time spent on the matter through the filing of

13   the motion, and for time spent preparing for and appearing at argument.

14   ~~The Court further finds that Plaintiffs' counsel demonstrated exceptional~~

15   ~~skill in prosecuting this case and that the case involved difficult and complex~~

16   ~~factual and legal claims. Accordingly, the Court orders that the amount of fees be~~

17   ~~subject to a 2.0 multiplier for a total of $ _____.~~

18   The Court further ORDERS that Defendants pay to Plaintiffs $7,046.00 in

19   reasonable out-of-pocket expenses.

20

21   Dated: December 8, 2008

22

23                                   Manuel L. Real
                                     United States District Judge

24   Lodged by:

25       /s/

26   Carol A. Sobel
     Attorney for Plaintiffs

27

28

-1-

**Computation of Plaintiffs' Attorneys Fees and Expenses in _Jones v. City of Los Angeles_**

| Firm & Timekeepers | Hours | Market Rate | Initial Lodestar | 2.0 Upward Enhancement | Adjusted Lodestar |
|---|---|---|---|---|---|
| **Law Office of Carol A. Sobel** | | | | | |
| Carol Sobel (1978) | 461.5 | $695 | $320,742.50 | $320,742.50 | $641,485.00 |
| Yvonne Simon (1994) | 71.8 | $480 | $ 34,464.00 | $ 34,464.00 | $ 68,928.00 |
| Negin Mirmirani (2000) | 21.0 | $425 | $ 8,925.00 | $ 8,925.00 | $ 17,850.00 |
| Wyeth McAdam (2000) | 17.2 | $390 | $ 6,708.00 | $ 6,708.00 | $ 13,416.00 |
| David Saldana (2001) | 16.3 | $380 | $ 6,194.00 | $ 6,194.00 | $ 12,388.00 |
| Leah Greenwald (law student) | 29.1 | $200 | $ 5,820.00 | $ 5,820.00 | $ 11,640.00 |
| Jina Tednori (law student) | 18.2 | $200 | $ 3,640.00 | $ 3,640.00 | $ 7,280.00 |
| | | | $386,493.50 | | $772,987.00 |

1

P14

| Firm & Timekeepers | Hours | Market Rate | Initial Lodestar | 2.0 Upward Enhancement | Adjusted Lodestar |
|---|---|---|---|---|---|
| **ACLU Foundation of Southern California** | | | | | |
| Mark Rosenbaum (1974) | 238.0 | $725 | $172,550.00 | $172,550.00 | $345,100.00 |
| Peter Eliasberg (1994) | 11.4 | $490 | $ 5,586.00 | $ 5,586.00 | $ 11,172.00 |
| Catherine Lhamon (1996) | 61.8 | $455 | $ 28,119.00 | $ 28119.00 | $ 56,238.00 |
| Artulanantham Ahilan (1999) | 14.4 | $400 | $ 5,760.00 | $ 5,760.00 | $ 11,520.00 |
| Ben Wizner (2000) | 112.5 | $380 | $ 42,750.00 | $ 42,750.00 | $ 85,500.00 |
| Adam Wolfe (2001) | 31.0 | $365 | $ 11,315.00 | $ 11,315.00 | $ 22,630.00 |
| Jennifer Stark (law student) | 31.0 | $200 | $ 6,200.00 | $ 6,200.00 | $ 12,400.00 |
| Stuart Allen (law student) | 18.4 | $200 | $ 3,680.00 | $ 3,680.00 | $ 7,360.00 |
| Joyce Bradberg (paralegal) | 11.8 | $175 | $ 2,065.00 | $ 2,065.00 | $ 4,130.00 |
| | | | $278,250.00 | | $556,050.00 |

2

**EXHIBIT 4**

1

2

3                                                                          O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11  DONALD FITZGERALD, DELBERT          )  Case No. CV 03-01876 DDP (RZx)
    EUGENE HUDSON, DILWORTH             )
12  MENEFELE and MARIO                  )
    YOUNGBLOOD, as individual          )  **ORDER GRANTING MOTION FOR**
13  plaintiffs and as                  )  **ATTORNEYS' FEES**
    representatives of the             )
14  classes,                           )  [Motion filed on March 6, 2009]
                                        )
15              Plaintiffs,             )
                                        )
16      v.                             )
                                        )
17  CITY OF LOS ANGELES, CHIEF         )
    OF POLICE WILLIAM BRATTON          )
18  and CAPTAIN CHARLIE BECK, in       )
    their individual and              )
19  official capacities, and          )
    DOES 1-10, in their               )
20  individual and official           )
    capacities,                       )
21                                      )
                Defendants.            )
22  _____        )

23      This matter comes before the Court on Plaintiffs' Motion for

24  Attorneys' Fees.  Plaintiffs seek attorneys' fees for time spent on

25  their motion to extend the injunction issued in this case and for

26  time spent between the extension of the injunction and the entry of

27  the enforceable settlement agreement on February 17, 2009.

28  Defendant City argues that Plaintiffs have waived any claim to

1 attorneys' fees for this work, that Plaintiffs do not meet the
2 standard for attorneys' fees, and that their fee requests are
3 unreasonable. After reviewing the materials submitted by the
4 parties and hearing oral argument, the Court grants Plaintiffs'
5 motion.

6 **I.   FACTUAL AND PROCEDURAL BACKGROUND**

7       Plaintiffs, who are persons living in the area of Los Angeles
8 commonly known as "Skid Row," filed their Complaint on March 10,
9 2003.  Plaintiffs filed their suit pursuant to 42 U.S.C. § 1983,
10 alleging that a Los Angeles Police Department search and seizure
11 policy violated the Fourth Amendment and seeking injunctive and
12 declaratory relief.  This case was assigned to the Honorable Nora
13 Manella.  On March 31, 2003, the Court granted a temporary
14 restraining order.  The Court granted a preliminary injunction on
15 April 14, 2003.

16      **A.   The Settlement Agreement**

17      On December 8, 2003, the Court approved a settlement between
18 the parties.  The Settlement Agreement stated the parties' "desire
19 to resolve this matter without further litigation" and that they
20 "therefore intend with this Settlement Agreement to resolve all
21 issues pertaining to case number CV03-1876 upon the terms and
22 conditions set forth in this Agreement."  Def. Ex. 7 at ¶ E.  The
23 Settlement Agreement provided for a stipulated three-year permanent
24 injunction.  Id. at §§ I-II.  The permanent injunction enjoined the
25 City of Los Angeles as follows: (1) officers were prohibited from
26 conducting detentions or "Terry" stops without reasonable suspicion
27 that the person is involved in criminal activity or has committed a
28 crime or violated parole or probation, but were not prohibited from

2

1  engaging in consensual encounters; (2) officers would not search
2  the persons/possessions of those stopped on the public streets and
3  sidewalks of the Skid Row area without probable cause or reasonable
4  suspicion that the person has committed a crime or violated parole
5  or probation, though officers were not prohibited from performing
6  "pat-down" searches in accordance with law; and (3) officers would
7  not search the residences of those on Skid Row except in certain
8  circumstances.  The Settlement Agreement provided that the
9  plaintiffs could move for an extension of the injunction for a
10 period of up to 36 months.  Id. at § II.

11      The Settlement Agreement further provided for a payment to
12 plaintiffs and attorneys fees and costs.  Specifically, section IV
13 of the Settlement Agreement, titled "Attorney's Fees and Costs"
14 provided:

15      Within 60 days after this Agreement is executed by all
16      parties, Defendants City of Los Angeles will pay plaintiffs
17      the amount of $75,000 and plaintiffs' attorneys fees and cost
18      [sic] in the amount of $94,720.  Plaintiffs accept this amount
19      as full payment for any all monetary amounts owed in
20      connection with Case Number CV03-1876, and, on behalf of
21      themselves, hereby release all defendants, as well as all
22      other employees and entities of the City of Los Angeles, from
23      any further obligations to pay any further amounts.
24 Id. at § IV.  Section V, titled "Release of Defendants," stated:
25 "Except as provided for in this Agreement, plaintiffs hereby
26 release Defendants . . . from any an all obligations and
27 liabilities in connection with the injunctive relief claims in case
28 number CV03-1876 and the allegations made therein."

3

1    On the same day, Judge Manella also granted plaintiffs'
2 application for attorneys' fees. Plaintiffs requested $94,720 in
3 fees and costs, and presented documentation showing that this
4 number reflected billable hours up to that point. See Order
5 Granting Plaintiffs' Application for Attorneys' Fees, at 4-5
6 (Docket No. 42) (December 8, 2003). Overall, the Court granted
7 $93,091 in attorneys' fees and $1,258.19 for costs, for a total of
8 $94,393.19. Id. at 6.

9    **B.   Extension of the Injunction**

10    Plaintiffs filed a motion to extend the original injunction on
11 December 8, 2006. The Court extended the injunction until it could
12 decide the motion. On April 20, 2007, the Court granted the motion
13 to extend the injunction for a period of four months (120 days)
14 from the issuance of the order because "even viewing the evidence
15 in the light most favorable to Defendants, they have admitted to an
16 unconstitutional policy." See Order Granting Motion to Extend
17 Injunction (Docket No. 64) (April 20, 2007) at 32-33. The Court
18 posited that the four-month period "should provide the LAPD with
19 ample time to review its policies and practices to ensure that they
20 comply with current Fourth Amendment law." Id. at 32.

21    On July 11, 2007, Defendants filed a motion to vacate the
22 injunction. This motion was noticed for hearing on August 6, 2007.
23 Plaintiffs opposed the motion on the grounds that Defendants were
24 still not abiding by the terms of the injunction and had not
25 satisfied the legal standard for vacating it. On August 20, 2007,
26 Plaintiffs filed a second motion to extend the injunction, alleging
27 that Defendants were continuing to violate its terms. Prior to the
28 hearing on the motion, the parties initiated settlement

4

1 negotiations. These negotiations eventually resulted in the
2 parties' reaching a settlement agreement, which the Court signed on
3 February 17, 2009. See Docket Entry Nos. 113 (February 3, 2009)
4 and 117 (February 17, 2009). The agreement provides that (1)
5 searches incident to arrest are not permissible when a person is
6 cited for an infraction or misdemeanor and released, (2) that the
7 police may not compel persons to answer whether they are on
8 probation or parole, and (3) that the time for a warrant check may
9 not exceed the time reasonably required for an officer to complete
10 his or her other duties. Settlement and Order (Docket Entry No.
11 117), at ¶¶ 6, 13, 17.[1] The February 17, 2009 Settlement and Order
12 noted the parties' disagreement over the issue of attorneys' fees.
13 Id. at ¶ 21.

14     Plaintiffs filed this Motion on March 6, 2009. Plaintiffs
15 seek attorneys' fees incurred (1) in litigating the motion to
16 extend the injunction in 2006 and 2007 and (2) for time spent
17 between the extension of the injunction and the entry of the
18 enforceable settlement agreement on February 17, 2009.

19

20     [1]On February 17, 2009, the Court also granted Plaintiffs'
21 request to substitute an attorney, filed on February 3, 2009. In
particular, Plaintiffs sought to substitute the ACLU of Southern
22 California and the Law Offices of Carol Sobel as attorneys of
record for plaintiffs in place of Hadsell Stormer Keeny Richardson
23 & Renick LLP ("Hadsell Stormer"). Plaintiffs explained that one of
Hadsell Stormer's associates, who did no work on this case, married
24 one of the Court's law clerks in August 2008. Defendants did not
oppose Plaintiff's request.
25     Plaintiffs are seeking attorneys' fees for Hadsell Stormer
through this motion. Although the subject associate has not worked
26 on this case, Hadsell Stormer is not seeking fees for any time
after July 2008. Richardson Decl., ¶ 23. The Court also notes
27 that the subject law clerk, who started his term in September 2008,
is not assigned this case. Additionally, the Court notes that it
28 has an extern who formerly worked for Hadsell Stormer. That extern
has assured the Court that she did not work on this case.

1 **II.   LEGAL STANDARD**

2         Pursuant to 42 U.S.C. § 1988, a district court in its

3 discretion may award a reasonable attorney's fee to the prevailing

4 party in § 1983 litigation.   42 U.S.C. § 1988(b).   Under § 1988, "a

5 prevailing plaintiff should ordinarily recover an attorney's fee

6 unless special circumstances would render such an award unjust."

7 Hensley v. Eckerhart, 461 U.S. 424, 4429 (1983) (internal quotation

8 marks omitted).   A plaintiff "prevails" when there is a material

9 alteration of the legal relationship between the parties that

10 modifies the defendant's behavior in a way that directly benefits

11 the plaintiff.   See Farrar v. Hobby, 506 U.S. 103, 111-12 (1992).

12 Settlement agreements enforced through consent decrees can form the

13 basis of an attorneys' fee award.   Buckhannon Bd. & Care Home v. W.

14 Va. Dep't of Health & Human Resources, 532 U.S. 598, 603-04 (2001);

15 Maher v. Gagne, 448 U.S. 122, 129 (1980).   Additionally, a district

16 court has the discretion to award fees to a prevailing party in

17 consent decree litigation for work reasonably spent to monitor and

18 enforce compliance with the decree.   Keith v. Volpe, 833 F.2d 850,

19 855-57 (9th Cir. 1987); N.A.A.C.P. v. San Francisco Unified Sch.

20 Dist., 284 F.3d 1163, 1166 (9th Cir. 2002) (citing Volpe and noting

21 that this principle is "settled law" in the Ninth Circuit).

22 Attorneys' fees may be waived as part of the settlement process.

23 Evans v. Jeff D., 475 U.S. 717, 737-38 (1986).

24         California law also provides a basis for attorneys' fees in

25 some actions.[2]   Pursuant to California Code of Civil Procedure

26

27         [2]The Complaint in this matter also had a claim under
California Civil Code § 52.1.   "[W]hen state statutes authorize fee
28 awards to litigants in a particular class of cases, the statutes
                                                      (continued...)

6

1  § 1021.5, "a court may award attorneys' fees to a successful party
2  . . . in any action which has resulted in the enforcement of an
3  important right affecting the public interest," where certain
4  requirements are met.  Cal. Civ. Proc. Code § 1025.1.  Attorneys'
5  fees will be appropriate if (a) a significant benefit has been
6  conferred on the general public or a large class of persons, (b)
7  the necessity and financial burden of private enforcement make the
8  award appropriate, and (c) such fees are not paid out of the
9  recovery.  Id.  Although the section "is phrased in permissive
10  terms . . ., the discretion to deny fees to a party that meets its
11  terms is quite limited," and generally requires a full fee award
12  unless special circumstances would render such an award unjust.
13  Lyons v. Chinese Hospital Ass'n, 136 Cal. App. 4th 1331, 1344
14  (2006).

15      Where a plaintiff is entitled to attorneys' fees, a district
16  court must determine the amount of a reasonable fee.  The "starting
17  point for determining the amount of a reasonable fee is the number
18  of hours reasonably expended on the litigation multiplied by a
19  reasonable hourly rate."  Hensley, 461 U.S. at 433.  The Court
20  should exclude from the initial fee calculation hours that were not
21  reasonably expended.  Id. at 434.  There is a strong presumption
22  that the lodestar figure represents a reasonable fee.  Jordan v.
23  Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987).  After
24  calculating the "lodestar," other considerations "may lead the

25

26  [2](...continued)
   are substantive for Erie[v. Tompkins, 304 U.S. 64 (1938)] purposes
27  if there is no 'direct collision' with the Federal Rules."  CRST
   Van Expedited, Inc. v. Werner Enters., Inc., 479 F.3d 1099, 1111
28  (9th Cir. 2007); see In re Larry's Apartment, L.L.C., 249 f.3d 832,
   837-38 (9th Cir. 2001).

7

1  district court to adjust the fee upward or downward." Id.  Among
2  those other considerations is "the important factor of the 'results
3  obtained.'" Id.; see also id. at n.9 (suggesting that the factors
4  identified in Johnson v. Georgia Highway Express, Inc., 488 F.3d
5  714, 717-19 (5th Cir. 1974), may be particularly helpful, but also
6  noting that "many of these factors usually are subsumed within the
7  initial calculation of hours reasonably expended at a reasonable
8  hourly rate").

9  **III. DISCUSSION**

10      Defendant City of Los Angeles ("City" or "Defendant") argues
11  that Plaintiffs are not entitled to the fees they request.  First,
12  and primarily, Defendant argues that Plaintiffs are entitled to no-
13  fees because the 2003 Settlement Agreement waived any rights to
14  attorneys' fees for work performed in the future.  Second, in the
15  alternative, Defendant attacks the fees Plaintiffs request and asks
16  the Court to award less.

17  **A.   Waiver**

18      As a threshold matter, Defendant argues that Plaintiffs waived
19  their right to attorneys' fees through the December 2003 Settlement
20  Agreement.[3]  As mentioned above, the general rule is that a
21  prevailing party in a civil rights action - including one concluded
22  through settlement - is entitled to attorneys' fees.  Where parties
23  in a civil rights action resolve the action by settlement, the
24  availability of attorneys' fees for successful plaintiffs may be
25  waived as part of the settlement process.  Evans v. Jeff D., 475

26  ―――――――――――――――――――――――
27      [3]City does not appear to distinguish between the extension of
    the injunction in April 2007 and the second settlement entered in
28  February 2009.  Rather, City refers to these efforts collectively.

8

 1 | U.S. 717, 737-38 (1986). In the Ninth Circuit, however, a waiver
 2 | of attorneys' fees must be clear: "a prevailing plaintiff may sue
 3 | for reasonable attorneys' fees unless the defendant shows that the
 4 | plaintiff clearly waived fees as part of the settlement."
 5 | Muckleshoot Tribe v. Puget Sound Power & Light Co., 875 F.2d 695,
 6 | 697 (9th Cir. 1989); see Wakefield v. Mathews, 852 F.2d 482 (9th
 7 | Cir. 1988). A defendant may demonstrate a waiver of attorneys'
 8 | fees in two ways. The basic rule is that the court focuses on "the
 9 | language in the settlement agreement." Id. at 698. "[A] waiver of
10 | attorneys' fees may be established by clear language in the
11 | release," either because it "contains an explicit reference to
12 | fees" or because "the breadth of the release is so 'sweeping' that
13 | it necessarily includes attorneys' fees." Id. Alternatively, "if
14 | the language in the release is unclear or ambiguous, surrounding
15 | circumstances may clearly manifest the intent of the parties that
16 | attorneys' fees be waived." Id. Generally, "waiver of attorneys'
17 | fees should not be presumed from a silent record." Wakefield, 852
18 | F.2d at 484. Ultimately, "any waiver or limitation of attorney
19 | fees in settlements of [civil rights] cases must be clear and
20 | unambiguous." Holland v. Roeser, 37 F.3d 501, 503-04 (9th Cir.
21 | 1994).[4]

22 |

23 | [4]In Wakefield, the Ninth Circuit held that the release at
   | issue was so sweeping as to cover attorneys' fees, even though it
24 | did not provide those fees by name. That release provided that it
   | applied to
25 |    any and all manner of action or actions, causes or causes of
   |    action, in law or in equity, suit, debts, liens, contracts,
26 |    agreements, promises, liabilities, claims, rights,
   |    obligations, demands, damages, including punitive damages,
27 |    injuries, debts, losses, costs or expenses of any nature
   |    whatsoever, known or unknown, fixed or contingent ..., which
28 |    [plaintiffs] now [have] or may hereafter have against each or
   |    [plaintiffs] now [have] or may hereafter have against each or
                                                          (continued...)

9

1    The Court begins with an analysis of whether the language in
2  the agreement clearly waives attorneys' fees for work performed in
3  connection with the extension of the injunction.  The critical
4  section is subsection IV.  Titled "Attorney's Fees and Costs," the
5  section provides the following payment: (1) a payment to plaintiffs
6  in the amount of $75,000 and (2) attorneys' fees and costs in the
7  amount of $94,720.  The section then contains language releasing
8  the defendant as follows: "Plaintiffs accept this amount as *full*
9  *payment for any and all monetary amounts owed in connection with*
10  *Case Number CV03-1876,* and . . . *release all defendants* . . . from
11  *any further obligations to pay any further amounts.*"  Def. Ex. 7 at
12  § IV (emphasis added).  The parties focus on different portions of
13  this section.  Plaintiffs emphasize the past-tense nature of the
14  word "owed," and distinguish that language from the language used
15  in Wakefield, which more expressly contemplated sums for a future
16  amount.  Defendant argues that the section also contemplates future
17  obligations, through its release of defendants from "any further
18  obligations to pay any further amounts."  Plaintiffs argue that the
19  better way of reading the agreement is that "the scope of the
20  release is . . . simply coextensive with the scope of the payment.
21  In other words, in exchange for the payments of $75,000 and
22  $94,720, Plaintiffs were only agreeing to release defendants from
23  their obligations to pay any more for harms already suffered and
24  attorneys work already performed."  Reply at 1:24-28.

25

26    [4](...continued)
27  any of the [defendants] arising out of, or what might be
       considered to arise out of or in any way connected with the
28  aforementioned lawsuit or the conduct of [defendants] to date.
       852 F.2d at 483.

10

1    The Court agrees with Plaintiffs. Although the term "further"
2  could take on the meaning Defendants suggest, it does not clearly
3  do so.  Section IV does *not* say, for example, that Plaintiffs
4  accept the amount as full payment for all monetary amounts owed,
5  now or in the future.  See Wakefield, 852 F.2d at 483 (waiving
6  claims which plaintiffs now have or may hereafter have against the
7  defendants).  The only indication that future liabilities or fees
8  *might* be covered is the use of the word "further."  In context,
9  however, the use of that term is not clear.  It could mean that the
10  plaintiffs would not later claim they were owed something for which
11  they were not compensated – either damages or attorneys' fees – in
12  December 2003 (i.e., Defendants owe nothing further as of December
13  2003).  Or it could mean that the amount was meant to cover all
14  future work by the plaintiffs in, for example, extending and
15  enforcing the injunction (i.e., Defendants will owe nothing for any
16  further work performed on the case).

17    Other provisions in the Settlement Agreement do not clarify
18  this issue.  Defendant argues that additional language supports its
19  reading.  In particular, Defendant argues that other provisions
20  show that the City of Los Angeles paid attorneys' fees in part as
21  consideration for the waiver of additional attorneys' fees and
22  costs in the event Plaintiffs sought to extend the injunction in
23  the future.  Defendant points to the integrative language in the
24  agreement, i.e., paragraph 3 of the "Background", which suggests
25  that the agreement was intended to resolve "all issues pertaining
26  to case number CV03-1876 upon the terms and conditions set forth in
27  this Agreement."  Additionally, Defendant emphasizes that the
28  Agreement expressly contemplated a motion to extend.  Taking these

11

P27

1  different parts of the agreement together, Defendant argues,
2  attorneys' fees in conjunction with a motion to extend must have
3  been covered. The Court is not persuaded by this reading. The
4  fact that the parties specifically contemplated a motion to extend
5  and yet did not expressly include language that stated an intent
6  for the settlement amount to cover fees not yet incurred or fees in
7  connection with the motion to extend – but instead only included
8  the ambiguous term "further" – mitigates the force of Defendants'
9  argument. Cf. Wakefield, 852 F.2d at 484 ("[W]aiver of attorneys'
10  fees should not be presumed from a silent record.").

11      Defendant's reliance on section V is likewise unavailing.
12  Defendant argues that section V serves to emphasize the breadth of
13  Plaintiffs' waiver. The Court finds Plaintiffs' reading of section
14  V more plausible: while section IV talks about payment in
15  connection with the case, section V specifically mentions
16  injunctive claims in connection with the case. The Court is
17  hesitant to read the terms "obligations and liabilities" to include
18  attorneys' fees. While Defendants correctly note that the
19  Wakefield release deemed sweeping enough to waive attorneys' fees
20  did include the terms "obligations" and "liabilities," it also
21  included the terms "costs or expenses of any nature whatsoever."
22  See Wakefield, 852 F.2d at 483. Courts have tended to consider
23  attorneys' fees to be *costs*, not *liabilities* in this context. See,
24  e.g., 42 U.S.C. § 1988(b) (attorneys fees will be included as
25  costs); Parker v. Metropolitan Water Reclamation Dist. of Greater
26  Chicago, 782 F. Supp. 387 (N.D. Ill. 1992) ("liability, claims, and
27  demands" is not broad enough to include attorneys' fees where
28  release failed to mention the term or even costs).

1    While the Court finds Defendant's reading of the agreement to
2  be reasonable, the Court cannot find that the language of the
3  agreement betrays a clear waiver or a waiver so sweeping as to
4  necessarily encompass attorneys' fees. See Muckleshoot Tribe, 875
5  F.2d at 698. Rather, the structure of section IV and the use of
6  "further" instead of "future," "not yet incurred," or something
7  that clearly indicated these fees were not yet "owed" suggest that
8  the payment of attorneys' fees was only for the liabilities
9  incurred up to that point. Accordingly, the Court finds that the
10 language is ambiguous.

11    Ambiguous language is not necessarily the end of a waiver
12 story in all cases, but it is here. As the Ninth Circuit explained
13 in Muckleshoot Tribe, where "the language in the release is unclear
14 or ambiguous, surrounding circumstances may clearly manifest the
15 intent of the parties that attorneys' fees be waived." 875 F.2d at
16 698. Although Defendant has made reasonable arguments as to its
17 intent - i.e., that the payment of attorneys' fees was in part
18 consideration for the option to extend - Defendant has presented no
19 evidence of the surrounding circumstances that would indicate such
20 an approach was in fact the intent or understanding of the
21 parties.[5] Plaintiffs, who do not have the burden to show waiver,
22 have highlighted why Defendant's proffered mutual intent would not

23

24    [5]For example, City has presented no evidence (or argument
    devoid of evidence) that would suggest the amount of fees in the
25 Settlement Agreement - nearly $95,000 - would have been an
    unreasonable estimate of fees and costs for only the work performed
26 up to December 2003. If it had, such evidence might support City's
    argument that the amount paid included the possibility of
27 additional legal work. In fact, Judge Manella's December 8, 2003
    order granting the application for attorneys' fees shows that
28 nearly $94,000 of this amount was for actual hours billed and costs
    incurred.

1  make sense: it seems less likely that Plaintiffs would waive any
2  right to seek payment for future fees when (1) they do not know how
3  the City would respond to the injunction once it is issued (and
4  therefore how intense enforcement or a motion to extend would be),
5  (2) they do know they would be entitled to attorneys' fees for
6  monitoring and enforcing the injunction under Volpe, and (3) they
7  are cognizant of the broad nature of the injunction (and, thus, the
8  likelihood that it will need monitoring).

9      Because the language of the Settlement Agreement does not
10 clearly waive the right to seek attorneys' fees for the motion to
11 extend or for the work leading up to the 2009 Settlement and Order,
12 and because the City has presented no evidence that its reading of
13 the ambiguous language reflects the intent of the parties, City has
14 not met its burden to show that Plaintiffs have "clearly waived"
15 attorneys' fees in this matter.

16  **B.  Entitlement to Fees**

17     Plaintiffs seeks attorneys' fees for two general endeavors:
18 the time they spent on the motion to extend the injunction and the
19 work done between the Court's order extending the injunction and
20 the entry of the judicially enforceable settlement agreement.
21 Although Defendant argues that Plaintiffs do not seek reasonable
22 fees, Defendant does not appear to argue that, even if Plaintiffs
23 have not waived a claim to fees, they are entitled to no fees.

24     1.  Motion to Extend Injunction

25     Plaintiffs seek fees for time spent on the motion to extend
26 the injunction, which the Court granted in April 2007.[6]  Plaintiffs

27 _____

28     [6]The standard for extending the injunction, "good cause," was
                                              (continued...)

14

1  argue that the order extending the injunction, like the initial
2  order granting a permanent injunction, altered the legal
3  relationship between the parties.  Additionally, Plaintiffs argue
4  that they are entitled to fees for that time because it was time
5  spent to monitor and enforce compliance with the decree.  While
6  Defendant argues that Plaintiffs' fee award should be reduced
7  because of the hours claimed and the results reached, Defendant
8  does not appear to argue that Plaintiffs may not recover at all for
9  this work (except for the reasons discussed above).  The Court
10  finds that the successful motion to extend the injunction entitles
11  Plaintiffs to fees for the hours reasonably spent enforcing the
12  injunction.  See Volpe, 833 F.2d at 855-57.

13                    2.    Time Between Extension of Injunction and Entry of
14                          Enforceable Settlement Agreement

15       Plaintiffs also seek reasonable attorneys' fees for the time
16  spent between the entry of the Court's order extending the
17  injunction and the Settlement & Order that was approved by the
18  Court in February 2009.  Again, while Defendant contests the amount
19  of fees, Defendant does not contest entitlement to fees at all,
20  except through its "waiver" argument.  For the reasons stated in
21  Plaintiffs' Motion, see Pl.'s Mem. at 3:21-8:24, and in light of no
22  argument to the contrary (except for waiver), the Court also finds
23  that Plaintiffs are entitled to reasonable fees for this work under
24  federal and state law.

25       C.    Amount of Fees

26

27       [6](...continued)
28  "less than that needed for a permanent injunction."  Order Granting
     Motion to Extend Injunction, at 7:23-27.

15

1     The Court next addresses the amount of a reasonable fee.  "In
2  determining a reasonable attorney's fee, the district court's first
3  step is to calculate a 'lodestar' by multiplying the number of
4  hours it finds the prevailing party reasonably expended on the
5  litigation by a reasonable hourly rate."  McGrath v. County of
6  Nevada, 67 F.3d 248, 252 (9th Cir. 1995).  In calculating the
7  lodestar, "the district court should take in to account the factors
8  set forth in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70
9  (9th Cir. 1975), . . . that it finds to be relevant."  McGrath, 67
10 F.3d at 252.[7]  Once the court has calculated the lodestar, the
11 "second step . . . is to assess whether the presumptively
12 reasonable lodestar figure should be adjusted on the basis of Kerr
13 factors not already subsumed in the initial calculation."  Id.

14    "The fee applicant bears the burden of documenting the
15 appropriate hours expended in the litigation and must submit
16 evidence in support of these hours worked."  Gates v. Deukmejian,
17 987 F.2d 1392, 1397 (9th Cir. 1992).  Once the fee applicant has
18 met that burden, the opposing party "has a burden of rebuttal that
19 requires submission of evidence to the district court challenging
20 the accuracy and reasonableness of the hours charged or the facts

21

22

23    [7]The Kerr factors include: (1) the time and labor required,
24 (2) the novelty and difficulty of the questions involved, (3) the
   skill requisite to perform the legal service properly, (4) the
25 preclusion of other employment by the attorney due to acceptance of
   the case, (5) the customary fee, (6) whether the fee is fixed or
26 contingent, (7) time limitations imposed by the client or the
   circumstances, (8) the amount involved and the results obtained,
27 (9) the experience, reputation, and ability of the attorneys, (10)
   the "undesirability" of the case, (11) the nature and length of the
28 professional relationship with the client, and (12) awards in
   similar cases.  526 F.2d at 70.

16

P32

1  asserted by the prevailing party in its submitted affidavits."  Id.
2  at 1397-98.

3        1.   Lodestar

4             a.   Hours Reasonably Expended

5        The court must examine the amount of hours claimed by the
6  moving party and "in order to award fees based on them, [must] find
7  that the time actually spent was reasonably necessary."  Carson v.
8  Billings Police Dep't, 470 F.3d 889, 893 (9th Cir. 2006).

9        Plaintiffs seek compensation for a total of 862.50 hours
10 expended on interviewing declarants, briefing for the first motion
11 to extend the injunction and the reply, preparing for and doing
12 oral argument, briefing the second motion to extend the injunction
13 and reply, briefing the opposition to Defendants' motion to vacate
14 the injunction, negotiating the settlement agreement entered in
15 February 2009, and communicating with co-counsel.  Those 862.50
16 hours reflect work by attorneys Mark Rosenbaum, Carol Sobel, Anne
17 Richardson, Peter Bibring, Peter Eliasberg, and Sanjukta Paul;
18 legal assistant Joyce Bradberg; and Teresa Virgen-Torres and law
19 students who helped gather declarations in connection with the
20 motions to extend and the motion to vacate.

21       In determining the amount of hours for which compensation is
22 sought, Plaintiffs exercised billing judgment.  See Hensley, 461
23 U.S. 434.  The ACLU is not seeking compensation for more than 72
24 hours spent on the matter up to the Court's extension of the
25 injunction or for an additional approximately 50 hours spent on the
26 matter between the time of the Court's extension of the injunction
27 and the entry of the settlement agreement.  See Eliasberg Decl.
28 ¶¶ 14-15.  In addition to reducing the hours of certain

                              17

1   individuals, the ACLU is not seeking compensation for anyone who
2   billed less than 10 hours on the matter.  Id. at ¶ 15.  Ms. Sobel
3   reduced the time spent on briefing and research by a total of 44
4   hours.  Hadsell Stormer is not seeking compensation for about 8% of
5   the firm's total billing.  Finally, Plaintiffs have taken the total
6   amount after the exercise of billing judgment and reduced it by an
7   additional 5% to ensure that no excessive or duplicative time is
8   being sought.  Plaintiffs have submitted evidence as to the
9   calculation of billing rates and the hours actually expended.
10  See Eliasberg Decl.; Richardson Decl.; Sobel Decl.; Litt Decl;
11  Thorland Decl.  This evidence is sufficient to meet their burden
12  "of documenting the appropriate hours expended in the litigation
13  and . . . submit[ting] evidence in support of these hours worked."
14  Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992).

15       Defendant argues that the hours billed are unreasonable and
16  must be reduced in a number of ways.  The Court finds that
17  reductions for duplication and the interviews and declarations are
18  appropriate.

19                    i.   Block Billing

20       First, Defendant argues that Plaintiffs block-billed their
21  hours spent on litigation, and therefore that the Court should
22  reduce the amount by 25%.  Block billing is "the time-keeping
23  method by which each lawyer and legal assistant enters the total
24  daily time spent working on a case, rather than itemizing the time
25  expended on specific tasks."  Welch v. Metropolitan Life Ins. Co.,
26  480 F.3d 942, 945 n.2 (9th Cir. 2007).  It can be appropriate to
27  take a reduction of 20% on hours due to block billing.  Welch, 480
28  F.3d at 948.  However, "the use of block billing does not justify

18

1  an across-the-board reduction or rejection of *all* hours," but only
2  those that are block-billed. Mendez v. County of San Bernardino,
3  540 F.3d 1109, 1129 (9th Cir. 2008).

4      Defendant identifies 162.4 hours ($89,922.00) that are alleged
5  to be block-billed. Knapton Decl. ¶ 24. Plaintiffs argue that
6  many of the entries identified as block-billed actually list in
7  significant detail the tasks performed during those hours.
8  Plaintiffs emphasize that the important thing is that "sufficient
9  detail has been provided so that [the Court] can evaluate what the
10  lawyers were doing and the reasonableness of the number of hours
11  spent on those tasks." Smith v. District of Columbia, 466 F. Supp.
12  2d 151, 158 (D.D.C. 2006). The Court has reviewed the entries
13  identified as block-billed by Defendant's consultant. See Knapton
14  Decl., Ex. 3. After this careful review, the Court concludes that
15  a reduction for block billing is not necessary. All of the entries
16  are detailed enough for the Court to compare the hours expended
17  against the tasks and assess the reasonableness of those tasks.
18  Many of entries identified as block-billing are actually different
19  parts of the same task, and many of the entries identified as
20  block-billing identify a total of a few hours.

21                  ii.  Duplicative Internal Conferences and
22                       Multiple Attendance by Attorneys

23      Second, Defendant argues that Plaintiffs seek fees for 238.35
24  unnecessarily duplicative hours, totaling $106,240.50. Knapton
25  Decl. ¶ 26 & Ex. 4. "The court may reduce the number of hours
26  awarded because the lawyer performed unnecessarily duplicative
27  work." Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir.
28  2008). "[D]etermining whether work is inherently duplicative is no

                                  19

1 easy task," because some duplication is "inherent in the process of
2 litigating over time." Id. Concerns about overstaffing are a
3 relevant consideration, but determining whether there has been
4 unnecessary duplication requires the exercise of "judgment and
5 discretion, considering the circumstances of the individual case."
6 Democratic Party of Washington State v. Reed, 388 F.3d1281, 1286-87
7 (9th Cir. 2004).

8        Defendant argues that the hours identified are duplicative
9 because they begin when "it is clear that both sides wanted to
10 agree on a plan" and use multiple, very experienced litigators to
11 attend hearings and settlement conferences. Plaintiffs note that
12 with respect to a number of identified entries, Defendant's expert
13 does not separate duplicative time from non-duplicative time within
14 an entry. The Court does not find the presence of lawyers at court
15 meetings to be excessive or unnecessarily duplicative in this case:
16 Plaintiffs typically only seek fees for two or three lawyers at
17 those meetings, a number comparable to the lawyers present for the
18 City at such meetings. Additionally, the Court finds that
19 Plaintiffs did not bill excessively for drafting or reviewing
20 documents.

21        The Court does note, however, that there are a significant
22 number of very experienced civil rights litigators on this case,
23 which did not have especially complex legal issues. The Court
24 notes that such experience may have been necessary in light of the
25 nature of this action, which involved the civil rights of thousands
26 of Skid Row residents as affected by a significant City of Los
27 Angeles initiative. However, the Court expresses some concern,
28 looking at the hours billed, that the number of attorneys on this

20

1   case perhaps produced an excessive amount of conferencing.  To
2   compensate, the Court will cut 50% of the time billed for
3   conference calls and/or cross-firm team meetings.  According to the
4   Court's independent review of the records (including estimations
5   where necessary due to how hours were recorded), this will reduce
6   attorneys' hours in the following amounts: Rosenbaum by 2;
7   Eliasburg by 3.8; Bibring by 9.3; Sobel by 7.1; Richardson by 7.3;
8   Paul by 5.4.

9                    iii. Interviewing and Collecting Declarations
10       Defendant also argues that the time spent interviewing and
11  collecting declaration is excessive.  Defendant notes that
12  Plaintiffs request a total of 170.75 hours (fees of $55,607.50) for
13  interviewing and collecting approximately 40 declarations of Skid
14  Row residents.  See Knapton Decl. at ¶ 30.  Defendant compares the
15  time spent by City on declarations (about .3 hours per declaration)
16  to the time spent by Plaintiffs per declaration (about 4.37 hours).

17       The Court agrees that the time spent for collecting
18  declarations was excessive in this case.  While the Court does not
19  expect Plaintiffs to spend an equal amount of time to the City on
20  each declaration, the Court finds that an average of around four
21  hours per declaration is excessive under the circumstances, even
22  considering the time it might take to review those documents and
23  the burden plaintiffs may have had on the motion to extend the
24  injunction.[8]  Accordingly, the Court will reduce the time billed

25  _____

26       [8]For example, it seems less than efficient for an attorney
    billing at a rate of $740 per hour to spend seven hours – or almost
27  twenty percent of the attorney's time billed for this case – on
    this type of fact-gathering.  The Court recognizes the importance
28  of understanding the facts of one's case, but notes that, in
                                                    (continued...)

21

P37

1  for interviewing and taking declarations by two-thirds.  On the
2  Court's review of the billing records,[9] this will reduce the
3  respective hours by the following amounts: Rosenbaum by 4.7,
4  Bibring by 17.5, Richardson by 1.6, Paul by 7, paralegals by 13.7,
5  and law students by 27.7 hours.

6                          iii. Reasonable Hours

7       The Court has also reviewed the remainder of the hours billed,
8  as well as the Knapton Declaration, for reasonableness, and has
9  found that the remaining hours, with the 5% across-the-board
10 reduction to account for potential excessive time or duplication
11 not already considered, are properly charged.[10]  Thus, in light of
12 the adjustments above, the Court finds that the following hours
13 (plus the 5% across-the-board reduction to account for potential
14 excessive time) are reasonable:

| Name | Requested Hours | With Court's Reductions | With 5% Across-the-Board Reduction |
|------|------|------|------|
| Sobel | 175.7 | 168.6 | 160.17 |
| Rosenbaum | 40.1 | 33.4 | 31.73 |
| Eliasberg | 88.6 | 84.8 | 80.56 |

[8](...continued)
conjunction with the significant additional fact-gathering, this
amount is excessive.

[9]Plaintiffs note that much of the time interveiwing and
drafting declarations has been wrongly classified by Defendants'
expert.  In calculating the reduction in time, the Court used only
that billed time that was spent interviewing or preparing
declarations.

[10]The Court has included the fees requested for the Reply into
the requested hours, above.

22

| Bibring | 345.1 | 318.3 | 302.385 |
| Rastegar | 18.8 | 18.8 | 17.86 |
| Law students | 41.5 | 13.8 | 13.11 |
| Paralegals | 37.7 | 24.0 | 22.8 |
| Richardson | 69.4 | 60.5 | 57.475 |
| Paul | 77.8 | 65.4 | 62.13 |

### b. Reasonable Hourly Rate

Next, the Court addresses a reasonable hourly rate for each of the individuals for which Plaintiffs seek compensation. For the purposes of attorneys' fee motions, courts look to the "prevailing market rate[] in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." Blum v. Stenson, 465 U.S. 886, 895-96 & n.11. "[T]he relevant community is the forum in which the district court sits." Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997). The established standard for determining the reasonable hourly rate is the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." Id. at 502 (internal quotation marks omitted). In determining an appropriate rate, a district court may make reference to the factors in Kerr, which "include the novelty and difficulty of the issues involved in a case, the skill required to litigate those issues, the preclusion of other employment, the customary fee, relevant time constraints, the amount at stake and the results obtained, the experience, reputation, and ability of the attorneys, the nature and length of their professional relationship with the client, the 'undesirability' of a case, and awards in similar suits." Davis v.

23

City and County of S.F., 976 F.2d 1536, 1546 (9th Cir. 1992),

vacated in part on other grounds by 984 F.2d 945 (9th Cir. 1993).[11]

Plaintiffs seek to the following hourly rates for the lawyers in this case:

| Name | J.D. | Requested Rate |
|---|---|---|
| Sobel | 1978 | $710 |
| Rosenbaum | 1974 | $740 |
| Eliasberg | 1994 | $525 |
| Bibring | 2002 | $375 |
| Rastegar | 2007 | $240 |
| Richardson | 1989 | $575 |
| Paul | 2003 | $350 |

Additionally, Plaintiffs seek fees for the work of law students in the amount of $200 per hour, and for paralegals at the rate of $175 per hour.

Plaintiffs have presented evidence in support of each of these rates. See Eliasberg Decl. (discussing experience of ACLU personnel); Sobel Decl. (discussing rates awarded in other cases); Litt Decl. (discussing rates granted in other cases and civil rights litigation in Southern California); Richardson Decl. (discussing rates for Hadsell Stormer personnel); Thorland Decl. (discussing rates for attorneys at Loeb & Loeb in Los Angeles).[12] In response, Defendants' expert has discussed the Laffey Matrix, a publication based on District of Columbia averages that can be

---

[11]Determining a prevailing market rate can be especially difficult in situations where an attorney takes cases on a contingency or nonprofit basis.

[12]The Court is satisfied with the rate sought for Ms. Virgen Torres, which is equivalent to that of a paralegal. See Reply at 5; Lhamon Decl.; Torres Decl.

24

1   adjusted for different regions. Defendants have not otherwise
2   presented argument or evidence as to reasonable market rates in the
3   field. In particular, with the exception of offering the Laffey
4   Matrix as an alternative, Defendants have not explained why
5   Plaintiffs rates are not within the reasonable range of rates.
6   While Knapton suggests that rates for commercial law firms are not
7   completely helpful, he does not undercut the testimony from
8   Richardson as to the rates charged by Hadsell Stormer lawyers or
9   the declarations from others who have testified to the rates at
10  which they were awarded fees in previous years. The Court is not
11  persuaded that the Laffey Matrix, even adjusted for Los Angeles, is
12  more helpful than the rates actually used by other courts or the
13  rates of law firms. The Court recognizes that many of the
14  attorneys in this case are experienced, renowned civil rights
15  litigators. Defendants have not explained why the rates suggested
16  by Plaintiffs are not reasonable.

17      After a review of the evidence presented by the parties in
18  support of fees, the Court finds that these requested rates are
19  reasonable for each of the attorneys and paralegals.

20              c.   Lodestar

21      Based on the hours and rates presented above, the lodestar
22  amount is as follows.

| Name | Firm | Hours | Rate | Lodestar |
|------|------|-------|------|----------|
| Sobel | Law Office of Carol Sobel | 160.17 | $710 | $113,720.70 |
| Rosenbaum | ACLU | 31.73 | $740 | $23,480.20 |
| Eliasberg | ACLU | 80.56 | $525 | $42,294.00 |

25

| | | | | |
|---|---|---|---|---|
| Bibring | ACLU | 302.385 | $375 | $113,394.37 |
| Rastegar | ACLU | 17.86 | $240 | $4,286.40 |
| Law students | ACLU | 13.11 | $200 | $2,622.00 |
| Paralegals | ACLU | 22.8 | $175 | $3,990.00 |
| Richardson | HS/HSKRR | 57.475 | $575 | $33,048.12 |
| Paul | HS/HSKRR | 62.13 | $350 | $21,745.50 |
| | | | **Total** | $358,581.29 |

## 2. Adjustment of Lodestar

While the lodestar figure presumptively represents a reasonable amount of attorneys' fees, "other considerations . . . may lead the district court to adjust the fee upward or downward." Hensley, 461 U.S. at 433; see McGrath, 67 F.3d at 252. The Supreme Court has highlighted the "results obtained" as a particularly important factor in determining whether the fees should be adjusted. Hensley, 461 U.S. at 433. Hensley noted that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," while the lodestar figure may be excessive for a plaintiff who "has achieved only partial or limited success." Id. at 435-36.[13]

City argues that the lodestar figure should be reduced because the results obtained were not "excellent." In particular, City

---

[13]Plaintiffs argue that an analysis of their results is irrelevant because they are entitled to fees for hours "reasonably spent" for monitoring and enforcing the a consent decree, "even as to matters in which [they] did not prevail" under N.A.A.C.P. v. San Francisco Unified School District. The Court does not read this quote as holding inapplicable the normal, two-step fee-assessment approach. Rather, the Volpe and N.A.A.C.P courts addressed whether the normal § 1988 fee calculations apply at all to time spent monitoring a consent decree. See Volpe, 833 F.2d at 855-57, 859.

26

1   notes that the extension of the injunction did not require
2   especially difficult legal issues or complicated facts, and that
3   the injunctions essentially adopted the legal standard.  Moreover,
4   City notes that Plaintiffs did not meet the normal permanent
5   injunction standard, but rather were only required to institute
6   "good cause," which the Court interpreted as akin to a summary
7   judgment standard.  Plaintiffs emphasize that they succeeded in
8   securing exactly what they sought: an extension of the injunction
9   in April 2007 and a new injunction and order.

10      The Court imposes a downward adjustment of 10% here.  The
11  Court finds that the ten percent downward adjustment properly
12  reflects the significant success on important issues that
13  Plaintiffs had in this litigation and respects the presumptive
14  reasonableness of the lodestar calculation, while also recognizing
15  that Plaintiffs did not prevail on every point, either in the
16  motion to extend or the final settlement.  While important, the
17  legal and factual issues presented in the motions to extend the
18  injunction were akin to prior arguments before the Court.
19  Additionally, the Court did not extend the injunction on the
20  theories set forth by the Plaintiffs, and did so for a limited
21  time.  The February 2009 Settlement and Order represents at least
22  some compromise in Plaintiffs' position (of course, it also
23  represents some compromise in City's position).  At the same time,
24  although Plaintiffs did not need to meet the normal permanent
25  injunction standard, they largely succeeded in what they sought,
26  i.e., an extension of the injunction, over opposition by Defendant.
27  Additionally, the February 2009 Settlement and Order included a
28  number of different terms than the 2003 injunction, and specified

27

1  that certain practices defendants had defended as lawful activity

2  are enjoined. E.g., Settlement & Order (February 17, 2009), at

3  ¶¶ 6-8; Def.'s Opp. to Second Mot. to Extend Injunction at 14-15.

4  Accordingly, the Court finds that the reasonable attorneys' fees in

5  this case are $ 322,723.16.

6  **D.    Costs**

7  Pursuant to Plaintiffs' request, the Court grants costs in the

8  amount of $1,546.14. See Eliasberg Decl. at ¶ 17 & Ex. 2.

9  **IV.   CONCLUSION**

10  For the foregoing reasons, the Court grants Plaintiffs' Motion

11  for Attorneys' Fees and awards Plaintiffs $322,723.16 in attorneys'

12  fees and $1,546.14 in costs.

13

14  IT IS SO ORDERED.

15

16

17  Dated: April 7, 2009

DEAN D. PREGERSON
18  United States District Judge

19

20

21

22

23

24

25

26

27

28

28

**EXHIBIT 5**

BARRETT S. LITT, SBN 45527
E: blitt@littlaw.com
LITT, ESTUAR, HARRISON &
KITSON, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
T: (213) 386-3114; F: (213) 380-4585

CAROL A. SOBEL, SBN 84483
E: carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
429 Santa Monica Boulevard, Suite 550
Santa Monica, California 90401
T: (310) 393-3055; F: (310) 393-3605

PAUL L. HOFFMAN, SBN 71244
BENJAMIN SCHONBRUN, SBN 118323
JAMES DeSIMONE, SBN 119668
E: hoffpaul@aol.com
SCHONBRUN, DE SIMONE, et al.
723 Ocean Front Walk
Venice, California 90291
T: (310) 396-0731; F: (310) 399-7040

On Behalf of all MIWON Counsel

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULTI-ETHNIC IMMIGRANT WORKERS ORGANIZING NETWORK, et al. | Case No.: CV 07-3072 AHM (FMMx) |
| | [Honorable A. Howard Matz] |
| Plaintiffs, | ORDER AWARDING CLASS COUNSEL FEES AND COSTS |
| vs. | |
| CITY OF LOS ANGELES, et al., | DATE:         June 22, 2009 |
| | TIME:         10:00 A.M. |
| Defendants. | COURTROOM:  14 |

1

## I.  INTRODUCTION

This case is a class action on behalf of those whose First and Fourth Amendment rights were alleged to have been violated at the May 1, 2007, protest rally at MacArthur Park. The case was settled on terms spelled out in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

As a result of the lawsuit, a Consent Judgment will be entered embodying the terms of the settlement. Included in these terms is an order entered by the Court requiring certain guidelines and actions by the LAPD and the City of Los Angeles in its future handling of rallies, demonstrations and marches. Thus, this case definitively altered practices that had been an issue within the LAPD for many years.

This case settled for a total monetary award of $12,850,000, after extensive mediation efforts, to be divided among 297 individual class members represented individually by various MIWON or other counsel, and a residual class fund. From this, the Court was to be requested to award $3,455,000 plus $258,000 in medical liens and litigation costs, for a total of $3,713,000, to MIWON Counsel (as well as to approve the arrangement under which the non-MIWON counsel received approximately $500,000 in statutory fees negotiated between them and MIWON Counsel, as part of the division of the settlement.)

Plaintiffs filed a motion for attorneys' fees seeking the foregoing agreed to fees and costs, based on both a class fund theory and a lodestar theory. For the reasons stated below, the Court awards Plaintiffs' counsel $3,713,000 in attorneys' fees and costs.

Defendants did not object to, or challenge, Class Counsel's request for fees and costs.

2

## II.  THE STANDARDS FOR AWARDING CLASS FUND ATTORNEYS' FEES.

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.,* 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007.

The Court will analyze the requested fees under both the percentage of the fund and the lodestar tests.

## III.  THE REQUESTED FEE IS REASONABLE UNDER THE PERCENTAGE OF THE FUND TEST.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18; *In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). The Court will address each factor below.

In this case, the Court finds that most of the factors enunciated above exists in this case.

### A.  THE COMPLEXITY OF THE ISSUES, COUNSEL'S SKILL AND EXPERIENCE, AND THE EFFORT INVOLVED.

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced

3

1 | because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011,

2 | 1976 U.S.Code Cong. & Admin.News at 5913.

3 |     While the legal issues in this case are not particularly novel, the factual

4 | issues were complex, and management of the process required a high level of skill

5 | and effort. Because this was a hybrid individual and class case, Plaintiffs' counsel

6 | and their staffs represented nearly 300 individuals. Defendants insisted that, in

7 | order to settle the case, they needed independent verification (video, photos, third

8 | party witnesses, medical reports) for the vast majority of the Represented

9 | Individuals, even though the case was a class action.

10 |     Counsel litigated this case aggressively. The work performed included: 1)

11 | extensive investigation of the underlying circumstances, including interviewing

12 | each of the approximately 300 Represented Individuals at length, and many

13 | witnesses as well; 2) reviewing LAPD reports and investigations, as well as

14 | hundreds of hours of videos to locate photos of Represented Individuals; 3)

15 | preparation of the complaint; 4) the Rule 26 conference and report; 5) obtaining the

16 | medical records for the Represented Individuals; 6) preparing mediation write-ups

17 | regarding the specifics of each Represented Individual, and then preparing a

18 | mediation package with photographic and video evidence to support each of the

19 | 300 individual claims of presence in the park, and injury; 7) filing the class

20 | certification motion and related papers; 8) engaging counsel for all the Represented

21 | Individuals in a common process of valuing cases, after MIWON Counsel

22 | established and refined a system for assessing the cases, as a result of which all

23 | counsel in all case agreed to the approach; 9) preparing lengthy mediation papers;

24 | 10) attending six mediation sessions; 11) working out a series of individual

25 | problem cases, with the participation of Class Counsel, the individual counsel

26 | representing the client, and Judge Woehrle; and 12) preparing and negotiating the

27 | settlement documents with the defendants.

28 |

4

1      Class Counsel have represented that the monetary terms of the settlement

2 represent, to their knowledge, the largest total settlement in the country for a

3 demonstration case, and the largest average per person damages recovery in any

4 mass demonstration case to date. In addition, the settlement encompasses

5 comprehensive structural relief.

6      The appointed MIWON Class Counsel – Barry Litt, Carol Sobel and Paul

7 Hoffman – are highly skilled civil rights and civil rights class action litigators.

8 Each has outstanding reputations as exceptional civil right attorneys.

9      **B.**    **THE RISKS OF NON-PAYMENT ASSUMED BY COUNSEL**

10      While there may not have been a great risk of lack of proof of liability in the

11 case, , there was substantial risk that the cost of litigating it could outstrip the

12 damages in the case, particularly if the Class were not certified. Those risks

13 included: 1) a potentially very difficult discovery process, requiring thousands of

14 additional hours for the case; 2) a requirement (asserted by the City at the class

15 certification hearing) that Plaintiffs prove lack of probable cause on an individual

16 basis; 3) in the current economic climate, the risks of non or delayed payment are

17 substantial (a form of which has occurred in that payment is delayed until sale of a

18 judgment bond to fund the settlement).

19      Other risks included class certification, settling the case expeditiously,

20 managing the factual complexities of the case effectively, receiving an adequate

21 fee award commensurate with the work involved, the disproportionate

22 responsibility of the MIWON counsel to carry the case.

23      While risk is normally tied to the right to receive a multiplier above the

24 ordinary hourly rate to compensate for contingent risk, in this case, the opposite is

25 true, i.e., counsel seek an award that actually represents a discount from lodestar,

26 as is discussed in the lodestar section.

27

28

5

1    **C.   THE RESULT OBTAINED FOR THE CLASS AND THE CLASS' REACTION.**

2    As discussed, this settlement represents the largest financial settlement of a

3    demonstration case Class Counsel know of, with a residual class fund. In addition,

4    in the past, the LAPD had privately agreed to changes, but had not implemented

5    those agreements. The current settlement incorporates a Consent Judgment under

6    which the City and the LAPD agree to a series of policies and procedures, as well

7    as the continued jurisdiction of the Court to enforce the Consent Judgment as part

8    of the Court's order approving the final settlement.

9    There was only one objection to the settlement itself or to the award of

10   attorney's fees, and there were no opt-outs. This is a highly favorable reaction by

11   the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,* 2001 WL

12   34089697, 8 (W.D.Wash. 2001) (court found that the "class members

13   overwhelmingly support[ed] the settlement" where there were over 37,000 notices

14   sent out, 2,745 class members participated in the settlement, "only nine objections

15   were submitted", and there were 86 timely opt-outs and over 20 additional

16   defective or untimely opt-outs; "these indicia of the approval of the class of the

17   terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon*

18   *v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections

19   and appeal by objectors, "fact that the overwhelming majority of the class willingly

20   approved the offer and stayed in the class presents at least some objective positive

21   commentary as to its fairness"; court did not abuse its discretion in approving

22   settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977)

23   (approximately 1% of 31,000 class members opted out; "the fact that the

24   overwhelming majority of the class willingly approved the offer and stayed in the

25   class presents at least some objective positive commentary as to its fairness").

26   **D.   THIRTY-ONE PERCENT IS A REASONABLE CLASS FUND AWARD IN**
     **THIS CASE.**

27

28

6

1    Where the percentage of the fund award is employed, the Ninth Circuit has

2    "established 25% of the common fund as the 'benchmark' award for attorney

3    fees." *E.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993).

4    Although 25% is the benchmark, the Ninth Circuit has recognized that a variety of

5    factors may lead to an upward adjustment of the percentage. *E.g., In re Pac. Enter.*

6    *Sec. Litig.,* 47 F.3d 373, 379 (9th Cir.1995) (district court "may adjust the

7    benchmark when special circumstances indicate a higher or lower percentage

8    would be indicated"). The percentage amount can be adjusted upward or

9    downward, or replaced by a lodestar calculation, to account for any unusual

10   circumstances involved in the case, which, for example, would indicate that the

11   percentage recovery would be either too small or too large in light of the hours

12   devoted to the case. *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d

13   1301, 1311 (9th Cir.1990). When making an adjustment, the district court should

14   identify "how it arrives at the figure ultimately awarded." *Paul, Johnson, Alston &*

15   *Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989); see also *Six Mexican Workers,*

16   *supra.*

17   Nationally, the average percentage of the fund award in class actions is

18   approximately one-third. The Federal Judicial Center published a report in 1996,

19   entitled "Empirical Study of Class Actions in Four Federal District Courts: Final

20   Report to the Advisory Committee on Civil Rules" ("FJC Report"). The study is

21   based on 407 class action lawsuits that either settled or went to verdict in the two

22   year period from July 1, 1992, through June 30, 1994, in four federal district

23   courts: the Eastern District of Pennsylvania (Philadelphia); the Southern District of

24   Florida (Miami), the Northern District of Illinois (Chicago); and the Northern

25   District of California (San Francisco). (FJC Report, pp. 3-4, 7-8.) The Empirical

26   Study found that "the fee-recovery rate infrequently exceeded the traditional 33.3%

27   contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in

28

7

1   the study were between 20% and 40% of gross monetary settlement." (*Id.* at pp.

2   68-69; citation and footnote omitted.). The Report concluded that "attorneys' fees

3   were generally in the traditional range of approximately one-third of the total

4   settlement." (*Id.* at p. 90.)

5       Another study, cited by Silber and Goodrich, *Common Funds and Common*

6   *Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534

7   (1998), was done by National Economic Research Associates, an economics

8   consulting firm, in 1994. It found that attorneys' fees in class actions averaged

9   approximately 32% of the recovery, regardless of the case size, and averaged

10  34.74% when the fees and expenses were added together. Silber and Goodrich,

11  *supra* at 545-546. Silber and Goodrich conclude with the observation that a 33%

12  fee award is both reasonable, and in line with the general market for contingent fee

13  work. *Id.* at 546-549. This is the general percentage that they recommend. *See also*

14  *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing

15  three studies ("[O]ne study of securities class action settlements over $10 million ...

16  found an average percentage fee recovery of 31%; a second study by the Federal

17  Judicial Center of all class actions resolved or settled over a four-year period ...

18  found a median percentage recovery range of 27-30%; and a third study of class

19  action settlements between $100 million and $200 million ... found recoveries in

20  the 25-30% range were 'fairly standard.'") (citations omitted).

21      In this case, based on a fee of $3,955,000 (the requested MIWON statutory

22  fees plus the non-MIWON statutory fees), Plaintiffs would receive, as a percentage

23  of the fund, a 31% award. This is well within the reasonable range of percentage of

24  the fund awards, just at what most studies and commentators have characterized as

25  the median nationally.

26      The Ninth Circuit has recognized that many cases result in a higher

27  percentage than the benchmark. See, e.g., *Vizcaino v. Microsoft Corp.*, 290 F3d

28

8

1  1043 (9th Cir. 2002) (affirming a 28% award, resulting in a multiplier for

2  Plaintiffs' counsel of 3.65, based on 1) an exceptional result, 2) litigation risk, 3)

3  benefits generated beyond the cash settlement, 4) the 28% figure was at or below

4  market rate, and 5) the lengthy time period of the litigation and foregoing other

5  work). Most , if not all of these factors are present here, but the biggest difference

6  is that there is no multiplier above lodestar, but a discount, a factor favoring an

7  upward adjustment.

8      In addition, because there was a statutory attorney's fee available, it was an

9  independent factor in the settlement negotiations and significantly increased the

10  recovery. The settlement agreement, ¶24, states that "Plaintiffs' potential claim for

11  statutory attorney's fees was a substantial factor in arriving upon the final

12  settlement amount of $12,850,000" and that "the statutory attorney's fee claim

13  materially and substantially increased the final settlement amount from what it

14  otherwise would have been." In such a situation, and where the lodestar exceeds

15  the benchmark percentage of the fund amount, it is appropriate to consider the

16  lodestar in determining a reasonable upward adjustment of a percentage fee award.

17  Various factors support this conclusion, including that 1) the amount requested was

18  factored in by Class Counsel in determining the reasonableness of the settlement;

19  2) the MIWON Plaintiffs agreed to post-fee amounts, i.e., the amount they would

20  actually receive, and the award requested here does not affect any of those

21  amounts; and 3) the MIWON Counsel – in contrast to the non-MIWON counsel –

22  waived their right to any percentage of the recovery beyond what the Court

23  awarded with any of their individual clients.

## IV.  THE REQUESTED FEE IS REASONABLE UNDER THE LODESTAR TEST.

### A.  *LODESTAR STANDARDS.*

24

25

26  Lodestar is defined generally as the number of hours reasonably expended

27  on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461

28

9

1   U.S. 424, 433 (1983). Where a plaintiff has obtained excellent results, his or her

2   attorney should recover a fully compensatory fee. *See Hensley, supra,* 461 U.S. at

3   435. Full compensation normally encompasses all hours reasonably expended on

4   the litigation. *Id.*

5       In *Blum v. Stenson*, 465 U.S. 886, 895, n.11 (1984), the United States

6   Supreme Court explained that "'reasonable fees' ... are to be calculated according

7   to the prevailing market rates in the relevant community." The Court should pay

8   "close attention" to "the fees charged by 'lawyers of reasonably comparable skill,

9   experience and reputation.' " *Davis v. City and County of San Francisco*, 976 F.2d

10  1536, 1545-1546 (9th Cir. 1992). Subsequently, in *City of Riverside v. Rivera*, 477

11  U.S. 561, 575-576 (1986), the Supreme Court elaborated that rates for civil rights

12  litigation should be based on the market for complex federal litigation, citing

13  Congress intent in enacting Section 1988 that it "intended that the amount of fees

14  awarded under [§1988] [sic] be governed by the same standards which prevail in

15  other types of equally complex Federal litigation, such as antitrust cases."

16      **B.    THE REQUESTED RATES ARE REASONABLE**

17      Exhibit "J" to Plaintiffs' Motion for Attorney's Fees is a summary chart of

18  the number of hours expended by each person being billed as well as detail of time

19  billed. For the attorneys involved, the chart includes their year of law school

20  graduation. The chart below provides, in order of hours worked, the graduation

21  year, hourly rate, hours and totals for the six MIWON attorneys who were most

22  active in the litigation (which represents over 50% of the total bill).

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|------|-----------|-------|------|-------|
| Carol Sobel | 1978 | 867.3 | $710 | $624,456.00 |
| Barry Litt | 1969 | 668.1 | $800 | $534,480.00 |
| Robert Myers | 1975 | 522.1 | $710 | $362,859.50 |
| Cynthia Anderson-Barker | 1994 | 497.2 | $490 | $236,170.00 |
| Rebecca Thornton | 2001 | 465.3 | $425 | $181,467.00 |

28

10

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|------|-----------|-------|------|-------|
| Paul Hoffman | 1976 | 307.3 | $750 | $230,475.00 |
| | | | | $2,169,907.50 |

The rates used here are reasonable and are supported by abundant evidence demonstrating that attorneys of lesser years handling complex litigation have comparable or higher billing rates, and that several courts have awarded comparable rates to these and other counsel. The Court finds that the rates requested by the MIWON counsel are reasonable.

### C.   THE HOURS EXPENDED ARE REASONABLE

While the hours expended by MIWON Counsel are substantial, they are not unexpected in light of the character of the case. MIWON Counsel represented nearly 200 individuals, and there was a total of 297 Represented Individuals, including those represented by non-MIWON counsel. MIWON counsel took the lead on all fronts of the case.

MIWON Counsel assigned each attorney or law firm a group of clients for which they were responsible. The interaction with that client throughout the case, the documentation, client assessment, medical workups where needed, and written summary were the responsibility of that attorney. A handful of full client meetings were held, in which all the MIWON clients and Counsel were invited to participate. In those meetings, there were presentations on general questions applicable to all clients (e.g., how a class action works, mediation plans, and the like), discussions of the progress of the case and the Police Department investigation of complaints, with a time set at the end of each meeting for the larger group of clients to break into the smaller assigned groups to meet with the individual attorneys assigned to each group of clients. This was a reasonable means of communication with clients, and an effective means of investing them in the

11

1  case as a whole -- a necessity for a case that, at best would take two to three years
2  and, if it did not settle, far longer.

3       MIWON Counsel worked with the non-MIWON counsel to agree to a
4  common approach to settlement, reviewed the write-up for each non-MIWON
5  Plaintiff, recommending changes, conforming its format, evaluating the individual
6  rating and damages for that individual, and then meeting with each of the non-
7  MIWON counsel so as to ensure uniformity. This occurred with the non-MIWON
8  counsel after the same process had been completed for the MIWON counsel. In
9  addition, MIWON Counsel prepared all the pleadings and early discovery, all the
10 negotiations with the City and Judge Woehrle (in some of which some of the non-
11 MIWON counsel participated), all of the negotiations to reach the structural relief
12 agreement, and the vast majority of the review of the demonstration documentation
13 to locate participants and respond in concrete form to the City's requirement that
14 Plaintiffs provide some form of verification of their presence in MacArthur Park at
15 the date and time of the police action..

16      In order to ensure uniformity of each case assessment -- essential if a
17 settlement were to be reached -- MIWON Counsel established a committee of
18 several MIWON Counsel responsible to evaluate every case uniformly -- both
19 those represented by MIWON and non-MIWON counsel. They developed a
20 uniform scoring system; reviewed each Plaintiff, his/her facts, documentation and
21 medical records; and scored the Plaintiff.

22      MIWON counsel met with the non-MIWON counsel primarily responsible
23 for the particular client, and used the same methodology used for the MIWON
24 clients to come to an agreement about the valuation of their clients' claims. They
25 reviewed all the documents for the non-MIWON as well as the MIWON clients.
26 Further, MIWON Counsel participated directly in meeting with reluctant clients of
27 other counsel -- generally in conjunction with Judge Woehrle -- to work out ways of
28

12

1   resolving this issue so that it would not stymie the settlement process. Dozens of
2   hours were spent by MIWON Counsel in just this effort.

3       All settlement documents were prepared by MIWON Counsel and the City.

4       It was generally acknowledged by all counsel that the MIWON Counsel
5   were the driving force in resolving the settlement. MIWON Counsel ultimately
6   negotiated with each set of non-MIWON attorneys the recovery, including
7   statutory fees, that would be assigned each attorney and his/her clients.

8       Analyzed on a per client basis, with approximately 300 clients – since the
9   MIWON Counsel were effectively co-representing the non-MIWON clients – and
10  9600 hours, it means that 32 hours were expended per client. The mean recovery
11  was over $25,000. Attorney's fees of $4,000,000 prorated (including the statutory
12  fees paid to non-MIWON counsel) prorated among 297 clients comes to slightly
13  more than $13,000 per client. This is reasonable for a case that involved litigation,
14  informal discovery, extensive mediation, and a class process.

15      Accordingly, the Court finds that the hours expended in this case were
16  reasonable. The Court also notes that the actual hours being compensated, based on
17  the approved hourly rates, amounts to a 13%-14% discount from lodestar (the
18  difference between a $4,000,000 lodestar based on the approved rates and hours
19  and factoring in a modest amount of further work) and the $3,455,000 requested as
20  MIWON fees.

21      Accordingly, whether using the lodestar or the percentage of the fund
22  method, the fee requested is reasonable.

23  **V.   ALLOCATION OF LIEN REDUCTIONS.**

24      The Court has been advised that MIWON counsel has successfully
25  negotiated some liens and expects to reduce the size of the MIWON liens
26  somewhere between $50,000 and $100,000. These lien funds are part of the total
27  $3,753,000 requested by MWION counsel. MIWON counsel have further advised

28

13

1    the Court that, under their arrangements with their clients, each client is to receive

2    a specified amount, and counsel assumed responsibility for the liens. The Court has

3    also been advised by MIWON counsel that, probably as a result of the larger than

4    expected Unrepresented Class Member claims, there is a bill of $30,617.80 to

5    cover the Class Administrator's billing to date, and the Class Administrator

6    estimates an additional $11,315 and possibly more to complete the claims

7    administration (excluding particular efforts that may be requested by the City at its

8    expense). This bill is greater than had originally been expected. Originally,

9    $50,000 in class administrative costs was anticipated, including payment of

10    $20,000 to Plaintiff organizations for outreach to Unrepresented Class Members.

11    Based on the currently anticipated Class Administrator bills, the costs of class

12    administration will be approximately $12,000 more than anticipated.

13           In light of the fact that the amount to be paid to MIWQN counsel is less than

14    their lodestar, the Court approves that any sums saved by the reduction of liens

15    shall be deemed fees to the MIWON counsel. However, from that reduction,

16    MIWON counsel shall pay the additional class administrative costs so that the

17    funds available for distribution to Unrepresented Class Members remains

18    $200,000.

19    **VI.    THE REQUESTED COSTS ARE REASONABLE.**

20           Plaintiffs seek an award of $258,000 in costs, most of which are for medical

21    liens yet to be paid. To the extent they are not, ~~MIWOUN~~ MIWON Counsel submitted an

22    itemization of costs, which the Court finds reasonable. Accordingly, those costs are

23    awarded as well.

24

25    DATED:  June 24, 2009                              _____

26                                                         UNITED STATES DISTRICT JUDGE

27

28

14

P59

1

2   Submitted by:

3   LITT, ESTUAR, HARRISON & KITSON, LLP
4   LAW OFFICES OF CAROL SOBEL

5

6

7   By :    /s/ Barrett S. Litt
        BARRETT S. LITT
8        Attorneys for Plaintiff Class

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                15

**EXHIBIT 6**

ENTERED
CLERK, U S. DISTRICT COURT

AUG 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

FILED
CLERK, U S. DISTRICT COURT

AUG 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

Priority
Send
Clsd
Enter
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

HERMAN ATKINS,

          Plaintiff,

   v.

DANNY C. MILLER,

          Defendants.

Case No. CV 01-01574 DDP (Ex)

**ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

[Motion filed on July 9, 2007]

This matter comes before the Court on Plaintiff Herman Atkins's ("Atkins" or "Plaintiff") motion for attorneys' fees and costs. After reviewing the papers submitted by the parties, the Court grants the motion and adopts the following order.

## I. BACKGROUND

In 1988, Herman Atkins was convicted of a 1986 rape that he did not commit. After his wrongful conviction, he worked to establish his innocence. The Innocence Project accepted his case in 1993 and sought biological evidence to submit to DNA testing, but were opposed in their efforts by the Riverside County District

1  Attorney.  The Innocence Project was eventually able to conduct DNA
2  testing that proved Herman Atkins's actual innocence, and on
3  February 12, 2000, Atkins was released from prison.

4       In 2001, Atkins filed this 42 U.S.C. § 1983 wrongful
5  conviction action, alleging that various Riverside County
6  officials, including then-Detective Danny C. Miller ("Miller" or
7  "Defendant"), engaged in unconstitutional misconduct that caused
8  Atkins's wrongful conviction and imprisonment.  All defendants
9  moved to dismiss, and the claims were narrowed in opinions issued
10 by the Hon. Margaret Morrow.  The matter was transferred to the
11 Hon. Percy Anderson on June 12, 2002, upon his appointment to the
12 federal bench.  After discovery, the remaining defendants moved for
13 summary judgment, which Judge Anderson granted in full on May 7,
14 2003, dismissing the entire case.

15      Atkins appealed.  On September 14, 2005, the Ninth Circuit
16 reversed in relevant part and remanded for trial against Miller on
17 two theories of liability arising under the Fourteenth Amendment:
18 (1) that he deliberately fabricated evidence - a statement he
19 attributed to Eric Ingram - and; (2) that he withheld the material
20 fact of his misconduct from the prosecution, in violation of Brady
21 v. Maryland, 373 U.S. 83 (1963), and its progeny.

22      After remand, discovery was reopened.  Trial was initially set
23 to begin on May 30, 2006, but was rescheduled twice.  Pretrial
24 litigation continued from the initial trial date through to the
25 eventual trial, including eight defense and five plaintiff motions
26 in limine and three pre-trial conferences.

27      During the proceedings post-remand, Judge Anderson issued two
28 orders: the first excluding as irrelevant any evidence of Atkins's

2

1 actual innocence, and the second requiring Atkins to disclose to
2 Miller, before trial, work product concerning areas that would be
3 raised during his adverse examination of Miller. In opposition to
4 these two rulings, Atkins filed an emergency motion for a writ of
5 mandamus to the Ninth Circuit, which the Ninth Circuit ultimately
6 granted on both grounds.

7     On August 25, 2006 - the Friday before trial was to begin -
8 Judge Anderson faxed a minute order inviting Miller to move for
9 summary judgment as to causation on Atkins's fabrication-of-
10 evidence theory. Atkins immediately filed a second emergency
11 motion for a writ of mandamus on the ground that this very matter
12 had been determined by the Ninth Circuit in reversing Judge
13 Anderson's grant of summary judgment and finding a triable issue on
14 the fabrication claim. The Ninth Circuit ordered Judge Anderson to
15 file a response, but Judge Anderson instead withdrew the August 25
16 minute order and the mandamus petition was denied as moot.

17     Atkins filed a motion to recuse Judge Anderson on Monday,
18 August 28, 2006, the day before jury selection was to begin. The
19 motion was referred to the Hon. Florence-Marie Cooper, who found
20 the question "close" but denied the recusal request. Atkins then
21 filed a third emergency motion to the Ninth Circuit seeking a writ
22 of mandamus the same day. The Ninth Circuit agreed that the
23 question was close, but denied the motion without prejudice.

24     The case went to trial in front of Judge Anderson. After a
25 two-week trial, the case was submitted to the jury. Shortly into
26 the deliberations, the jurors sent back a note stating that they
27 did not think they would be able to reach a unanimous verdict.
28 They later sent another note inquiring whether unanimity was

3

1 required for all substantive questions on the verdict form.[1]   When
2 they returned the following morning, the jurors indicated that they
3 would like to continue the deliberations.  At the end of that day,
4 Judge Anderson polled the individual jurors as to their thoughts on
5 the probability of reaching an unanimous verdict; six indicated
6 that they thought it was probable, two thought it was not.  The
7 next morning, Judge Anderson stated his intent to declare a
8 mistrial, over the objections of both parties.

9      Atkins filed a fourth emergency motion for a writ of mandamus,
10 seeking to enjoin Judge Anderson from releasing the jury.  After
11 another deadlock note was received, the Ninth Circuit ordered Judge
12 Anderson to respond to the petition, but ultimately granted him
13 leave to do as he saw fit.  Judge Anderson granted a mistrial and
14 discharge the jury on September 13, 2006.  Accordingly, the
15 mandamus petition was denied as moot.  However, the Ninth Circuit
16 issued an opinion ultimately recusing Judge Anderson.

17      The case was reassigned to the Hon. Christina A. Snyder on
18 September 19, 2006.  On October 17, 2006, the Ninth Circuit sua
19 sponte issued an amended order, reiterating its findings of bias
20 but adding that it would have been preferable, before ruling on the
21 recusal motion and ordering the case be transferred to a different
22 judge for a new trial, to allow Atkins to first present his renewed
23 motion to the district judge who considered the initial motion.

24
25
26      [1]  The verdict form indicated that if the answer to Question 1
27 (whether Miller fabricated evidence) was "No," the jury need not
   answer any other question, but instead should sign and return the
28 form.  Thus, this question indicates that the jury had tentatively
   found for Atkins on the question of fabrication.

4

1 | Thus, the Ninth Circuit permitted Atkins to make such a motion if
2 | he wished to do so.

3 |     Accordingly, the case was reassigned back to Judge Anderson on
4 | October 27, 2006 and Atkins made a renewed recusal motion to Judge
5 | Cooper on October 30, 2006. Judge Cooper granted the renewed
6 | motion on November 13, 2006, and this case was transferred to this
7 | Court on November 14, 2006.

8 |     Miller then filed a Rule 50 motion for judgment on the
9 | fabrication claim and Atkins filed for reconsideration of several
10 | motions in limine decided by Judge Anderson. After further pre-
11 | trial litigation and more lengthy negotiations as to the proposed
12 | jury instructions, a three-week trial was conducted in April 2007.
13 | At the conclusion, the jury found for Miller on the fabrication of
14 | evidence claim, but found for Atkins on the Brady claim, finding
15 | that Miller had fabricated the Ingram statement and that Miller's
16 | suppression of that fabrication and other evidence favorable to
17 | Atkins had caused Atkins's wrongful conviction. The jury awarded
18 | Atkins $2 million in damages. Miller then filed a post-trial Rule
19 | 50 motion, which this Court denied on June 26, 2007.

20 |     Atkins now moves the Court for attorneys' fees and costs under
21 | 42 U.S.C. § 1988.

22 |

23 | **II.  DISCUSSION[2]**

24 |     A.  Attorneys' Fees

25 | ────────────

26 |     [2] Defense counsel argues that Plaintiff's counsel failed to
27 | comply with the meet and confer requirements of L.R. 7-3. Although
the Court could deny the motion for failure to comply with this
rule, it is not clear to the Court that Plaintiff's counsel failed
28 | to comply. Accordingly, in the interest of deciding this case on
the merits, the Court will consider the motion.

5

1    Under 42 U.S.C. § 1988, the district court may, in its
2 discretion, award attorneys' fees to a prevailing party in an
3 action brought under § 1983. To determine the appropriate
4 attorneys' fee award under § 1988, courts use the "lodestar"
5 method, which "multiplies the number of hours the prevailing party
6 reasonably expended on the litigation by a reasonable hourly rate."
7 Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006)
8 (quotation and citation omitted). After making that computation,
9 courts then assess whether it is necessary to adjust the
10 presumptively reasonable lodestar figure on the basis of twelve
11 factors. Cunningham v. County of Los Angeles, 879 F.2d 481, 487
12 (9th Cir. 1988). The twelve factors are:

13    (1) the time and labor required, (2) the novelty and
14    difficulty of the questions involved, (3) the skill
15    requisite to perform the legal service properly, (4)
16    the preclusion of other employment by the attorney due
17    to acceptance of the case, (5) the customary fee, (6)
18    whether the fee is fixed or contingent, (7) time
19    limitations imposed by the client or the
20    circumstances, (8) the amount involved and the results
21    obtained, (9) the experience, reputation, and ability
22    of the attorneys, (10) the "undesirability" of the
23    case, (11) the nature and length of the professional
24    relationship with the client, and (12) awards in
25    similar cases.

26 Id. at 252 n. 4 (citing Kerr v. Screen Extras Guild, Inc., 526 F.2d
27 67, 70 (9th Cir. 1975)). However, many of these factors are
28 subsumed within the initial lodestar determination, and therefore

6

1  it is only the rare case in which this lodestar determination

2  should be adjusted.  <u>Cunningham v. County of Los Angeles</u>, 879 F.2d

3  481, 487 (9th Cir. 1988).

4      Defendant concedes that Plaintiff is the prevailing party

5  under § 1988 and that fees should be awarded.  However, Defendant

6  contends that the amount Plaintiff is requesting is excessive.

7      1.  Rates

8      Plaintiff's counsel is seeking reimbursement for a total of

9  3,174 substantive hours.[3]  Plaintiff requests the following rates

10  for the work of his legal staff:

11      Peter Neufeld:      $675

12      Debi Cornwall:      $400

13      Jennifer Laurin:    $315

14      Anna Hoffman:       $300

15      Defendant argues that Plaintiff's requested rates are

16  excessive.  Defendant suggests the following rates:

17      Peter Neufeld:      $350 to $400

18      Debi Cornwall:      $200 to $250

19      Jennifer Laurin:    $150 to $200

20      Anna Hoffman:       $150 to $200

21      A reasonable hourly rate is one "in line with those prevailing

22  in the community for similar services by lawyers of reasonably

23  comparable skill, experience, and reputation."  <u>Sorenson v. Mink</u>,

24  239 F.3d 1140, 1145 (9th Cir. 2001).  The plaintiff bears the

25  burden of producing evidence that the requested rates are in line

26  _____

27      [3]  <u>See</u> Pl.'s Ex. 1, attached to Reply.  Several other
    attorneys also worked on the case over the six years it was
28  litigated.  Plaintiff is not seeking compensation for their
    efforts.

7

1   with those prevailing in the community for similar services by
2   lawyers of reasonably comparable skill, experience and reputation.
3   Id. The burden is on the defendant to produce rebuttal evidence in
4   support of a lower hourly rate. Id.

5       All four Plaintiff's counsel are lawyers at Cochran, Neufeld
6   and Scheck, LLP ("CNS"), a small civil rights firm formed nine
7   years ago by Johnnie Cochran, Peter Neufeld and Barry Scheck. CNS
8   is a seven-attorney firm with a nationwide practice devoted
9   entirely to police misconduct § 1983 cases, and predominantly
10  wrongful conviction suits. Plaintiff represents that CNS is the
11  only firm in the country litigating these cases full-time.

12      Peter Neufeld, a founding partner of CNS, graduated from New
13  York University Law School in 1975. He has over 30 years of
14  experience as a trial attorney. He is a cofounder and co-director
15  of the Innocence Project at the Benjamin N. Cardozo Law School, and
16  has written or co-authored several articles and a book on wrongful
17  convictions. For his work in criminal justice, civil rights and
18  trial practice, he has been repeatedly honored by countless
19  reputable schools and organizations. He represents that he has
20  probably litigated more wrongful conviction cases than any lawyer
21  in the country outside of CNS.

22      Debi Cornwall graduated from Harvard Law School in 2000. She
23  clerked for the Hon. Robert Sweet of the Southern District of New
24  York before joining CNS, where she has worked as an associate for
25  nearly six years. At CNS, she has successfully litigated and co-
26  chaired wrongful conviction suits in cases across the country. In
27  2006, she became a partner at CNS.

28

8

1    Anna Hoffman graduated third in her class from New York
2  University School of Law in 2004.  She clerked for the Hon.
3  Reginald C. Lindsay of the District of Massachusetts before joining
4  CNS as an associate in 2006.

5    Jennifer Laurin graduated first in her class from Columbia Law
6  School in 2003.  She clerked for the Hon. Thomas P. Griesa of the
7  Southern District of New York and the Hon. Guido Calabresi of the
8  Second Circuit before joining CNS.

9    Plaintiff's requested rates fall at the high end of the
10  spectrum.[4]  However, as noted above, this case had a long and
11  difficult history.  It involved complex and novel issues of
12  criminal procedure, constitutional law, tort law and governmental
13  immunities.  Plaintiff's briefs and oral arguments were excellently
14  presented and, during the trial, the Court found Plaintiff's
15  attorneys exceedingly well-prepared and skilled at trial
16  litigation.  In short, the Court believes that Plaintiff's
17  attorneys did an excellent job trying this complicated, difficult
18  case.  Their experience, reputation and skill are all considerable,
19  and Defendant has not submitted any relevant evidence or cited to
20  authority that would indicate Plaintiff's counsel's proposed rates
21  are above market.[5]  Accordingly, the Court does not find that
22  Plaintiff's requested rates are so exceptionally high as to justify
23  deviating from the lodestar figure.  The Court is therefore

24

25    [4]  In support of its motion, Plaintiff submitted the
26  declarations of Carol Sobel and Barrett Litt, two experienced civil
   rights lawyers who primarily practice in Los Angeles, as well as
27  recent National Law Journal articles on billing rates.  (Pl.'s Exs.
   2-5.)

28    [5]  Most of Defendant's cases are from out of district.

9

1  inclined to apply those rates in calculating Plaintiff's attorneys'
2  fees.

3      Defendants also argue that Plaintiff's requested rate of
4  $100/hour for the work performed by Plaintiff's paralegal, Tanya
5  Koshy, is too high. However, in Los Angeles,[6] such a rate is
6  typical, if not modest. (See, e.g., Pl.'s Ex. 2, Declaration of
7  Barrett S. Litt ¶ 25.) Accordingly, the Court is not inclined to
8  deviate from Plaintiff's requested paralegal fee.

9

10          2.  Hours: unsuccessful claims and degree of success
11              obtained

12     Where the prevailing party has not won every claim initially
13 brought, the reviewing court must determine the appropriate level
14 of compensation to plaintiff's counsel for time spent on claims she
15 did not win. Webb v. Sloan, 330 F.3d 1158, 1168 (9th Cir. 2003);
16 Sorenson v. Mink, 239 F.3d 1140, 1147 (9th Cir. 2001). In making
17 this determination, the first step is to consider whether "the
18 plaintiff fail[ed] to prevail on claims that were unrelated to the
19 claims on which he succeeded." Hensley v. Eckerhart, 461 U.S. 424,
20 434 (1983). Claims are "unrelated" if they are "entirely distinct
21 and separate" from the claims on which the plaintiff prevailed.
22 Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1499 (9th Cir. 1995).
23 Hours expended on unrelated, unsuccessful claims should not be
24 included in an award of fees.

25

26 ────────────────────
27     [6] Defendant argues that "Inland Empire" rates should apply
    because the case could have been filed in Riverside. That,
    however, is not the standard. It was filed in Los Angeles, and
28 therefore the higher Los Angeles rates apply.

10

1    The second step is to consider whether "the plaintiff

2  achieve[d] a level of success that makes the hours reasonably

3  expended a satisfactory basis for making a fee award." <u>Hensley</u>,

4  461 U.S. at 434.  In answering that question, a district court

5  "should focus on the significance of the overall relief obtained by

6  the plaintiff in relation to the hours reasonably expended on the

7  litigation." <u>Id.</u> at 435.  "Where a plaintiff has obtained

8  excellent results, his attorney should recover a fully compensatory

9  fee." <u>Id.</u>  A plaintiff may obtain excellent results without

10 receiving all the relief requested. <u>Id.</u> at 435 n. 11.

11    Here, there were no unrelated claims.  The fabrication of

12 evidence claim and the <u>Brady</u> claim that were litigated in the

13 second civil trial were clearly intertwined.[7]  Moreover, the claims

14 Plaintiff initially brought against all four defendants arose out

15 of the same core set of facts and legal theories, such as those

16 related to identification procedures, that prevailed at trial.

17 Finally, the forensic <u>Brady</u> and fabrication claims were important

18 to the materiality and causation elements of the <u>Brady</u> claim

19 against Miller that ultimately prevailed.  Thus, the Court is

20 inclined to find that Plaintiff's claims were all related.  <u>See</u>

21 <u>Webb v. Sloan</u>, 330 F.3d 1158, 1169 (where all claims arise out a

22 common core of facts and a common course of conduct, it is

23 reversible error for a district court to exclude such claims as

24 "entirely distinct and separate" from the successful claims).

25

26

27         [7]  Indeed, to find for Plaintiff on the <u>Brady</u> cause of action,
   the jury necessarily found (as indicated on the Special Verdict
28 Form) that Defendant had fabricated the Ingram statement.

11

1    Next, the Court must determine "the significance of the
2  overall relief obtained by the plaintiff in relation to the hours
3  reasonably expended on the litigation." Defendant argues that
4  plaintiffs who have won similar wrongful conviction civil rights
5  lawsuits typically have received awards much larger than Atkins's.
6  Thus, Defendant contends, Plaintiff's $2 million verdict is not
7  "excellent." This contention, however, fails to take into account
8  the unique circumstances giving rise to this case. This case was
9  complicated factually, procedurally and substantively. Plaintiff's
10 counsel, who litigates wrongful conviction suits almost
11 exclusively, has stated that this case stood out as presenting
12 unique hurdles to success. (Declaration of Deborah L. Cornwall ¶
13 20.) Given the complexity of this action, a two million award is
14 an excellent result.[8] Moreover, as Plaintiff explains, the number
15 of hours spent in litigating this case was exceptionally low, given
16 its long history and its difficulty. In short, there is no support
17 for reducing Plaintiff's fees based on the size of the verdict.

18

19         3.   Travel time

20    Defendant argues that Plaintiff is not entitled to
21 compensation for substantive work completed during travel. In the
22 Ninth Circuit, courts determine whether the travel time was
23 reasonably incurred. See Davis v. City of San Francisco, 976 F.2d
24 1536, 1543 (9th Cir. 1992), diff't potion vacated by 984 F.2d 345

25

26    [8]  Significantly, even if Plaintiff had prevailed under his
   fabrication of evidence theory, the jury could not have awarded him
27 any further damages; Plaintiff prevailed against Defendant for the
   full extent of his loss.
28

12

1  (9th Cir. 1993). Here, Plaintiff billed travel time at 50% of the
2  proposed substantive rates. Plaintiff has provided evidence that
3  its firm has a unique expertise in this area of law, as the only
4  firm nationally handling wrongful conviction cases full time.
5  Moreover, Plaintiff's lead counsel, Peter Neufeld, had a
6  longstanding relationship with Plaintiff from his years of pro bono
7  representation resulting in Plaintiff's exoneration and release.
8  Given these circumstances, the Court finds that Plaintiff's
9  counsel's travel work was necessary and reasonable.

10

11          4.   Administrative work

12      In the Ninth Circuit, "even purely clerical or secretarial
13  work is compensable if it is customary to bill such work
14  separately." Trustees of Const. Industry & Laborers Health &
15  Welfare Trust v. Redland Ins. Co., 460 F.3d 1253, 1257 (9th Cir.
16  2006) (citation omitted). In Los Angeles, it is customary to bill
17  administrative tasks separately. Here, Plaintiff's counsel has
18  separated out the administrative tasks and billed them at 50% of
19  the proposed substantive rates. Thus, the Court is inclined to
20  grant this portion of the fee request.

21

22          5.   Fees on fees

23      The Ninth Circuit has repeatedly held that time spent by
24  counsel in establishing the right to a fee award is compensable.
25  See, e.g., D'Emanuele v. Montgomery Ward & Co., 904 F.2d 1379,
26  1387-88 (9th Cir. 1990). Plaintiff has requested "fees on fees" in
27  the total amount of $6,500 for the work done in preparing this
28  motion. Plaintiff has calculated this rate as follows: For the

13

1 work of Debi Cornwall, 10 hours x \$200/hr (proposed 50% discounted
2 rate); for the work of Anna Hoffman, 30 hours X \$150/hr (proposed
3 50% discounted rate). Defendant argues that because Plaintiff's
4 substantive fee request is unreasonable, Plaintiff's fees on fees
5 request should be reduced. Because the Court finds Plaintiff's
6 substantive request reasonable, however, it is also inclined to
7 grant Plaintiff's fees on fees request.

8

9        **B.**    <u>Expenses and Costs[9]</u>

10      Federal Rule of Civil Procedure 54(d)(1) provides generally
11 that "costs other than attorney's fees shall be allowed as of
12 course to the prevailing party unless the court otherwise directs."
13 Fed. R. Civ. P. 54(d)(1). "Under § 1988, the prevailing party may
14 recover as part of the award of attorney's fees those out-of-pocket
15 expenses that would normally be charged to a fee paying client."
16 <u>Dang v. Cross</u>, 422 F.3d 800, 814 (9th Cir. 2005). Such out-of-
17 pocket expenses are recoverable when reasonable. <u>Id.</u>

18

19           **1.**    <u>Jury Consultant Fees</u>

20      Courts in the Ninth Circuit will award prevailing parties the
21 expenses and fees of jury consultants who ran focus groups and
22 assisted in jury selection at trial. <u>See, e.g.</u>, <u>Confederated</u>

23

24       [9] Plaintiff's counsel is not seeking reimbursement for
approximately \$22,000 of costs incurred before 2003, when
25 Plaintiff's counsel shifted to a new book-keeping system. This
includes the costs of the 11 depositions taken before summary
26 judgment, and travel expenses associated with taking those
depositions.
27     Plaintiff's counsel also withdrew its request for \$1,000 in
mediation costs, and its request for compensation for \$1,228.58
28 incurred to bring Plaintiff to New York for his second deposition.

14

1  <u>Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.</u>, No. CV 00-

2  1693-A, 2003 WL 23715982, at *8-9 (D. Or. Oct. 27, 2003) (allowing

3  $60,000 in costs for trial consulting service to conduct a mock

4  trial), <u>aff'd</u> 411 F.3d 1030 (9th Cir. 2005), <u>vacated and remanded</u>

5  <u>on other grounds sub nom Weyerhauser Co. v. Ross-Simmons Hardwood</u>

6  <u>Lumber Co., Inc.</u>, 127 S.Ct. 1069 (2007). Plaintiff's counsel used

7  Josh Dubin Consulting Services for their jury consultant needs and

8  negotiated a discounted rate. Given the complexity of the issues

9  in this case and the discounted rate, the Court is inclined to find

10 Plaintiff's total jury consultant expenses of $20,935.32

11 reasonable.

12

13          2.   Travel expenses

14     Travel costs are compensable so long as they are reasonable.

15 See <u>Lasha v. Tharp</u>, 907 F.2d 154 (mem. op.) at *2 (9th Cir. 1990).

16 Here, Plaintiff's counsel attempted to minimize the number of

17 flights to Los Angeles, appearing telephonically when possible. At

18 times, however, Plaintiff's counsel and witnesses were required to

19 travel to Los Angeles on a week's notice or less, which increased

20 the costs of travel. During both three-week trials, lead counsel

21 Peter Neufeld stayed with a friend rather than in a hotel. The

22 total cost of travel, lodging and meals over five years of

23 litigation is $40,363.35. The Court is inclined to find this

24 amount reasonable.

25

26          3.   Shipping expenses

27     Defendant argues that Plaintiff's shipping expenses should not

28 be reimbursed. However, most of Plaintiff's shipping expenses are

15

1 for filings to this Court, which does not have civil e-filing.
2 Thus, even local counsel must use a shipping carrier, send a
3 runner, or bill paralegal time and travel costs to file documents.
4 Plaintiff's other major shipping expense was sending boxes of
5 documents to Los Angeles for the two trials. The Court is inclined
6 to find these shipping expenses reasonable and compensable.

7

8 ### 4. Investigator expenses

9 Defendant appears to argue that Plaintiff's investigation
10 expenses of $54,995.48 were unreasonable. However, Plaintiff
11 incurred many of these expenses in his efforts to locate Riverside
12 Deputy Chris Taylor, a witness whose identity and location
13 Defendant did not reveal to Plaintiff before trial. Plaintiff also
14 used an investigator to locate and initiate contact with Eric
15 Ingram, whose testimony was critical to Plaintiff's claims, as well
16 as the three eyewitnesses, so that their testimony could be taken
17 by deposition. Given the length of time that had passed between
18 Plaintiff's wrongful conviction and his release, this work required
19 an extremely skilled investigator. Accordingly, the Court is
20 inclined to find Plaintiff's request for investigation expenses
21 reasonable.

22

23 ## III. CONCLUSION

24 For the foregoing reasons, the Court finds that no reduction
25 to the lodestar is warranted. Accordingly, the Court is inclined
26 to grant the motion and award Atkins § 1988 attorneys' fees in the
27 amount of $1,368,834, fees on fees in the amount of $6,500, and
28

16

1  costs in the amount of $165,067.22.[10]  The Court is also inclined to

2  award post-judgment interest under 28 U.S.C. § 1961(a).

3

4

5  IT IS SO ORDERED.

6

7

8  Dated:   8·27-07

DEAN D. PREGERSON
9                                              United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27 ─────────────────────

28        [10]  This figure does not include the $4,763.50 requested
separately in a Bill of Costs under § 1920.

17

1

2

3

4

5

6

7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11

LYNNE WANG, YU FANG INES              )     No. CV04-1498 CBM (JWJx)
KAI, AND HUI JUNG PAO, ON             )
BEHALF OF THEMSELVES AND              )     CLASS ACTION
ALL OTHERS SIMILARLY                  )
SITUATED,                             )     ORDER RE PLAINTIFFS' MOTION
              Plaintiffs,             )     FOR AWARD OF ATTORNEYS' FEES
                                      )
v.                                    )
                                      )
CHINESE DAILY NEWS, INC., et al.      )
                                      )
                                      )
              Defendant.              )
_____
_____

21          The matter before the Court is Plaintiffs' Motion for Attorneys' Fees. This

22   Court entered Judgment in favor of Plaintiffs on all issues except for injunctive

23   relief on February 27, 2008. Plaintiffs now seek attorneys' fees in the instant

24   motion.

25                              **JURISDICTION**

26          This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

27                    **FACTUAL AND PROCEDURAL HISTORY**

28

1

1    Plaintiffs filed this suit on March 5, 2004, alleging multiple labor violations

2    by Chinese Daily News, Inc. ("Defendant") pursuant to the Fair Labor Standards

3    Act ("FLSA"), the California Business and Professions Code § 17200 et seq., and

4    the California Labor Code.  The action was tried to a jury commencing on

5    November 28, 2006 and was submitted to the jury on January 5, 2007.  On

6    January 10, 2007 the jury returned a verdict in favor of Plaintiffs on all causes of

7    action.  A bench trial commenced on July 31, 2007, addressing Plaintiffs' claims

8    under California Business & Professions Code § 17200, penalties under the

9    California Labor Code and pre-judgment interest.  On February 28, 2008, the

10   Court issued its findings of fact and conclusions of law and entered Judgment in

11   favor of plaintiffs for damages, restitution, penalties and pre-judgment interest.

12   The Court denied Plaintiffs request for injunctive relief.

## DISCUSSION

14   **I. EVIDENTIARY OBJECTIONS**

15   Defendant objects to the declarations of Della Bahan, Randy Renick,

16   Virginia Keeny, Robert Newman and Brad Seligman submitted in support of

17   Plaintiffs Motion for Attorneys' Fees.  When Plaintiffs originally submitted their

18   Motion for Attorneys Fees, they attached only summaries of fees billed.  Plaintiffs

19   requested the Court to review the actual billing records in camera.  The Court

20   denied this request and Plaintiffs supplemented their motion with the actual billing

21   records.  In the meantime, Defendant filed objections to the various declarations

22   cited by Plaintiffs in their original motion.  Defendant's objections focus on best

23   evidence and foundational objections based on Plaintiffs' only referencing their

24   fee summaries.  Now that the Court and Defendant have the actual statements, the

25   Court overrules Defendant's objections to the declarations of Della Bahan, Randy

26   Renick and Virginia Keeny as moot.  The Court considered the actual billing

27   records in analyzing Plaintiffs' Motion for Attorneys' Fees.

28

1    Defendant also objects to the declarations of Brad Seligman and Robert D.

2   Newman. Plaintiffs offer these declarations of attorneys in the community as

3   evidence to support Plaintiffs' attorney billing rates. Defendant objects on the

4   grounds that portions of said declarations lack personal knowledge, lack

5   foundation, call for speculation and draw legal conclusions. The Court overrules

6   Defendant's one objection to Mr. Newman's declaration and overrules all

7   objections to Mr. Seligman's declaration except for Defendant's objection to para.

8   11, line 9-10, which the Court sustains.

9   **II. DOES THE CALIFORNIA FEE AWARD ANALYSIS APPLY TO PLAINTIFFS' STATE**

10  **AND FEDERAL CLAIMS**

11    The jurisdictional basis for this case is federal question. It involved claims

12  based on California state labor laws and the federal Fair Labor Standards Act.

13  Plaintiffs request this Court to apply a California fee award analysis to Plaintiffs

14  state and federal claims. (Pl. Mot. at 3.) Defendant argues that because this case

15  involves a federal question, and is not a diversity action, "no *Erie* considerations

16  govern here." (Def. Surreply at 2.) Therefore, Defendant argues that attorneys'

17  fees should be awarded according to a federal fee award analysis.

18    Plaintiffs cite *Mangold v. Cal. Pub. Utils. Com'n.*, 67 F.3d 1470 (9th Cir.

19  1995), in support of its argument. In *Mangold*, the Ninth Circuit addresses the

20  issue of whether state or federal law controls the method of calculating attorneys'

21  fees awarded to a plaintiff who had prevailed on discrimination claims brought

22  under both Title VII and the California Fair Employment and Housing Act. The

23  plaintiffs in *Mangold*, as in the instant case, succeeded on both federal and state

24  statutory claims. Applying state law, the lower court in *Mangold* awarded fees,

25  enhanced by a multiplier of 2.0. The defendant argued that federal law should

26  apply based on *City of Burlington v. Dague*, where the United States Supreme

27  Court held that contingency-fee multipliers are unavailable under federal fee-

28  shifting statutes. *Mangold*, 67 F.3d at 1478. The defendant also asserted that

3

1     under an *Erie* analysis, the right to a fee is a matter of state substantive law, but

2     the method of calculating that fee is procedural and therefore subject to federal

3     law. The court in *Mangold* stated that "[e]xisting Ninth Circuit precedent has

4     applied state law in determining not only the right to fees, but also the method of

5     calculating the fees." *Id.* Moreover, the Ninth Circuit clarified that while the *Erie*

6     analysis applies in a diversity action, it also "applies equally in the context of

7     pendant jurisdiction." *Id* (internal citations omitted). The court further noted that

8     other circuits have applied state law in calculating the fee, and one case even used

9     a multiplier under state law because *Dague* precluded it under federal law. *Id.*

10          Having reviewed the arguments herein, this Court applies the California

11     state standard for awarding attorneys' fees in the instant case.

12     **III.**    **WHETHER THE PROPOSED ATTORNEYS' FEES ARE REASONABLE**

13          The starting point of every fee award must be a calculation of the attorney's

14     services in terms of the time he has expended on the case. *Serrano v. Priest*, 20

15     Cal. 3d 25, 49 n.23 (Cal. 1977) (hereafter "*Serrano III*"). As the California

16     Supreme Court explained, "*Serrano III* requires the trial court to first determine a

17     'touchstone' or 'lodestar' figure based on a 'careful compilation of the time spent

18     and the reasonable hourly compensation for each attorney.'" *Press v. Lucky*

19     *Stores, Inc.*, 34 Cal. 3d 311, 322 (Cal. 1983).

20          **A. REASONABLENESS OF RATES**

21          California courts rely upon federal cases in stating that "a reasonable hourly

22     rate is the product of a multiplicity of factors…the level of skill necessary, time

23     limitations, the amount to be obtained in the limitation, the attorney's reputation,

24     and the undesirability of the case." *Margolin v. Regional Planning Com.*, 134 Cal.

25     App. 3d 999, 1004 (1982) (internal citation omitted).

26          The standard for determining a reasonable hourly rate is the market rate in

27     the community where the case is litigated. *Carson v. Billings Police Dept.*, 470

28

1    F.3d 889, 891 (9th Cir. 2006).  There are many ways to support the reasonable

2    value of services rendered by an attorney.  One way is to determine what fees

3    were sought and deemed reasonable by courts in other cases.  Another method is

4    to review rates charged by "comparable law firms for the work of similarly

5    situated partners, associates and lay experts." *Margolin v. Regional Planning*

6    *Com.*, 134 Cal. App. 3d 999, 1006 (1982).  The Court may also rely on expert

7    testimony. *Children's Hosp. and Medical Center v. Bonta*, 97 Cal. App. 4th 740,

8    783 (2002).

9         Plaintiffs provide their lodestar determination of hours worked and

10   reasonable hours rate as follows:

11

| Law Firm/Attorney | Hours (Rate) | Lodestar |
|---|---|---|
| **Hadsell & Stormer, Inc.** **(associated in 2006)** | **1,625.90** | **$707,210.00** |
| Dan Stormer | 35.20 ($800) | $28,160.00 |
| Virginia Keeny | 417.30 ($575) | $239,947.50 |
| Cornelia Dai | 892.40 ($425) | $379,270.00 |
| Sanjukta Paul | 60.90 ($350) | $21,315.00 |
| Callie White | 120.20 ($175) | $21,035.00 |
| Ella Wagener | 38.80 ($175) | $6,790.00 |
| Brooke Glass-O'Shea | 49.20 ($175) | $8,610.00 |
| Rachel Bloomekatz | 11.90 ($175) | $2,082.50 |
| **Bahan & Associates** | **2,329.10** | **$677,481.50** |
| Della Bahan | 452.9 ($545) | $246,830.50 |
| Peter Bibring | 908.30 ($240) | $217,992.00 |
| Jennifer Reisch | 652.30 ($230) | $150,029.00 |
| Maria Stroud | 295.60 ($175) | $51,730.00 |
| **Law Offices of R. Renick** **(associated in 2006)** | **1,865.20** | **$882,822.50** |
| Randy Renick | 1,243.50 ($550) | $683,925 |
| Kathleen Langan | 137.40 ($500) | $68,700.00 |
| Josh Piovia-Scott | 76.90 ($375) | $28,837.50 |
| Matthew Sirolly | 25.70 ($325) | $8,352.50 |
| Ben Stormer | 260.20 ($225) | $58,545.00 |
| Stephen Muzio | 81.30 ($325) | $26,422.50 |
| Maria Stroud | 40.20 ($200) | $8,040.00 |

27

28

5

| TOTAL LODESTAR | 5,820.20 | $2,267,514.00[1] |
|---|---|---|

Mr. Renick, Ms. Keeny and Ms. Bahan served as Plaintiffs' senior attorneys during this action. As evidence of reasonableness of their fees, Plaintiffs provided the Court with declarations of attorneys in the community. (*See* Newman, Seligman and Traber Decl.) The declarations state that the hourly rates for the above noted attorneys were reasonable given their experience and background. (*See* Seligman and Traber Decl.) Mr. Renick's 2007 hourly rate of $500 was approved in a number of cases, in Los Angeles Superior Court, San Francisco Superior Court and San Diego Superior Court. (Renick Decl. at ¶ 40.) Plaintiffs supplement its motion with declarations from Mr. Stormer, and exhibits attached thereto, and Barrett S. Litt. The Court finds the declarations support the reasonableness of Mr. Stormer's billing rate given his background and experience in the community. Based on the foregoing, the Court finds that the rates for Mr. Stormer, Ms. Keeny, Mr. Renick and Ms. Bahan are reasonable based their experience and background and are consistent with prevailing market rates in the community.

Mr. Renick supports the hourly rate of the associates and staff at the law offices of Randy Renick based on the National Law Journal 2007 survey of rates. He provides the Court with some hourly rates charged by law firms based on the associate class; the survey is based on the nation's largest law firms and the portion submitted to the Court as Exhibit 2 is only a "sampling." The survey provides the Court with a list of rates for several law firms in Southern California. Messrs. Matthew Sirolly and Stephen Muzio bill out at $325/hour. Both are third year associates at Mr. Renick's firm. The Southern California law firms range from $240-$375 per hour for a third year associate. Mr. Renick's rates are highly competitive with those of a large Los Angeles firm; however, based on evidence

---

[1] Plaintiff seeks a Multiplier of 2.0 for their lodestar, which would bring the total amount to $4,535,028.00. *See infra.* Section D for discussion.

6

1    that some third year associates bill out at substantially less, the Court reduces the

2    rates for the above two associates to $300/hour, or the mid-point of the above

3    noted range, given their experience and background. Accordingly, the lodestar

4    shall be reduced by $2675. Mr. Ben Stormer and Ms. Stroud are law clerk and

5    paralegal respectively at Mr. Renick's firm. Both are experienced. The median

6    amount charged for a paralegal in the Los Angeles area is $195 per hour based on

7    the International Paralegal Management Association's Annual Compensation

8    Survey for Paralegals/Legal Assistances and Managers, 2007 Edition.

9    Accordingly, the Court finds the rates of $225/hour and $220/hour for Mr.

10   Stormer and Ms. Stroud, respectively, are reasonable. The Court also finds that

11   Mr. Piovia-Scott's rate of $375 is reasonable for his experience and background.

12   Lastly, Ms. Langan is a contract attorney for Mr. Renick's firm. She is an

13   experienced attorney and has been practicing since 1989. Her rate of $500/hour,

14   however, is high based on her experience and work history for a comparable

15   attorney in the community. Accordingly, the Court reduces Ms. Langan's rate to

16   $475/hour.

17        Ms. Keeny supports the hourly rate of the Hadsell & Stormer associates

18   Cornelia Dai and Sanjukta Paul in her declaration. Based on their experience and

19   background, the Court finds that the rates listed, $425 and $350 respectively, are

20   reasonable. Hadsell & Stormer also notes that they had four law clerks billing at

21   $175/hour. Based on the law clerks' backgrounds and the median rates for

22   paralegals in the area ($195/hour), the rate of $175/hour is reasonable for a law

23   student.

24        Ms. Bahan supports the hourly rate of associates Peter Bibring and Jennifer

25   Reisch in her declaration and supplemental declaration. Based on their experience

26   and background, the Court finds that the rates listed, $240 and $230 respectively,

27   are reasonable.

28

7

## B. REASONABLENESS OF HOURS

### 1. VAGUE TIME ENTRIES

Defendant argues that some of Plaintiffs' time entries are too vague to support an award. Defendant states that the Court must be provided with sufficient detail of the dates, hours and nature of the work performed, *citing See In re Washington Pub. Power Supply Sys. Secur. Litig.*, 19 F.3d 1291, 1305-06 (9th Cir. 1994) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) stating "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly.") Defendant lists examples of vague tasks that are listed by Plaintiffs. Defendant adds that some of the tasks are often repeated. Plaintiffs argue that the time entries are sufficient to support an award of fees and moreover that California case law permits fee awards in the absence of detailed time sheets. *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255 (Ct. App. 2001).

The "experienced trial judge is the best judge of the value of professional services rendered in his court." *Sommers v. Erb*, 2 Cal. App. 4th 1644, 1651 (1992). Having reviewed the arguments and time records, the Court, in its discretion, finds that Plaintiffs' time entries are reasonable and accordingly does not discount Plaintiffs fee award based on vagueness.

### 2. BLOCK BILLING

"Block billing" is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing time expended on specific tasks. *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007). If billing statements lump together multiple tasks, it is impossible for the Court to determine how much time was spent on particular activities, or to evaluate whether the time spent on such tasks was reasonable. *See id.* at 948. Furthermore, a 2003 study by the California State Bar's Committee on Mandatory Fee Arbitration concluded that block billing "may increase time by

8

1  10% to 30%." *Id. citing* The State Bar of California Committee on Mandatory Fee

2  Arbitration, Arbitration Advisory 03-01 (2003). Accordingly, the Ninth Circuit

3  has approved fee reductions to account for increased hours attributable to block

4  billing. *Welch*, 480 F.3d at 948, *citing Hensley*, 461 U.S. at 437, (holding that

5  applicant should "maintain billing time records in a manner that will enable a

6  reviewing court to identify distinct claims"); *Fischer v. SJB-P.D. Inc.*, 214 F.3d

7  1115, 1121 (9th Cir.2000) (holding that a district court may reduce hours to offset

8  "poorly documented" billing).

9        Approximately 40% of Plaintiffs billing entries are block billed. The Court

10  finds that a 5% reduction should be applied to the lodestar amount to account for

11  increased time that may have resulted from block billing. Although the Court has

12  not calculated a precise percentage, less than half of all hours submitted by

13  Plaintiffs are block-billed. In order to ensure that reductions are not taken on

14  billing entries that contain single tasks, the 5% reduction will only be applied to

15  40% of the total lodestar amount. *See Welch*, 480 F.3d at 948 (holding any

16  reduction for block billing must fairly account for those hours actually billed in

17  block format).

18  ### 3. DUPLICATE WORK

19        Defendant argues that much of Plaintiffs work was duplicated due to the

20  substitution of counsel a few months prior to trial — from Bahan & Associates to

21  Hadsell & Stormer and the Law Offices of Randy Renick. Therefore, Defendant

22  argues that the Court should discount time spent by attorneys getting up to speed

23  and familiarizing themselves with the claims in this lawsuit. Defendant also

24  argues that fees related to duplication of work such as multiple attorneys at

25  hearings or depositions should be discounted. While the Court is not persuaded by

26  Defendant's arguments that the presence of more than one attorney at a hearing or

27  deposition merits reduction in fees, the Court does find that some work was

28

9

1    unreasonably duplicative due to Plaintiffs' substitution of counsel. In response to

2    the Court's inquiry, Defendant provided the Court with a submission of additional

3    information, including a chart of billing entries reflecting duplicative work. *See*

4    Def. 8/26/08 Submission, Ex. A. Plaintiffs filed a response to Defendant's

5    submission. The chart lists entries that result in 172 hours of work, totaling

6    $76,280; however, the Court finds that only some time should be reduced for

7    unreasonable duplication. Accordingly, the Court finds that 40% of the above

8    amount or $30,512, is an appropriate reduction.

9                    **4. RESEARCH**

10          Defendant objects to Plaintiffs' fee request for certain entries involving

11   research conducted by attorney Kathleen Langan, whose fee rate is $500/hour.

12   Defendant argues that the particular research conducted by Ms. Langan would be

13   customarily done by a junior lawyer. Defendant notes that Ms. Langan billed

14   more than 137 hours to this case.

15          Plaintiff argues that Ms. Langan took a significant role in opposing

16   Defendant's five post-trial motions. Due to the extensive nature of each motion,

17   Plaintiffs argue that it engaged all available personnel to work on the briefs.

18   While much of the work performed by Ms. Langan was reasonable and necessary,

19   the Court finds that 48.6 hours were spent by Ms. Langan doing basic research or

20   tasks more appropriate for a junior attorney. Accordingly, the Court reduces 48.6

21   hours of Ms. Langan's total hours to $350/hour. This rate is in between the rate of

22   a senior associate and a junior associate at Mr. Renick's firm.

23                    **5. REVIEW OF FILES**

24          Defendant objects to Plaintiffs' fee request to the extent that "Plaintiffs'

25   billing records refer to excessive 'review of files.'" Defendant argues that

26   Plaintiffs' records detail over two hundred hours of "mere 'review' of files" and

27   that Plaintiffs entries are vague "such that it is impossible to determine what work

28

10

1   was actually performed." Plaintiffs state that these hours were "proper and reflect

2   hours required to litigate this action." Plaintiffs explained that the paralegal

3   'review of files' included reviewing, analyzing and maintaining documents for

4   written discovery, deposition, and motions; Plaintiffs however, did not address

5   why over two hundred hours were expended in the review. In response to the

6   Court's inquiry, Defendant provided the Court with a submission of additional

7   information, including a chart of billing entries reflecting review of files. *See* Def.

8   8/26/08 Submission, Ex. B. Plaintiffs filed a response to Defendant's submission.

9   The chart lists entries that result in 203.9 hours of work, totaling $44,877.50.

10  Based on its knowledge of the case and its review of the papers, the Court finds

11  that Plaintiffs' entries, listed by Defendants in Exhibit B, are excessive and

12  include insufficient descriptions in order for the Court to determine what work

13  was actually performed. Since a reasonable 'review of files' is necessary in the

14  course of protracted litigation, the Court finds a 65% reduction of the above

15  amount, or $29,179.38, is appropriate.

16              **6. CLERICAL WORK**

17          Defendant objects to Plaintiffs' fee request to the extent Plaintiffs' billing

18  records demonstrate that Plaintiffs counsel charged attorney rates for clerical and

19  secretarial work. *Cf. Missouri v. Jenkins*, 491 U.S. 274, 288 (1989). In response

20  to the Court's inquiry, Defendants provided the Court with a submission of

21  additional information, including a chart of billing entries reflecting time billed for

22  secretarial and clerical work. *See* Def. 8/26/08 Submission, Ex. E. Plaintiffs filed

23  a response to Defendant's submission. The chart lists entries that result in 36.6

24  hours of work, totaling $7,373.50. The Court finds the following entries involve

25  secretarial and clerical work that should be excluded from the lodestar calculation:

26  "arrange for translation on phone calls with clients; scheduling phone interviews

27  and interpretation service; waiting for Ines Kai's husband; [and] travel to/from

28

11

1   storage to retrieve CDN payroll registers." *Id.* Accordingly, the Court reduces the

2   lodestar amount by $1017.00.

3                    **7. FEES ON UNRELATED OR UNSUCCESSFUL WORK**

4            Defendant argues that Plaintiffs should not recover fees on the two claims

5   on which they did not ultimately prevail: reporters' rest breaks and injunctive

6   relief.  However, Plaintiffs prevailed on 11 related claims.  Since the claims for

7   which Plaintiffs prevailed are not entirely distinct with respect to preparation,

8   research, etc., Plaintiffs argue that the time spent is still compensable. *See*

9   *Thomas v. City of Tacoma*, 410 F.3d 644, 649 (9th Cir. 2005) (If a lawsuit consists

10  of related claims, a plaintiff who has won substantial relief should not have his

11  attorney's fee reduced because the court did not adopt each contention raised.  To

12  determine whether claims are related, the court should focus on whether the

13  claims on which Plaintiff did not prevail "involve a common core of facts or are

14  based on related legal theories.")  Defendant also argues that Plaintiffs pursued

15  numerous claims that Plaintiffs later dismissed on the eve of trial or during trial.

16          The Court finds that the facts surrounding Defendant's payroll practices

17  support all of Plaintiffs' claims.  Plaintiffs have won "substantial relief" and

18  therefore should not have their fees reduced because the Court did not adopt "each

19  contention raised." *See id.*  Defendant argues that waiting time penalties under

20  Labor Code § 203 are penalties and therefore do not fall within the purview of

21  Labor Code § 218.5 and 1194, which pertain to non-payment of wages, overtime,

22  fringe benefits, health and welfare, and pension fund contributions.  Defendant

23  states that neither of the above cited statutes awards fees for "penalties."

24          **C. FEES FOR SECTION 203 WAITING TIME PENALTIES**

25          Defendant argues that waiting time penalties under California Labor Code §

26  203 are penalties and therefore do not fall within the purview of California Labor

27  Code § 218.5 and 1194, which pertain to non-payment of wages, overtime, fringe

28

                                            12

1   benefits, health and welfare, and pension fund contributions.  Defendant states that

2   neither of the above cited statutes awards fees for "penalties."

3       Plaintiffs argue that Section 203 provides up to 30 days of wages as a

4   penalty anytime an employer fails to pay wages owed at the time of termination.

5   Plaintiffs state that because a Section 203 violation necessarily involves the

6   payment of wages, it triggers the fee provision of Section 218.5.  Alternately,

7   Plaintiffs argue that if Section 218.5 does not provide for an award of fees, fees

8   should still be awarded since the claim is based on the same set of facts as the

9   overtime and break claims; and, a plaintiff who prevails on claims that allow for

10  the recovery of attorney's fees, along with claims which do no, is entitled to

11  recover all of the attorney's fees incurred so long as the claims all arise from a

12  "common core of facts." *See Hensley*, 461 U.S. at 433; *see also Bell v. Vista*

13  *Unified School District*, 82 Cal. App. 4th 672, 687 (Ct. App. 200) ("Such fees

14  need not be apportioned when incurred for representation on an issue common to

15  both causes of action in which fees are proper and those in which they are not.")

16      There is little guidance on whether fees are recoverable under Section 218.5

17  for violation of Section 203; however the Court need not reach this issue in the

18  instant case.  Plaintiffs Section 203 claim stems from issues common to causes of

19  action in which fees are proper and therefore there should be no fee

20  apportionment.  Accordingly, the Court finds that fees related to Plaintiffs'

21  Section 203 should not be reduced.

22      **D. MULTIPLIER**

23      Plaintiffs cite *Mangold, see infra.* Section II, to support their argument that

24  a multiplier of 2.0 is appropriate.  *Mangold*, 67 F.3d at 1478-79.  In *Mangold*, the

25  district court awarded an upward multiplier of 2.0 in recognition of the contingent

26  risk assumed by plaintiffs' attorneys. The Ninth Circuit affirmed the contingent

27  fee multiplier, holding that it was bound to apply California law in determining

28

13

1  whether a multiplier was appropriate. *Id.*[2] As stated, the Court finds that

2  California law applies in the instant case. The factors to be considered based on

3  California law in determining the proper multiplier include: "(1) the novelty and

4  difficulty of the questions involved, (2) the skill displayed in presenting them, (3)

5  the extent to which the nature of the litigation precluded other employment by the

6  attorneys, (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal.

7  4th 1122, 1131 (2001).

8      While a court may apply a multiplier in the instant case, this Court still has

9  discretion to include a multiplier in its fee award. *See Ketchum*, 24 Cal. 4th at

10  1138. The Court finds that counsel represented Plaintiffs on a contingency basis

11  and prevailed after a protracted trial and subsequent court trial on damages. The

12  result obtained was exceptional in light of Defendant's approach to the litigation.

13  *See e.g. Crommie v. PUC*, 840 F.Supp. 719 (N.D. Cal. 1994). Counsel was also

14  precluded from other employment due to the time and attention required by this

15  case. Having considered the relevant factors noted above, this Court finds a

16  multiplier of 1.5 appropriate.

17  **E. COSTS**

18      Plaintiffs filed the instant motion, including a request for $120,699.15 in

19  costs, prior to the determination of the Bill of Costs by the Clerk of Court. In its

20  reply brief, Plaintiffs state that "it is Plaintiffs intention that the [sic] any award of

21  litigation expenses made by this Court exclude or supersede any costs previously

22  awarded by the Clerk of Court." In its Bill of Costs, Plaintiffs sought recovery in

23  the amount of $48,140.85 for costs related to deposition transcripts, photocopies,

24

25  [2] Plaintiffs cites *Andrea Savaglio et al. v. Wal-Mart Stores, Inc., et al*, 2006 WL 3626295 (Cal.Superior) (not reported in Cal. Rptr. 3d) to support their argument that this Court should apply a multiplier of 2.0. The court in

26  *Savaglio* applied a 2.0 multiplier in a wage and hour case due to the skill of counsel, the preclusion of other employment and the risk in undertaking such a case on a contingent basis. The court in *Graham v.*

27  *DaimlerChrysler Corp.*, 34 Cal. 4th 553, 582 (Cal. 2004), held that the trial court may consider results obtained in awarding a fee multiplier. The trial court based the enhancement, in *Graham*, on the contingency of the litigation,

28  the delay in payment and the quality of the result. In *Ketchum*, the court awarded a 2.0 multiplier for the contingency risk and delay in payment. *Ketchum*, 24 Cal. 4th at 1137.

14

1   and interpreter services. On April 4, 2008, costs were taxed in the amount of

2   $45,354.85. The Clerk disallowed "expediter costs for video depositions" and

3   therefore reduced Plaintiffs' request by $2,486.  Plaintiffs may file a Motion to

4   Retax Costs with this Court for the additional amount; however said motion must

5   be filed within five days of the Clerk's decision.

6         In addition to costs already recovered from the Clerk of Court, Plaintiffs

7   request includes costs not taxable under the local rules such as additional

8   photocopying, travel expenses, lodging, car rental and meals, messenger services,

9   postage/Fedex, "Lexis/Westlaw research" and "trial supplies." To support

10  recovery of the additional costs, Plaintiffs cite California state cases permitting

11  recovery of similar costs, if found reasonable by the court. *See e.g. Bussey v.*

12  *Affleck*, 225 Cal. App. 3d 1162, 1163-64 (1990) *abrogated on other grounds by*

13  *Hsu v. Semiconductor Systems, Inc.*, 126 Cal.App.4th 1330 (2005). However,

14  Plaintiffs provide the Court with little to no specificity on the necessity or

15  reasonableness of these costs. Plaintiffs also cite *Keith v. Volpe*, 643 F. Supp. 37,

16  43 (C.D. Cal. 1985), to support its request. The court in *Keith* authorized

17  additional costs because the "documented expenses" were reasonably spent and

18  necessary, and because "declarations submitted by both parties establish that

19  current practice is to bill separately for these expenses." While Plaintiffs cite

20  *Keith* as support, they provide no explanation as to why the additional costs were

21  reasonably spent and necessary. Moreover, in the instant case, parties submit no

22  evidence of a "practice" to bill separately for these expenses. The Court finds

23  these additional costs to be unsupported by evidence. Accordingly, the Court

24  denies Plaintiffs request for additional costs.

25      **F. CONCLUSION**

26        Based on the foregoing discussion, the Court finds that Plaintiffs' requested

27  lodestar of $2,267,514 shall be reduced by $2,220 to adjust Ms. Langan's hourly

28  rate, $2,675 to adjust Messrs. Sirolly and Muzio's hourly rate, $7,290 to adjust

1   Ms. Langan's hourly rate for basic research, $45,350.28 for fees related to block

2   billing, $30,512 for fees related to duplicate work, $29,179.38 for fees related to

3   excessive review of files, and $1,017 for fees related to clerical work. Therefore

4   the above reductions result in a lodestar of $2,149,270.40. Plaintiffs supplement

5   their fee request for hours incurred since the entry of Judgment on February 28,

6   2008. Plaintiffs expended 458.30 hours for this time period. Finding the

7   additional lodestar amount reasonable, the Court adds $194,720 to the above noted

8   lodestar totaling $2,343,990.40. The lodestar added to a 50% enhancement of the

9   lodestar for purposes of the multiplier equals a fees award of $3,515,985.60.

10  **IV.   REQUEST FOR JUDICIAL NOTICE**

11          Plaintiffs cite *Andrea Savaglio et al. v. Wal-Mart Stores, Inc., et al*, 2006

12  WL 3626295 (Cal.Superior) (not reported in Cal. Rptr. 3d) and requests the Court

13  take judicial notice that said case found a lodestar multiplier of 2.0 or higher to be

14  proper in a case similar to the present.

15          Federal Rule of Evidence 201 provides guidelines for when a court may

16  take judicial notice of adjudicative facts. According to the Rule, "[a] judicially

17  noticed fact must be one not subject to reasonable dispute in that it is either (1)

18  generally known within the territorial jurisdiction of the trial court or (2) capable

19  of accurate and ready determination by resort to sources whose accuracy cannot

20  reasonably be questioned." Fed. R. Evid. 201(b). The Rule requires the court to

21  take judicial notice of a fact "if requested by a party and supplied with the

22  necessary information." Fed. R. Evid. 201(c).

23          The Court finds that Rule 201 does not apply to this case and therefore

24  denies Defendant's request for judicial notice. However, the Court advises parties

25  that it has read and reviewed the above cited case.

26

27                              **CONCLUSION**

28          For the forgoing reasons, the Court ORDERS an award of fees to Plaintiffs'

---

16

1    counsel in the amount of $3,515,985.60.

2

3         IT IS SO ORDERED.

4

5    DATED:   October   , 2008          By_____

6                                            CONSUELO B. MARSHALL
                                             UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

**EXHIBIT 8**

1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   CESSY LAUDERDALE, CORNELIO      )   CASE NO.: CV 08-979 ABC (JWJx)
     VERA, and BERTHA DAVIS,         )
12   individually and on behalf of   )   ORDER RE: ATTORNEY FEES AND COSTS
     the class of similarly situated )
13   individuals,                    )
                                     )
14                   Plaintiffs,     )
                                     )
15        v.                         )
                                     )
16   CITY OF LONG BEACH, a public    )
     entity, LONG BEACH POLICE       )
17   DEPARTMENT, a public entity,    )
                                     )
18                   Defendants.     )
     _____)
19

20        Plaintiffs Cessy Lauderdale, Cornelio Vera, and Bertha Davis, on

21   their behalf and on behalf of similarly situated individuals, filed a

22   motion on November 23, 2009, for reasonable attorney's fees and costs

23   following the parties' settlement of this class action lawsuit.

24   Defendants City of Long Beach and the Long Beach Police Department

25   (the "City") opposed on December 14, 2009 and Plaintiffs replied on

26   December 22, 2009.  The Court found this matter appropriate for

27   resolution without oral argument and vacated the January 11, 2010

28   hearing date.  Fed. R. Civ. P. 78; Local Rule 7-15.  Upon

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 100 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 2 of 35
#:825

1    consideration of the parties' papers and the case file, the Court
2    rules as follows.

3    **I.   BACKGROUND**

4       On February 13, 2008, Plaintiffs filed this class action lawsuit
5    against the City, alleging that the City had violated the rights of
6    people who are deaf or hard of hearing who have interacted, currently
7    interact, or will interact with the Long Beach Police Department
8    ("LBPD"), by failing to take appropriate steps to effectively
9    communicate with these individuals. The Complaint sought declaratory
10    and injunctive relief compelling the City to ensure effective
11    communication with individuals who are deaf or hard of hearing through
12    the provision of auxiliary aids and services and proper training of
13    LBPD officers on how to effectively communicate during official
14    interactions.

15       The Complaint and the motion for preliminary approval of the
16    class action settlement set forth the underlying facts in this matter,
17    and the Court need not summarize them here.

18       The parties ultimately entered a Settlement Agreement resolving
19    Plaintiffs' claims under Title II of the Americans with Disabilities
20    Act ("ADA"), Section 504 of the Rehabilitation Act, the Unruh Civil
21    Rights Act (Cal. Civ. Code §§ 51 et seq.), and the Blind and Other
22    Physically Disabled Persons Act (Cal. Civ. Code §§ 54 et seq.). The
23    Agreement provides that, among other relief: (1) the LBPD will take
24    appropriate steps to ensure effective communication with the class
25    through the provision of auxiliary aids and services; (2) the LBPD
26    will implement and follow a policy entitled "Communication with People
27    who are Deaf or Hard of Hearing"; (3) the LBPD will make available
28    Video Relay Service/Video Interpreting equipment at the main LBPD

2

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 101 of 232  Page ID
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 01/11/10  Page 3 of 35
#:920

1 │ station within one year after final approval of the agreement for a
2 │ minimum one-year period; and (4) the LBPD will train personnel on the
3 │ Settlement Agreement and policy.  In the Agreement, the City conceded
4 │ that Plaintiffs were prevailing parties for the purpose of attorney's
5 │ fees.  The parties agreed that Plaintiffs would apply to the Court for
6 │ a determination of the amount of fees.

7 │     Although the parties ultimately reached a settlement, Plaintiffs
8 │ portray the negotiations as unnecessarily drawn out by the City, while
9 │ the City claims the negotiations were protracted by Plaintiffs,
10 │ especially because the City knew that prolonging the matter could
11 │ expose it to more in fees.  In reality, the negotiations fell
12 │ somewhere in the middle.

13 │     Before Plaintiffs filed suit, they sent a tort claims letter to
14 │ the City in early 2007, which the City rejected.  (Parks Decl. ¶ 20.)
15 │ Plaintiffs sent another detailed letter to the City in January 2008,
16 │ which was again rejected by the City.  (Id. ¶ 20, Exs. H, I.)
17 │ Plaintiffs then filed suit in February 2008.

18 │     The Court suggested settlement of the case at a June 16, 2008,
19 │ conference with the parties and the first step to that settlement was
20 │ to negotiate the policy that the City would eventually adopt.  The
21 │ City began the process with the first of three attorneys, Principle
22 │ Deputy City Attorney Belinda Mayes.  (Parks Decl. ¶ 21; Fudge Decl. ¶
23 │ 4.)  But Ms. Mayes left the City Attorney's Office in October 2008 and
24 │ this matter was reassigned to Principal Deputy City Attorney Monte
25 │ Machit, who met with Plaintiffs' counsel on December 15, 2008.  Machit
26 │ informed Plaintiffs' counsel that the matter would be transferred
27 │ again to Deputy City Attorney Randall C. Fudge, who worked on the
28 │ matter from that time to the present.  (Parks Decl. ¶ 22; Fudge Decl.

3

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 102 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 4 of 35
#:327

1  ¶ 8.)  Plaintiffs claim that, during these transitional periods,
2  progress on settlement slowed.

3      Nevertheless, progress was made on the policy by January 2009
4  (which the LBPD began implementing), so the parties turned their
5  attention to the Settlement Agreement itself, setting up a series of
6  four meetings at the City Attorney's office in Long Beach.  (Parks
7  Decl. ¶ 23.)  The preliminary drafts of the agreement exceeded twenty
8  pages and the City objected to several terms, as did Plaintiffs, so "a
9  significant amount of time was expended in re-drafting portions of the
10 Settlement Agreement."  (Fudge Decl. ¶ 8; Parks Decl. ¶ 24, Ex. L
11 (letter from Attorney Fudge noting that the negotiations were "a
12 laborious process involving multiple revisions of a 20-some page
13 agreement.").  Nevertheless, the parties eventually agreed on most of
14 the issues.  (Fudge Decl. ¶ 9.)  The remaining issues were submitted
15 to a five-hour mediation on June 4, 2009, and an agreement on
16 injunctive and declaratory relief was reached in principle and the
17 amount of damages settled on.  (Parks Decl. ¶ 25.)  From October 2008
18 through July 2009, the parties exchanged at least ten drafts of the
19 proposed Settlement Agreement.  (Parks Decl. ¶ 27.)

20     But a final agreement was not immediately forthcoming.  Each side
21 claims that the other sought to change, amend, or renegotiate some of
22 the terms agreed to after the mediation, including aspects of the
23 policy the LBPD had already implemented.  (Compare Parks Decl. ¶ 26
24 ("Although Plaintiffs' counsel believed they had an agreement in
25 principle on the few remaining issues regarding injunctive and
26 declaratory relief at the parties' mediation, Defendants' counsel
27 sought to renegotiate a number of issues that were previously
28 negotiated and agreed upon by the parties.") with Fudge Decl. ¶ 10

4

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 103 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 5 of 35
#:320

1  ("Subsequently, in or about July 2009, Plaintiffs sought to amend the
2  Policy by adding terms to the Policy contained in the Settlement
3  Agreement.").) After much negotiation, the parties finally agreed
4  that the City would issue a supplemental Training Bulletin to LBPD
5  personnel. (Fudge Decl. ¶ 11.)

6       During the course of negotiations up to February 2009, the
7  parties did not engage in discovery, other than a public records
8  request by Plaintiffs before filing the Complaint. (Parks Decl. ¶
9  28.) With discovery cut-off and class certification deadlines looming
10 and no settlement reached, however, Plaintiffs moved forward with some
11 discovery, which they hoped would reveal the extent of the LBPD's
12 policies, procedures, and training, and, as a result, nudge the case
13 closer to settlement. (Parks Decl. ¶ 29.) They served on the LBPD
14 three sets of requests for production, two sets of requests for
15 admissions and interrogatories, and served on the City two sets of
16 requests for production, requests for admissions and interrogatories,
17 and Plaintiffs deposed representatives from the LBPD and the City.
18 (Parks Decl. ¶ 29.) The parties also exchanged correspondence in
19 setting the deposition dates, which were moved several times. (Parks
20 Decl. ¶ 30.) Ultimately, because deadlines were still approaching,
21 Plaintiffs drafted a class certification brief and supporting
22 declarations, although those documents were never filed with the
23 Court. (Parks Decl. ¶ 31.)

24      Having executed the Settlement Agreement and presented it to the
25 Court for approval, Plaintiffs now seek attorney's fees and costs for
26 the work performed. Plaintiffs claim reasonable fees in the amount of
27 $429,282.50 as calculated under the lodestar method, multiplied by 1.5
28 to reflect the inherent risk in the case and the results achieved, for

5

1  a total of $643,923.75. They also seek $10,378.95 in costs and
2  $51,024.50 for the hours expended on the fees motion. The City, on
3  the other hand, claims that Plaintiffs are entitled to no more than
4  $167,340 in attorney's fees and $7,439.79 in costs, but does not
5  dispute that Plaintiffs are entitled to $51,024.50 for the fees
6  motions.

7  **II.  DISCUSSION**

8      Plaintiffs' counsel, the Disability Rights Legal Center (the
9  "DRLC") and the private law firm of Munger, Tolles & Olsen LLP
10  ("MTO"), seek fees and costs under several statutes as the prevailing
11  parties: the ADA, 42 U.S.C. § 12205; the Rehabilitation Act, 29 U.S.C.
12  § 794a(b); the California Disabled Persons Act, Cal. Civ. Code § 55;
13  and Cal. Civ. Code § 1021.5. The lodestar fees they seek (not
14  including fees for the fees motion and costs) are as follows:

15      //
16      //
17      //
18      //
19      //
20      //
21      //
22      //
23      //
24      //
25      //
26      //
27      //
28      //

6

| Attorney | Year of Graduation | Rate | Hours | Amount |
|----------|--------------------|------|-------|--------|
| **DRLC** | | | | |
| Shawna L. Parks | 1999 | $525 | 99.00 | $51,975.00 |
| Sage Reeves | 2001 | $475 | 263.40 | $125,115.00 |
| Tiffany Green | 2005 | $375 | 225.40 | $84,525.00 |
| Matthew Strugar | 2004 | $400 | 9.60 | $3,840.00 |
| Law Clerks | | $165 | 81.80 | $13,497.00 |
| **Subtotal DRLC** | | | 679.20 | $278,952.00 |
| **MTO** | | | | |
| Kristina Wilson | 2006 | $350 | 263.60 | $92,260.00 |
| Bethany Woodard | 2005 | $395 | 118.70 | $46,886.50 |
| Robert Dell Angelo | 1992 | $550 | 9.90 | $5,445.00 |
| Law Clerks/Support Staff | | $65 to $220 | 30.60 | $5,739.00 |
| **Subtotal MTO** | | | 422.80 | $150,330.50 |
| **Total Lodestar** | | | 1102.00 | $429,282.50 |
| **with 1.5 Multiplier** | | | | $643,923.75 |

Generally, a prevailing party "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Barrios v. Cal. Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting and applying standards from Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40 (1983) to ADA claim); see also Armstrong v. Davis, 318 F.3d 965, 970-71 (9th Cir. 2003) (applying standard to ADA and Rehabilitation Act claims); Molski v. Arciero Wine Group, 164 Cal. App. 4th 786, 790, 79 Cal. Rptr. 3d 574, 577-78 (Ct. App. 2008) (interpreting Cal. Civ.

7

1   Code § 55).  The City agreed in the Settlement Agreement that
2   Plaintiffs were "prevailing parties" here, which is consistent with
3   controlling authority  See Barrios, 277 F.3d at 1134 ("Under
4   applicable Ninth Circuit law, a plaintiff 'prevails' when he or she
5   enters into a legally enforceable settlement agreement against the
6   defendant[.]"); see also Estrada v. FedEx Ground Package Sys., Inc.,
7   154 Cal. App. 4th 1, 16-17, 64 Cal. Rptr. 3d 327, 340-41 (Ct. App.
8   2007) (finding that disability class action obtaining awards for 209
9   drivers satisfied the "significant benefit," "public interest," and
10  "large class of persons" requirements of section 1021.5).

11      Once a party is considered "prevailing," the Court must determine
12  the reasonable amount of fees by calculating the "lodestar," which is
13  the number of hours reasonably spent multiplied by a reasonable hourly
14  rate.  Hensley, 461 U.S. at 433, 103 S. Ct. at 1939; Moreno v. City of
15  Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008); Camacho v. Bridgeport
16  Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008).  The lodestar amount is
17  also the touchstone for reasonable fees under California law.  See
18  Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 579, 21 Cal. Rptr.
19  3d 331, 157 (2004).  The lodestar is presumed to provide reasonable
20  fees, but "the district court may, if circumstances warrant, adjust
21  the lodestar amount to account for other factors which are not
22  subsumed within it."  Camacho, 523 F.3d at 978 (quoting Ferland v.
23  Conrad Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)).  To
24  make adjustments following calculation of the lodestar, the Court
25  considers the following factors:

26              (1) the time and labor required, (2) the novelty
               and difficulty of the questions involved, (3) the
27             skill requisite to perform the legal service
               properly, (4) the preclusion of other employment
28             by the attorney due to acceptance of the case, (5)

8

the customary fee, (6) whether the fee is fixed or
contingent, (7) time limitations imposed by the
client or the circumstances, (8) the amount
involved and the results obtained, (9) the
experience, reputation, and ability of the
attorneys, (10) the "undesirability" of the case,
(11) the nature and length of the professional
relationship with the client, and (12) awards in
similar cases.

Morales v. City of San Rafael, 96 F.3d 359, 363-64 & n.8 (9th Cir.
1996) (quoting Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th
Cir. 1975)), amended by 108 F.3d 981, 981 (9th Cir. 1997). The Court
must explain how it reached the ultimate amount of fees awarded,
although that explanation can vary somewhat in its level of detail
depending on the magnitude of the variation from the amount requested
and the amount awarded. See Moreno, 534 F.3d at 1111 (noting that
"the district court can impose a small reduction, no greater than 10
percent - a 'haircut' - based on its exercise of discretion and
without a more specific explanation.").

**A. Lodestar Amount**

Before applying any multiplier requested by Plaintiffs (which the
Court will discuss below), Plaintiffs claim a lodestar of $429,282.50.
(See Parks Reply Decl., Ex. A.)

1. Reasonable Hourly Rates

Reasonable hourly rates are based upon the "prevailing market
rates in the relevant community, regardless of whether plaintiff is
represented by private or nonprofit counsel." Blum v. Stenson, 465
U.S. 886, 895, 104 S. Ct. 1541, 1547, 79 L. Ed. 2d 891 (1984). The
relevant community is the "forum in which the district court sits."
Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997). And the
prevailing rate is the "'rate prevailing in the community for similar
work performed by attorneys of comparable skill, experience, and

9

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 108 of 232 Page ID
#:333
Case 2:08-cv-00979-ABC-JWJ Document 87 Filed 01/11/10 Page 10 of 35 Page ID

 1 │ reputation.'"  Id. at 502 (citation omitted).  "Affidavits of the

 2 │ plaintiffs' attorney and other attorneys regarding prevailing fees in

 3 │ the community, and rate determinations in other cases, particularly

 4 │ those setting a rate for the plaintiffs' attorney, are satisfactory

 5 │ evidence of the prevailing market rate."  United Steelworkers of Am.

 6 │ v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990).

 7 │      Plaintiffs seek fees based upon the following prevailing rates in

 8 │ this District:

 9 │      •    $375/hour for Tiffany Green of DRLC, a 2005 graduate of
   │           University of California, Los Angeles School of Law;
10 │
   │      •    $475/hour for Sage Reeves of DRLC, a 2001 graduate of
11 │           University of California, Davis School of Law;

12 │      •    $525/hour for Shawna L. Parks of DRLC, a 1999 graduate of
   │           Boalt Hall School of Law at the University of California,
13 │           Berkeley;

14 │      •    $400/hour for Matthew D. Strugar of DRLC, a 2004 graduate of
   │           University of Southern California School of Law;
15 │
   │      •    $395/hour for Bethany Woodard of MTO, a 2005 graduate of
16 │           University of Southern California School of Law;

17 │      •    $350/hour for Kristina Wilson of MTO, a 2006 graduate of
   │           Northwestern University School of Law;
18 │
   │      •    $550/hour for Robert Dell Angelo, a partner of MTO and a
19 │           1992 graduate of University of California, Los Angeles
   │           School of Law; and
20 │
   │      •    $165/hour and $220/hour for law clerks at DRLC and MTO,
21 │           respectively.

22 │      Plaintiffs have presented ample evidence that the rates they seek

23 │ are reasonable in the Central District.  Laurence W. Paradis, an

24 │ experienced civil rights litigator and the Executive Director and Co-

25 │ Director of Litigation of Disability Rights Advocates in Berkeley,

26 │ California, testified that he is familiar with the DRLC and its

27 │ attorneys and opined that the rates sought are consistent with market

28 │ rates for attorneys with similar experience in the Southern California

                                    10

1    market, and are consistent with the rates charged by his organization.
2    (Paradis Decl. ¶¶ 6-12.)  Barrett S. Litt, another experienced civil
3    rights litigator, also testified that the rates are in line with the
4    Southern California market, his own experience, and fee awards in
5    similar cases.  (Litt Decl. ¶¶ 26-31.)  Three other experienced civil
6    rights litigators also submitted declarations all attesting that the
7    rates Plaintiffs charge are consistent with market rates in Southern
8    California.  (See Stormer Decl. ¶¶ 8-13; Mann Decl. ¶¶ 15-19; Harris
9    Decl. ¶¶ 12-16.)

10      Indeed, two large law firms in the Los Angeles area - O'Melveny &
11   Myers and Gibson, Dunn & Crutcher - charge similar rates for attorneys
12   with equivalent experience.  In 2008, O'Melveny & Myers charged $450
13   per hour for a 2005 graduate (as compared to the $395 per hour for
14   MTO's Bethany Woodard, also a 2005 graduate) and charged $675 per hour
15   for a 1994 partner (as compared to $550 per hour for MTO partner
16   Robert Dell Angelo, a 1992 graduate).  (Litt Decl. ¶ 21.)  In a case
17   in which Gibson, Dunn & Crutcher partnered with the Los Angeles public
18   interest law firm of Public Counsel, that firm charged $525 per hour
19   for a 2004 graduate and $495 per hour for 2005 graduates.  (Litt Decl.
20   ¶ 23.)  Finally, Mr. Paradis testified that his organization charges
21   $375 per hour for its 2005 graduates and $420 per hour for its 2004
22   graduates.  (Paradis Decl., Ex. A.)[1]

23      Once the prevailing party provides evidence of the prevailing

24

25      [1]Although Mr. Paradis's organization is located in San Francisco,
26   he opined that rates there and in Southern California are similar.
     The City offered no contradictory evidence.  See Bouman v. Block, 940
27   F.2d 1211, 1236 (9th Cir. 1991) (accepting testimony of litigator and
     expert on attorney's fees that market rates in San Francisco and
28   California are similar).

11

1   market rates, "'[t]he party opposing the fee application has the

2   burden of rebuttal that requires submission of evidence to the

3   district court challenging the accuracy and reasonableness of the . .

4   . facts asserted by the prevailing party in the submitted

5   affidavits.'"   Camacho, 523 F.3d at 980 (citation omitted; ellipsis in

6   original).   To carry this burden, the City offers the testimony of

7   Andre Jardini, a legal auditor who provided an audit report on

8   Plaintiffs' fee request, to show that Plaintiffs' counsel's rates are

9   inflated.[2]   He explained:

10              Based on an Incisive Legal Intelligence
               publication entitled "The Survey of Law Firm
11             Economics 2009 Edition", the average hourly
               billing rate for an attorney with 8 to 10 years of
12             experience is $272.   The lower quartile is $212
               and the upper quartile $325.   The average hourly
13             rate for attorneys with five years experience like
               Matthew D. Strugar is $231 an hour and attorneys
14             with two to three years experience like Tiffany
               Green average $186 hourly rate.

15
    (Jardini Decl. ¶ 35.)   The Court does not find Mr. Jardini's position
16
    persuasive.   He does not include copies of the survey he cites and he
17

18

19      [2]Plaintiffs filed objections to the report of Andre E. Jardini in
    support of the City's opposition to the motion for attorney's fees.
20  Plaintiffs claim he is not qualified as an "expert" under Federal Rule
    of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
21  U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).   Generally, under
    Rule 702, the Court acts as a gatekeeper before expert evidence goes
22  to a jury, but "[t]here is less need for the gatekeeper to keep the
    gate when the gatekeeper is keeping the gate only for himself."
23  United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005).   "Thus,
    where the factfinder and the gatekeeper are the same, the court does
24  not err in admitting the evidence subject to the ability later to
    exclude it or disregard it if it turns out not to meet the standard of
25  reliability established by Rule 702."   In re Salem, 465 F.3d 767, 777
    (7th Cir. 2006).   Plaintiffs mostly disagree with the substance of Mr.
26  Jardini's conclusions, which the Court addresses infra as they are
    relevant to the Court's rulings.   To the extent that any part of his
27  testimony does not meet the standard of Rule 702, the Court has not
28  considered it.   The Court overrules Plaintiffs' other objections.

12

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 111 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 13 of 35
#:336

 1 | does not explain the methodology the authors of the survey might have
 2 | used to arrive at the "average" billing rate. The survey could very
 3 | well have included rates that encompassed all types of lawyers from
 4 | solo practitioners to partners at the largest law firms and could have
 5 | covered the entire country. That, of course, runs contrary to the
 6 | requirement that reasonable rates be set at the "'rate prevailing in
 7 | the community for similar work performed by attorneys of comparable
 8 | skill, experience, and reputation.'" See Barjon, 132 F.3d at 500,
 9 | 502.

10 | Mr. Jardini proposes a "blended rate" of $300 per hour, but again
11 | he does not explain how he reached this blended rate, which does not
12 | even seem to correlate with the survey he cited. (Jardini Decl. ¶
13 | 36.) Nor does he cite any legal authority for using a blended hourly
14 | rate, which may not reflect a reasonable rate. Cf. S.E.C. v. Goren,
15 | 272 F. Supp. 2d 202, 208 (E.D.N.Y. 2003) (rejecting use of blended
16 | hourly rate because it "risks under- and over-compensating [attorneys]
17 | for their efforts."). The Court finds this evidence insufficient to
18 | rebut Plaintiffs' proposed rates and concludes that those rates are
19 | reasonable.

20 |         2.    Reasonable Hours Expended

21 | Plaintiffs' counsel spent a total of 1,102 hours litigating this
22 | case (not including hours spent on the fees motion), which Plaintiffs
23 | claim is reasonable. (Parks Reply Decl., Ex. A.)[3] Plaintiffs'
24 | counsel arrived at that number after making discrete deductions from
25 | their hours equal to twenty percent. (Parks Decl. ¶ 33, Ex. A.)

26 |

27 | [3]This number reflects Plaintiffs' subtraction of 4.2 hours from
   | their initial total (3.7 from the hours spent by Tiffany Green and .5
28 | hours spent by Sage Reeves) based on conceded billing errors. (Parks
   | Reply Decl. ¶ 5.)

13

1  Further, eighty percent of the hours expended were spent by attorneys
2  at the associate level (and thus had lower billing rates) and that
3  number increases to ninety percent once support staff and law clerks
4  are included.  (Parks Decl. ¶ 32, Ex. A.)

5                a.    Reduction for MTO's Involvement

6        First, the City argues that all the work done by the MTO
7  attorneys was duplicative and unnecessary, so the 446.70 hours billed
8  by the MTO attorneys should be excluded entirely from the reasonable
9  hours spent on the litigation.  (Jardini Decl. ¶¶ 26-32, 49.)
10  Generally, billed time that includes unnecessary duplication of effort
11  should be excluded from the lodestar.  See Herrington v. County of
12  Sonoma, 883 F.2d 739, 747 (9th Cir. 1989).  Indeed, "courts ought to
13  examine with skepticism claims that several lawyers were needed to
14  perform a task, and should deny compensation for such needless
15  duplication as when three lawyers appear for a hearing when one would
16  do."  Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286
17  (9th Cir. 2004) (internal citations omitted).  Nevertheless, "[c]ommon
18  experience indicates that lawyers often hire other lawyers to help
19  them with specific issues in the case."  Bouman, 940 F.2d at 1236.  Of
20  course, there is some degree of duplication that is necessary in any
21  case, so "the court should defer to the winning lawyer's professional
22  judgment as to how much time he was required to spend on the case;
23  after all, he won, and might not have, had he been more of a slacker."
24  Moreno, 534 F.3d at 1112.

25        Here, MTO's participation was not unnecessarily duplicative.  MTO
26  brought its highly regarded civil litigation practice to the case,
27  relying on its years of experience litigating complex cases to help
28  bring the case to a favorable settlement.  Likewise, the DRLC is

                                14

P109

1  nationally recognized as an expert in the field of disability law and
2  undoubtedly assisted MTO attorneys on understanding the substantive
3  aspects of disability law, which may have reduced, not increased, the
4  number of hours MTO attorneys would have otherwise had to spend to
5  research and understand disability law.  As one DRLC attorney
6  explained, Plaintiffs' counsel employed a "team approach at settlement
7  meetings, leveraging the DRLC's expertise in the subject matter with
8  the litigation skills and resources brought to bear by MTO."  (Parks
9  Reply Decl. ¶ 10.)

10  Mr. Jardini opines that "MTO has used this matter as a training
11  ground for its younger associates to gain experience while providing
12  pro bono work" (Jardini Decl. ¶ 26), but he points to nothing to
13  suggest that the attorneys from MTO lacked competence to participate
14  in the case or that the DRLC attorneys engaged in any sort of
15  "training," apart from the normal supervision one would expect from
16  experts in the substantive law at issue.  In fact, were the City
17  right, Plaintiffs could never have staffed the case appropriately no
18  matter what they did: on the one hand, the City complains that higher-
19  billing attorneys spent too much time on the case (Jardini Decl. ¶ 36
20  (claiming case was staffed in a "top heavy fashion")), but on the
21  other hand the City criticizes the use of lower-billing MTO attorneys
22  for alleged "training" purposes (Jardini Decl. ¶ 26).  Whatever the
23  City believes should have been the proper staffing of the case, "the
24  district court may not set the fee based on speculation as to how
25  other firms would have staffed the case."  Moreno, 534 F.3d at 1114.
26  Thus, the Court finds that a total elimination of the 446.70 hours
27  spent by MTO attorneys on the case is unwarranted.

28  Although MTO's presence was not unnecessarily duplicative as a

15

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 114 of 232   Page ID
Case 2:08-cv-00979-ABC-JWJ   Document 67   Filed 01/11/10   Page 16 of 35
#:339

 1 general matter, Mr. Jardini points to three specific instances where
 2 utilizing multiple attorneys from both firms may have led to some
 3 duplicative work.[4]  First, Mr. Jardini indicates that unidentified
 4 entries from January 23, 2008 to March 14, 2008 of MTO's billing
 5 records[5] indicate that Kristina Wilson spent 16.45 hours drafting the
 6 complaint.  (Jardini Decl. ¶ 28.)  Similarly, unidentified entries
 7 from February 4, 2008 to February 13, 2008, indicate that several DRLC
 8 attorneys also spent approximately 13.3 hours reviewing and revising
 9 the complaint.  (Id.)  The Court does find the 29.75 hours spent on
10 the complaint were likely duplicative.  The DRLC has brought two
11 similar deaf and hard-of-hearing class action cases before this court
12 (Parks Decl. ¶ 9), so they probably could have used at least some part
13 of those prior complaints to save time drafting the complaint in this
14 case.  Yet, a relatively junior MTO attorney (Kristina Wilson, a 2006
15 graduate) spent 12.4 hours from January 23, 2008 to February 4, 2008,
16 before DRLC attorneys seem to have reviewed any part of the draft
17 complaint.  Then another relatively junior DRLC attorney (Tiffany
18 Green, a 2005 graduate) spent two hours reviewing and revising the
19 complaint before she sent it to a more experienced DRLC attorney,
20 Shawna Parks.  And even after that, counsel spent an additional 11.3
21 hours reviewing and revising the complaint.

22

23   [4]Mr. Jardini includes these three specific instances in his
     declaration.  He also created a chart of billing entries that he
24   suggests demonstrates other possible duplicate billing entries.  He
     has not set out the information in a useful way, however, because the
25   Court cannot tell from his list whether the two firms actually
     performed duplicate work.
26

27   [5]A further problem with Mr. Jardini's chart is that he does not
     identify the discrete billing entries he adds together to reach his
28   cumulative totals.  Neither Plaintiffs nor the Court has any way to
     verify the accuracy of each cumulative entry without that information.

16

1   As noted above, the DRLC brings its expertise in disability law
2   to this case – and specifically its experience litigating deaf and
3   hard-of-hearing class actions against municipalities – yet it
4   apparently did not immediately lend that support to the complaint-
5   drafting process, which likely prolonged the entire drafting process.
6   Thus, the Court finds that the 12.4 hours spent by junior MTO
7   associate Kristina Wilson before the DRLC attorneys reviewed the draft
8   complaint was duplicative and unnecessary, as was the two hours DRLC
9   junior attorney Tiffany Green spent before sending it to a more senior
10  DRLC attorney. Although the Court is not entirely convinced that all
11  of the remaining 15.35 hours spent by the two firms were still
12  necessary, the City provides no basis to reduce that number further
13  and the Court will not do so.

14  Second, Mr. Jardini identifies instances where multiple attorneys
15  attended court appearances and depositions, which the City claims were
16  overstaffed. As a general matter, "in an important class action
17  litigation such as this, the participation of more than one attorney
18  does not constitute an unnecessary duplication of effort." Probe v.
19  State Teacher's Retirement Sys., 780 F.2d 776, 785 (9th Cir. 1986).
20  Indeed, having multiple attorneys attend depositions, meetings and
21  settlement conferences allowed counsel to contribute creative
22  solutions, reduced the need for inter-office communications after
23  meetings, and ameliorated disagreements over what actually went on at
24  meetings. (Parks Reply Decl. ¶ 12.)

25  However, one DRLC attorney billed 5.9 hours and two MTO attorneys
26  billed a total of eight hours for attending a deposition on April 27,
27  2009. (Jardini Decl. ¶ 29.) First, the Court has reviewed the actual
28  billing records and they do not appear to correlate to Mr. Jardini's

17

1   entries. The entry for the DRLC attorney on that date reflects 6.10
2   hours billed for attending the deposition, not 5.9, and the entries
3   for the MTO attorneys on that date reflect 6.5 and 3.7 hours billed,
4   for a total of 10.2 hours, not eight hours.[6] Based on the numbers
5   contained in the actual billing records, the Court finds duplicative
6   the 3.7 hours spent by MTO associate Kristina Wilson, when an MTO
7   associate with similar seniority (Bethany Woodard, a 2005 graduate)
8   billed 6.5 hours for the deposition and DRLC attorney Sage Reeves (a
9   2001 graduate) billed 6.1 hours for the deposition. Having one senior
10  attorney and one more junior attorney attend the deposition was
11  plenty; the third junior attorney was excessive.

12      The Court, however, does not find that having two DRLC attorneys
13  and one MTO attorney attend the mediation in this case was
14  duplicative. Both Sage Reeves (again, a 2001 graduate) and Shawna
15  Parks (a 2000 graduate) from DRLC attended the June 4, 2009,
16  mediation, billing a total of 12.6 hours for the time preparing and
17  attending. Kristina Wilson also billed 8.8 hours for preparing for
18  and attending the mediation.[7] First, participation of more than one
19  attorney at a mediation does not automatically constitute an
20  unnecessary duplication of effort. See Kim v. Fujikawa, 871 F.2d
21  1427, 1435 n.9 (9th Cir. 1989). Second, the mediation was far more
22  important in this case than the deposition discussed above. Unlike
23  the deposition, the mediation sat at the very crossroads of the
24

25

26      [6]The Court also notes that the MTO attorneys spent a total of
       17.7 hours preparing for and attending the deposition, but subtracted
27     7.5 hours from that to arrive at 10.2 hours actually billed.

28      [7]Again, Mr. Jardini's calculation of eight hours for Ms. Wilson's
       hours billed was inaccurate based on the billing records.

18

1  resolution of this case. The parties had agreed to some terms of a
2  settlement, but needed a neutral to finalize it. The Court hesitates
3  to second-guess the choice of two senior DRLC attorneys to attend with
4  the assistance of a junior MTO associate, since an agreement may not
5  have been reached if both senior DRLC counsel had not brought to bear
6  their expertise and experience. The Court will not subtract hours on
7  this basis.

8                    b.    Specific Reductions for DRLC Hours

9       The City also seeks to reduce DRLC's hours based on improper
10 billing for overhead, conducting excessive interoffice communication,
11 and for committing errors within its bills.

12      Mr. Jardini identifies 27.05 hours he claims were improperly
13 spent on "overhead," including "calendaring, scheduling and confirming
14 meetings, issues regarding retainer agreements, and electronic
15 filing." (Jardini Decl. ¶ 37.) In some circumstances, "attorneys'
16 fees for administrative and secretarial tasks . . should be considered
17 general overhead to run a law office," and already compensated in the
18 reasonable hourly fee, Eklund v. City of Seattle, No. C06-1815Z, 2009
19 WL 2019119, at *4 (W.D. Wash. July 2, 2009) (citing Keith v. Volpe,
20 644 F. Supp. 1312, 1316 (C.D. Cal. 1986)), but only if that is the
21 billing custom in the relevant market, see Trustees of Constr. Indus.
22 & Laborers Health & Welf. Trust v. Redland Ins. Co., 460 F.3d 1253,
23 1257 (9th Cir. 2006). The City has provided no evidence that this is
24 the practice in the Central District. Thus, the Court cannot subtract
25 these hours on that basis.

26      It is clear, however, that "[i]t is simply not reasonable for a
27 lawyer to bill, at her regular hourly rate, for tasks that a non-
28 attorney employed by her could perform at a much lower cost." Davis

                                    19

 1  v. City & County of San Francisco, 976 F.2d 1536, 1543 (9th Cir.
 2  1992), vacated in part on other ground by 984 F.2d 345, 345 (9th Cir.
 3  1993); see also Redlands Ins. Co., 460 F.3d at 1257. The Court has
 4  reviewed the entries for the hours claimed to be "overhead" or
 5  administrative and finds that most of them, while not models of
 6  billing clarity, arguably require the skills of an attorney to be
 7  performed. For example, on June 14, 2007, Tiffany Green spent three-
 8  tenths of an hour responding to an email from a law clerk "re
 9  questions about Long Beach Case . . . and Section 1983 COA," which
10  certainly entails attorney-level work. Similarly, on December 18,
11  2008, Sage Reeves billed one-tenth of an hour in a telephone
12  conference with the City's counsel Randall Fudge "re scheduling,"
13  which also could require an attorney's experience, especially if the
14  scheduling issue was disputed. On September 21, 2009, Sage Reeves
15  billed two-tenths of an hour for "Legal research re filing with Court
16  re need for settlement conference/extension," which again, is
17  obviously attorney-level work. And several entries reflect work
18  performed by Tiffany Green on retainer agreements, which also entails
19  attorney skill.

20      Not every entry identified needed an attorney to perform it,
21  however. For example, on July 2, 2007, Tiffany Green spent one-tenth
22  of an hour emailing "Cessy Lauderdale - re videophone," which the
23  Court suspects was intended to set up videoconferencing and required
24  no attorney-level skill. On January 25, 2008, Tiffany Green billed
25  .05 of an hour with the entry "Gave to SAC to be mailed off with a
26  check for 20.00," which certainly could have been done by a non-
27  attorney. Similarly, several times Ms. Green simply forwarded
28  electronic notices sent by the Clerk's office when a document is

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 119 of 232  Page ID
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 01/11/10  Page 21 of 35
#:116

1  electronically docketed, yet she charged one-tenth of an hour each
2  time.  On June 3, 2009, Sage Reeves spent .2 of an hour drafting an
3  "email to clients re mediation location and directions," which appears
4  to entail nothing but logistics.  And in September and October of
5  2009, an unidentified attorney by the initials of "M.D." (who the
6  court presumes is Matthew D. Strugar, who bills at $400 per hour)
7  spent half an hour "preparing" to mail declarations and cover letters
8  to the named Plaintiffs, spent .6 of an hour compiling and assembling
9  exhibits for the declaration of Barrett Litt, and spent .9 of an hour
10  compiling documents for the fee motion and settlement approval, none
11  of which required an attorney's skill, and especially not one at $400
12  an hour.

13      Rather than chronicle every improper entry here, the Court has
14  reviewed the entries Mr. Jardini identified as "overhead" and deducts
15  3.65 hours spent on clerical and administrative work that were
16  improperly billed at attorney rates.[8]

17      Next, the City claims that the DRLC attorneys spent an excessive
18  73.5 hours conferring among themselves and an excessive 56.6 hours
19  conferring with MTO attorneys.  Mr. Jardini proposes – without legal
20  authority or factual support – that the 73.5 hours be reduced by half
21  to 36.75 and the 56.6 hours be eliminated entirely.[9]  The Court will

23  [8]The Court notes that, on June 10, 2008, a law clerk billed 6.3
    hours for "Discovery matter: indexed defendant's initial disclosures."
24  That task could have reasonably required the expertise of a law clerk
    or paralegal, especially if some sort of summary or analysis of the
25  documents was required.  Thus, it was compensable at the law clerk
    rate of $165 per hour.

26
    [9]On the hours spent conferring with MTO attorneys, the Court only
27  presumes Mr. Jardini proposes eliminating the hours entirely, based on
    the summary chart included in his declaration (Jardini Decl. ¶ 49)
28                                                              (continued...)

21

P116

Case 2:04-cv-08510-SJO-SS  Document 57   Filed 04/16/10   Page 120 of 232   Page ID
Case 2:08-cv-00979-ABC-JWJ  Document 67   Filed 01/11/10   Page 22 of 35
#:945

1 | not do so.

2 | There is nothing inherently wrong with conferencing with co-
3 | counsel in a case; in fact, "conferences between attorneys to discuss
4 | strategy and prepare for oral argument are an essential part of
5 | effective litigation." McKenzie v. Kennickell, 645 F. Supp. 437, 450
6 | (D.D.C. 1986) ("Such supervision is necessary to avoid wasteful or
7 | disorganized efforts by inexperienced lawyers keeping fee claims
8 | within reasonable bounds."); see also Berberena v. Coler, 753 F.2d
9 | 629, 632-33 (7th Cir. 1985) (finding compensable the hours attorneys
10 | "spent mostly in consultation, negotiation, and on the telephone,"
11 | which "were of key importance to obtaining the consent decree" in the
12 | case). Conferences are especially important in cases like this one,
13 | where more junior attorneys took the laboring oar while more senior
14 | attorneys supervised, because "meetings between junior and senior
15 | lawyers to discuss the progress of research and review completed
16 | assignments are reasonable and appropriate means to secure proper
17 | supervision and efficient staffing of large class actions cases such
18 | as this." McKenzie, 645 F. Supp. at 450.

19 | Moreover, the total number of hours the City complains were
20 | excessively spent on consultation - 130.1 - amounts to just under
21 | twelve percent of the total 1102 hours spent. Given that the parties
22 | conducted only limited discovery, no motion work, and the case settled
23 | before going to trial, it is unremarkable that conferences accounted
24 | for this proportion of time. The City provides no cogent reason why

25 |

26 |

27 | ⁹(...continued)
28 | because his actual testimony in this section of his declaration is
   | unintelligible (Jardini Decl. ¶¶ 43-44).

22

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 121 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 23 of 35
#:940

1   this amount of conferencing was excessive, and the Court finds none.[10]
2   See Prison Legal News v. Schwarzenegger, 561 F. Supp. 2d 1095, 1104
3   (N.D. Cal. 2008) (rejecting request to reduce fees by eight percent
4   for excessive conferences because "Defendants have provided no
5   evidence or argument that any conference was excessive or
6   duplicative.").

7       Next, the City points out several entries it claims are the
8   result of duplicative billing errors and requests a reduction of 10.3
9   hours.  The DRLC attorneys conceded that 3.7 hours were billed by
10  Tiffany Green in error and half an hour was billed by Sage Reeves in
11  error (and those deductions are already reflected in the 1102 hours
12  sought by Plaintiffs).  They argue that the other entries were correct
13  for a simple reason: the same attorney can work on the same task at
14  two separate times in a single day.  Indeed, all the remaining
15  "errors" that Mr. Jardini points out appear to fall within that
16  category, and, in some instances, even reflect different amounts of
17  time spent on the same task.  The Court finds Plantiffs' explanation
18  reasonable and will not deduct the remaining 6.1 hours from the total
19  hours spent.

20      Finally, the City argues that the DRLC spent an excessive number
21  of hours drafting the settlement agreement in this case, which Mr.
22  Jardini calculates at 46.4 hours.  Mr. Jardini instead suggests that
23  the proper number should be twenty-four hours because the settlement
24  in this case was similar to the settlement agreement in a similar case
25  litigated before this Court.  See Valenzuela v. County of Los Angeles,

26
    _____

27      [10]Even the City's own expert, Mr. Jardini, opined in another case
    that conferences among co-counsel are not unreasonable, but beneficial
28  to a case.  (Parks Reply Decl., Ex. E at 7-8.)

23

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 122 of 232  Page ID
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 01/11/10  Page 24 of 35
#:947

1 | No. CV 02-902 ABC (JWJx).

2 |     The Court rejects the request for several reasons.  First, Mr.
3 | Jardini provides no explanation of how he arrived at the 46.4 hours,
4 | so the Court cannot tell whether that number accurately reflects only
5 | hours spent on drafting, or included hours spent on any other tasks
6 | related to the settlement agreement, such as research, conferences,
7 | consultation with clients, etc., and these tasks were obviously unique
8 | to this case.  Second, while Mr. Jardini suggests that the hours were
9 | excessive because the DRLC attorneys could have simply copied portions
10 | of the settlement agreement in <u>Valenzuela</u>, Plaintiffs submit a
11 | detailed declaration from DRLC attorney Shawna Parks explaining that
12 | the negotiations over the contents of the settlement agreement here
13 | reflected "the needs of this case, including operational aspects of
14 | the LBPD, the specific problems encountered by people who are deaf or
15 | hard of hearing and who have interacted with the LBPD, and advances in
16 | technology since the <u>Valenzuela</u> settlement."  (Parks Reply Decl. ¶ 6.)
17 | The Court has reviewed the two agreements and notes that the
18 | settlement agreement here was not simply a carbon copy of the
19 | settlement in <u>Valenzuela</u> and it is unsurprising that the parties spent
20 | a substantial amount of time finalizing it.  (Parks Reply Decl. ¶¶
21 | 7-9.)  Thus, the Court declines to subtract any hours for this work.

22 |                 c.   Total Hours Deducted

23 |     The Court concludes that Plaintiffs reasonably spent 1080.25
24 | hours on the case, which reflects the following deductions from
25 | Plaintiffs' proposed 1102 hours:

26 |         •    - 12.4 hours spent by MTO associate Kristina Wilson on
               drafting the complaint;
27 |
28 |         •    - 3.7 hours spent by MTO associate Kristina Wilson to
               prepare for and attend the April 27, 2009, deposition;

24

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 123 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 25 of 35
#:848

1    •    – 2 hours spent by DRLC attorney Tiffany Green on the
          complaint; and

2    •    – 3.65 hours spent as clerical and administrative work, 1.45
          of which was billed by Tiffany Green, .2 billed by Sage
3         Reeves, and two of which were billed by attorney Matthew D.
          Strugar.
4

5         4.    Total Lodestar Amount

6         Based on the above analysis, the Court calculates the lodestar

7    amount as \$421,458.75, which is broken down as follows:

| Attorney | Year of Graduation | Rate | Hours | Fees | Notes |
|---|---|---|---|---|---|
| **DRLC** | | | | | |
| Shawna L. Parks | 1999 | \$525 | 99.00 | \$51,975.00 | |
| Sage Reeves | 2001 | \$475 | 263.20 | \$125,020.00 | Reflects .2 hour reduction |
| Tiffany Green | 2005 | \$375 | 221.95 | \$83,231.25 | Reflects 3.45 hour reduction |
| Matthew Strugar | 2004 | \$400 | 7.60 | \$3,040.00 | Reflects 2 hour reduction |
| Law Clerks | | \$165 | 81.80 | \$13,497.00 | |
| **Subtotal DRLC** | | | 673.55 | \$276,763.25 | |
| **MTO** | | | | | |
| Kristina Wilson | 2006 | \$350 | 247.50 | \$86,625.00 | Reflects 16.1 hour reduction |
| Bethany Woodard | 2005 | \$395 | 118.70 | \$46,886.50 | |
| Robert Dell Angelo | 1992 | \$550 | 9.90 | \$5,445.00 | |
| Law Clerks/Support Staff | | \$65 to \$220 | 30.60 | \$5,739.00 | |
| **Subtotal MTO** | | | 406.70 | \$144,695.50 | |
| **Total Lodestar** | | | 1080.25 | \$421,458.75 | |

**B.    Use of a Multiplier**

Plaintiffs seek to apply a multiplier of 1.5 to the lodestar
amount under California law "to account for the contingent risk of the
litigation and the extraordinary results achieved." Even though a
multiplier is not available under federal fee-shifting statutes based

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 124 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 26 of 35
#:941

1    upon the contingency nature of a case, the Ninth Circuit has held that
2    when a plaintiff is entitled to fees for both federal and California
3    state claims, a federal court may apply a contingency multiplier under
4    California law. See Mangold v. Cal. Pub. Util. Comm'n, 67 F.3d 1470,
5    1478–79 (9th Cir. 1995).[11] To determine whether a multiplier is
6    appropriate, the Court considers factors similar to those considered
7    under federal law, such as "the novelty and difficulty of the issues
8    presented, the quality of counsel's services, the time limitations
9    imposed by the litigation, the amount at stake, and the result
10   obtained by counsel." City of Oakland v. Oakland Raiders, 203 Cal.
11   App. 3d 78, 83, 249 Cal. Rptr. 606, 609 (Ct. App. 1988).

12       While this case involves important issues and Plaintiffs obtained
13   substantial relief, Plaintiffs are not entitled to a multiplier.  The
14   case was not particularly difficult, given that the parties never
15   needed to litigate applicable legal standards and the city all but
16   conceded liability at the outset of the lawsuit.  Likewise, the DRLC
17   has reached settlements in at least two other similar cases against
18   municipalities.  (Parks Decl. ¶ 9.)  Furthermore, the lion's share of
19   the work in this case was spent on negotiating a settlement agreement.
20   Negotiations began early in the case and enabled the parties to avoid

21

22   [11]Even under federal fee-shifting statutes, the Court may adjust
     the lodestar in light of additional considerations, including the
23   results obtained. Hensley, 461 U.S. at 434.  However, a "strong
     presumption" exists that the lodestar figure represents a "reasonable
24   fee" and should be enhanced only in "rare and exceptional cases."
     Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478
25   U.S. 546, 565 (1986).  To overcome the strong presumption that the
     basic fee is reasonable, the fee applicant bears the burden of coming
26   forward with "specific evidence" that the lodestar amount is
     unreasonably low.  See Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d
27   1041, 1045 (9th Cir. 2000) (citing Delaware Valley, 478 U.S. at 565).
     This showing must be based on factors not already subsumed in the
28   lodestar calculation.  Id.

26

1   motion work and most discovery. Counsel was certainly well-equipped
2   to bring the case to a favorable resolution for Plaintiffs and the
3   class, but the reasonable hourly rates to which Plaintiffs' attorneys
4   are entitled more than adequately account for the quality of counsel's
5   representation. See Morales, 96 F.3d at 363-64 (noting that the Court
6   may adjust lodestar figure "on the basis of the Kerr factors that are
7   not already subsumed in the initial lodestar calculation."). The
8   Court also appreciates that Plaintiffs' counsel may have had to forego
9   some other clients to pursue this case, but once again that fact is
10  adequately reflected in the lodestar amount. See id.

11      Plaintiffs cite Beasley v. Wells Fargo Bank, 235 Cal. App. 3d
12  1407, 1419, 1 Cal. Rptr. 2d 459, 466 (Ct. App. 1991), overruled on
13  other grounds by Olson v. Auto. Club of S. Cal., 42 Cal. 4th 1142,
14  1151, 74 Cal. Rptr. 3d 81, 87 (2008), to argue that the purpose of
15  using a contingency risk multiplier "is to compensate for the risk of
16  loss generally in contingency cases as a class," (emphasis in
17  original), and such a risk is present in disability class action cases
18  (Parks Decl. ¶¶ 34-37; Stormer Decl. ¶ 15). Yet, the DRLC has brought
19  several cases involving deaf or hard-of-hearing individuals against
20  public entities and those cases have settled, suggesting the risks in
21  these specific types of cases are not so high that a multiplier is
22  necessary to assure class action plaintiffs obtain representation.[12]

23      The Court has already calculated the lodestar amount at over
24  $400,000, more than twice the amount of fees to which the DRLC agreed
25  in the Valenzuela case. The Court recognizes that the settlement here

26
27  [12]The Court notes as well that the lodestar amount of fees,
    including any enhancement, assessed against the City would fall on the
28  taxpayers. See Serrano v. Priest, 20 Cal. 3d 25, 49, 141 Cal. Rptr.
    315, 328 (1977).

27

1 was harder-fought than the one in <u>Valenzuela</u> and some of the issues
2 raised in this case were different from those in <u>Valenzuela</u>, but those
3 differences are adequately reflected in the lodestar. Applying a
4 multiplier on top of that is unwarranted.

## C. Reasonable Costs

6 Plaintiffs also seek reimbursement for costs expended in the
7 litigation in the amounts of $2,367.25 to the DRLC and $8,011.70 to
8 MTO. (Parks Decl., Ex. A.) The City does not dispute that Plaintiffs
9 are entitled to costs generally. <u>See</u> 42 U.S.C. § 12205; Cal. Code
10 Civ. Proc. § 1032(b). Nor does the City dispute that the DLRC should
11 recover the full $2,367.25 it seeks. Thus, the Court awards the DRLC
12 its full $2,367.25 in costs.

13 The City does dispute the amount sought by MTO, however.[13] Mr.
14 Jardini identifies two possible duplicate entries on the costs billing
15 records submitted by MTO: (1) a duplicate charge of $30 for a filing
16 fee on June 25, 2008; and (2) a duplicate charge on March 10, 2009,
17 for a court reporter for a deposition to occur on April 27, 2009. As
18 to the first charge, it appears that the entries were not for "filing
19 fees," but each was for a "Certified Case Records Request" to the
20 Superior Court. It is possible that these two entries are not
21 duplicates, but two separate requests. But Plaintiffs were unable to
22 respond to the City's argument because they belatedly filed a notice
23 of errata and supplemental submission to which the City appropriately
24 responded after briefing had otherwise concluded. Therefore, the

25

26 [13]In their initial request, Plaintiffs omitted the itemized list
of costs for MTO. Following the City's filing of its opposition,
27 Plaintiffs recognized the error and filed an errata including the
missing information. The City then filed a supplemental declaration
28 from Mr. Jardini analyzing the costs.

28

Case 2:04-cv-08510-SJO-SS  Document 57   Filed 04/16/10   Page 127 of 232   Page ID
Case 2:08-cv-00979-ABC-JWJ   Document 67   Filed 01/11/10   Page 29 of 35
#:352

1 | Court accepts the City's explanation and subtracts $30 from MTO's
2 | costs.

3 |     MTO's costs billing records also include a duplicate charge for a
4 | court reporter at a deposition on April 27, 2009.  MTO's records
5 | reflect that Kristina Wilson paid $1,143.22 to Barkley Court Reporters
6 | on March 10, 2009, in advance of a deposition scheduled on April 27,
7 | 2009.  A second entry on July 23, 2009, reflects that MTO attorney
8 | Bethany Woodard also paid $1,143.22 to Barkley Court Reporters for a
9 | deposition on April 27, 2009.  Both entries share the same invoice
10 | number of 368523 and nothing in the entries indicates that they were
11 | intended to be separate payments.  Again, because Plaintiffs' notice
12 | of errata and the City's response came after the close of briefing and
13 | Plaintiffs provided no explanation of the duplication, the Court can
14 | only conclude that these entries were in fact duplicative.  Thus, the
15 | Court subtracts $1,143.22 from MTO's costs and awards a total of
16 | $6,838.48 in costs expended by MTO.[14]

17 | //
18 | //
19 | //
20 | //
21 | //
22 | //
23 | //

24 |

25 |     [14]Mr. Jardini also renews his opinion that MTO's involvement in
26 | the case was unnecessary and duplicative, and therefore subtracts
   | costs from MTO's costs billing records to arrive at a total of
27 | $5,072.54.  For the reasons discussed supra, the Court rejects his
   | position that MTO attorneys were entirely unnecessary to the case and
28 | declines to subtract any costs on that basis.

29

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 128 of 232   Page ID
Case 2:08-cv-00979-ABC-JWJ   Document 67   Filed 01/11/10   Page 30 of 35
#:863

1    //

2    //

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 129 of 232   Page ID
Case 2:08-cv-00979-ABC-JWJ   Document 67   Filed 01/11/10   Page 31 of 35
#:354

1    **C.   Fees for the Fees Motion**

2        Plaintiffs also seek fees for the time spent on the fees motion:

| Attorney | Year of Graduation | Rate | Hours | Fees |
|---|---|---|---|---|
| DRLC | | | | |
| Shawna L. Parks | 1999 | $525 | 35.10 | $18,427.50 |
| Matthew Strugar | 2004 | $400 | 21.50 | $8,600.00 |
| Subtotal DRLC | | | 56.60 | $27,027.50 |
| MTO | | | | |
| Kristina Wilson | 2006 | $350 | 23.80 | $8,330.00 |
| Bethany Woodard | 2005 | $395 | 36.60 | $14,457.00 |
| Robert Dell Angelo | 1992 | $550 | 2.20 | $1,210.00 |
| Subtotal MTO | | | 62.60 | $23,997.00 |
| | | | | |
| Total Requested | | | 119.2 | $51,024.50 |

The City does not dispute that Plaintiffs may recover fees for
work done in litigating attorney's fees. See, e.g., Thompson v.
Gomez, 45 F.3d 1365, 1366 (9th Cir. 1995). The City also does not
dispute the amount presented by Plaintiffs of $27,027.50 for DRLC
attorneys and $23,997.00 for MTO attorneys, for a total of $51,024.50.

The Court nevertheless feels compelled to reduce the amount of
fees incurred on the fees motion by 10% for time spent on a frivolous
dispute over the date of the hearing on this motion. The Court may,
in its discretion, shave up to 10% off the fees sought without
reviewing and commenting on billing records entry-by-entry. See In re
Smith, 586 F.3d 1169, 1174 (9th Cir. 2009); Moreno, 534 F.3d at 1112.
That includes deducting excessive hours spent on a fees motion. See
Anderson v. Dir., Office of Workers Compensation Programs, 91 F.3d
1322, 1325 (9th Cir. 1996).

31

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 130 of 232  Page ID
Case 2:08-cv-00979-ABC-JWJ  Document 67  Filed 01/11/10  Page 32 of 35
#:995

1    Plaintiffs originally filed this motion on November 23, 2009 and
2  noticed the hearing for December 14, 2009.  On December 1, 2009, the
3  parties filed a stipulation with the Court purporting to move that
4  hearing date.  The stipulation did not clearly indicate which party
5  drafted it (the document contained the City's counsel's caption, but
6  the docket indicates that Plaintiffs' counsel filed it), but it was so
7  deficient that the Court not only denied it, but made clear its
8  displeasure with the parties' failures.  (Docket No. 55.)  The Court
9  did, however, grant the parties the opportunity to refile it properly.

10    That should have been the end of the matter.  But apparently the
11  parties could no longer agree on the new hearing date, due in no small
12  part to the Plaintiffs' obstinance.  (See Docket No. 56.)  To protect
13  its interests in opposing the fees motion, on December 4, 2009, the
14  City filed an ex parte application to set the new hearing date.  In
15  response, Plaintiffs' counsel filed a notice of non-opposition.  They
16  claimed the City acted prematurely in filing the ex parte application,
17  but the City was right to act promptly, as the Court had already
18  pointed out that the City missed the previous deadline to file its
19  opposition to the fees motion, which could have resulted in forfeiture
20  of any chance to oppose.  (See Docket No. 55.)  Plaintiffs never
21  provided a good explanation as to why they had not simply worked with
22  the City's counsel to file a new stipulation.  The Court finds that
23  the work spent on this motion practice - which the Court calculates at
24  approximately 10% of the total work done on the fees motion - was
25  unnecessary and unreasonable.

26    Moreover, even if the motion work were not unnecessary, the hours
27  spent on it were grossly excessive.  The Court need not - and will not
28  - chronicle every excessive hour, but a few entries are worth noting.

32

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 131 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 33 of 35
#:868

1    For example, on December 7, 2009, the date the non-opposition to the
2    ex parte application was filed, MTO associate Kristina Wilson spent
3    2.6 hours, for a total cost of $910, drafting the "notice of non-
4    opposition to defendant's ex parte application to continue hearing
5    dates; revise and file notice of non-opposition to defendants' ex
6    parte motion to continue hearing dates." On the same date, MTO
7    attorney Bethany Woodard also spent some part of one hour, at a cost
8    of $395, conferencing regarding the non-opposition, as well as
9    revising a draft of it. And then DRLC attorney Shawna Parks spent .4
10   hours, at a cost of $210, "receiv[ing] and review[ing] draft non-opp
11   to briefing schedule on fees motion, edits to same." The Court can
12   conceive of no justification for spending four hours at a total cost
13   of over $1,500 on a document that should have been one line (maybe two
14   if Plaintiffs felt compelled to explain their position) indicating
15   Plaintiffs did not oppose the City's request.

16        Similarly, MTO attorneys spent 3.6 hours on December 4, 2009, at
17   a cost of $1,350, conferencing with each other and with opposing
18   counsel, and researching the law on ex parte applications. Again, the
19   Court can identify no reason why MTO associates spent nearly four
20   hours discussing and researching the ex parte application that asked
21   for relief that Plaintiffs had previously agreed to.

22        The Court has reviewed the billing records for the motion work
23   and concludes that a 10% reduction from Plaintiffs' requested fees on
24   the fees motion is warranted, for a total reasonable award of
25   $45,922.05. Of that, $24,324.75 goes to MTO and $21,597.30 goes to

26

27

28

33

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 132 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 34 of 35
#:667

1  the DRLC, which is proportionate to each firm's share of the original

2  total fee amount requested.[15]

3  **III. CONCLUSION**

4      Based on the above analysis, the Court finds that Plaintiffs are

5  the prevailing parties entitled to reasonable attorney's fees and

6  costs.  The Court further finds that Plaintiffs' counsel's hourly

7  rates are reasonable and, after taking the deductions from the total

8  hours as noted above, finds the hours spent were reasonable.  The

9  Court denies Plaintiffs' request to apply a multiplier.  The Court

10 also awards reasonable costs to Plaintiffs, except those deducted

11 above, and awards Plaintiffs the fees spent in connection with the

12 fees motion with a 10% reduction.  Thus, the Court AWARDS Plaintiffs

13 the reasonable fees and costs in the amount of $476,586.53, which

14 breaks down as follows:

| DRLC Lodestar Fees | $276,763.25 | | MTO Lodestar Fees | $144,695.50 |
|---|---|---|---|---|
| DRLC Fees on Fees | $21,597.30 | | MTO Fees on Fees | $24,324.75 |
| DRLC Costs | $2,367.25 | | MTO Costs | $6,838.48 |
| | | | | |
| DRLC Total | $300,727.80 | | MTO Total | $175,858.73 |
| | | | | |
| | | | | |
| Total Award | $476,586.53 | | | |

        //

        //

        //

        //

        //

---

[15]In other words, MTO's share of the original $51,024.50 was
$27,027.50, or 53%, and the DRLC's share was $23,024.50, or 47%.  The
Court has used those same proportions to determine the reduced award
for each firm.

34

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 133 of 232 Page ID
Case 2:08-cv-00979-ABC-JWJ Document 67 Filed 01/11/10 Page 35 of 35
#:658

1    Plaintiffs are ordered to lodge with the Court **within 10 days of**

2  **the date of this Order** a proposed order that reflects the Court's

3  ruling.[16]

4    **IT IS SO ORDERED.**

5                                          Audrey B. Collins

6  DATED: January 11, 2010    _____
                                      AUDREY B. COLLINS
7                              UNITED STATES DISTRICT CHIEF JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    [16]In conjunction with this Order, the Court has also signed the
25  proposed Order granting preliminary approval of the class action
    settlement and class certification. The parties should treat this
26  Order as triggering paragraphs 9 and 10 of that Order for issuing
    class notice, for filing any counsel objections, and for calculating
27  the hearing date on the final approval of the settlement,
    notwithstanding the Court's request here that Plaintiffs file a
28  conforming proposed order on the attorney's fees and costs award.

**EXHIBIT 9**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE SEATTLE AFFILIATE OF THE OCTOBER 22ND COALITION TO STOP POLICE BRUTALITY, REPRESSION AND THE CRIMINALIZATION OF A GENERATION, an unincorporated association,<br><br>    Plaintiff-Appellant,<br><br> v.<br><br>CITY OF SEATTLE, ET AL.,<br><br>    Defendants-Appellees. | **No. 06-35597**<br><br>D.C. No. CV-04-00860-RSL<br>Western District of Washington, Seattle<br><br>**APPELLANT COALITION'S APPLICATION FOR ATTORNEY'S FEE AND MEMORANDUM IN SUPPORT** |

**INTRODUCTION**

On December 12, 2008, in a published decision, this Court reversed

the United State District Court for the Western District of Washington's

decision regarding the facial constitutionality of Seattle Municipal Code

Ordinance 11.25.020 ("Parade Ordinance") and held that the Parade

Ordinance violated the First Amendment to the United States Constitution.

*See Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality,*

*Repression and the Criminalization of a Generation v. City of Seattle, et al.,*

-- F.3d -- (9th Cir. 2008), 2008 WL 5192062 (9th Cir. Dec. 12, 2008).  The

City of Seattle did not file a petition for panel rehearing or for rehearing en

banc.  On January 5, 2009, this Court issued the Mandate in this case.  *See*

(Mandate Jan. 5, 2009).  The Appellant, The Seattle Affiliate of the October

22nd Coalition to Stop Police Brutality, Repression and the Criminalization

of a Generation (the "Coalition") makes a timely request for an attorney's

fee.  *See* Affidavit of Michael K. Ryan in Support of the Coalition's

Application for Attorneys' Fees ("Ryan Aff."), ¶ 3.

The Coalition, respectfully requests an attorney's fee on appeal as

detailed in the Ryan Affidavit and submits this memorandum in support of

this request pursuant to FRAP 39 and Ninth Cir. R. 39-1.6.  An attorney's

fee is authorized by 42 U.S.C. § 1988(b), as this case was brought under 42

U.S.C. § 1983.  The fee requested by the Coalition is for a reasonable

number of hours at a reasonable hourly rate.  Ryan Aff. ¶¶ 5,6, 7 & 14.

### FACTUAL BACKGROUND

On April 15, 2004, the Coalition commenced a lawsuit in the Western

District of Washington alleging, *inter alia*, that the Parade Ordinance was

facially unconstitutional because it vested unbridled discretion to the Seattle

Police Department.  The Coalition also brought claims that certain events

that occurred at the Coalition's October 22, 2003 march violated the First

Amendment and due process as applied.  *See* ER at 1-11 (Amended

2

Complaint).  The Coalition brought its claims under 42 U.S.C. § 1983 and

requested fees under 42 U.S.C. § 1988.  *Id.*

Ultimately, the parties settled the Coalition's as applied claims.  As

part of that settlement, the parties agreed that only claims for attorneys' fees

beginning on or after April 22, 2006 that specifically related to this appeal

survived the settlement agreement.  Ryan Aff. ¶¶ 4 & 5.  Accordingly, the

Coalition only seeks fees related to this appeal.

## LEGAL ARGUMENT

"In any action or proceeding to enforce a provision of [Section 1983]

… the court, in its discretion, may allow the prevailing party, other than the

United States, a reasonable attorney's fee as part of the costs" of having to

secure its rights secured by that Section.  42 U.S.C. § 1988(b); *see also*

*Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Ballen v. City of Redmond*, 466

F.3d 736, 745-46 (9th Cir. 2006).  "'The purpose of § 1988 is to ensure

effective access to the judicial process for persons with civil rights

grievances.  Accordingly, a prevailing party plaintiff should ordinarily

recover an attorney's fee unless special circumstances would render such an

award unjust.'"  *Ballen* at 746 (quoting *Hensley*); *see also Mendez v. County*

*of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008) ("Congress' intent

in enacting § 1988 was to attract competent counsel to prosecute civil rights

3

cases, where 'victims cannot afford to purchase legal services at the rates set

by the private market.'") (quoting *City of Riverside v. Rivera*, 477 U.S. 561,

576 (1986) (plurality opinion)). It is on this basis that the Coalition seeks an

attorney's fee.

## A.     The Coalition is the "Prevailing Party".

In order to be considered a "prevailing party" for the purposes of

Section 1988(b), this Court has held the ultimate decision in the case must

"materially alter[] the legal relationship between the parties by modifying

the defendant's behavior in a way that directly benefits the plaintiff[.]"

*Fischer v. SJD-P.D. Inc.*, 214 F.3d 1115, 1118 (9th Cir. 2000) (quotation

omitted). The Coalition meets the "prevailing party" standard.

First, the Coalition is an activist group that annually conducts protest

marches in Seattle and was thus (and would have been) subject to the Parade

Ordinance on an annual basis. Second, because this Court has held that the

Parade Ordinance is unconstitutional on its face under the First Amendment,

the City of Seattle will have to modify its behavior an develop a

constitutionally acceptable parade ordinance, which directly benefits the

Coalition (as well as other groups who seek to march on the streets of

Seattle). Accordingly, the Coalition is the "prevailing party" and is entitled

to a reasonable attorney's fee. *See, e.g., NAACP, Western Region v. City of*

4

*Richmond*, 743 F.2d 1346, 1358 (9th Cir. 1984) (holding that because "[t]he

NAACP and ACLU have successfully challenged the Richmond parade

ordinance" under a facial First Amendment challenge, they were entitled to a

reasonable attorney's fee); *see also Ballen* at 746 (upholding district court's

award of $165,508 in fees in First Amendment commercial speech case).[1]

## B.    The Amount Requested is Reasonable.

In this Circuit, "the customary method of determining the permissible

amount of attorneys' fees under § 1988 is the 'lodestar' method." *Ballen* at

746. This method multiplies the number of hours worked by the prevailing

party by a reasonable hourly rate. *Id.* Once this number is established,

"courts then assess whether it is necessary to adjust the <u>presumptively</u>

<u>reasonable</u> lodestar figure on the basis of twelve factors." *Id.* (emphasis

added).[2] This Court has cautioned, however, that "only in rare

circumstances should a court adjust the lodestar figure" because of its

---

[1] The "special circumstances" exception to Section 1988 is not applicable here. That exception is invoked only in "unusual cases" where the party opposing the fee award can demonstrate that the balance of equities favors the denial of fees. *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1126 (9th Cir. 2008).

[2] Those twelve factors include: (1) the time and labor required, (2) the difficulty of the questions involved, (3) the skill required to perform the legal services, (4) the preclusion of other employment by the attorneys accepting the case, (5) the customary fee charged by the attorney, (6) whether the fee is fixed, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the relationship with the client, and, (12) awards in similar cases. *Ballen* at 746 (quotations and citations omitted).

5

presumptive reasonableness. *Id.*

As set forth in the Ryan Affidavit, the hours expended by the
attorneys on this appeal were necessary and the rates applied are reasonable
for similar cases. Ryan Aff. at ¶¶ 5, 6, & 14. The number of hours
expended on this appeal were necessary given the complexity of the First
Amendment issues involved, which included reviewing and understanding
numerous cases that are often long in length, and the necessity of
understanding the extensive factual record. *Id.* at ¶¶ 6 & 14. The rates that
have been submitted are consistent with rates that are normally charged by
K&L Gates attorneys, or other attorneys with similar experience, in Seattle
for similar constitutional cases. *Id.* at ¶¶ 5 & 14. In addition, given that the
Court has ruled that the Parade Ordinance is facially unconstitutional and
therefore invalid, the benefits achieved not only inure to the Coalition but to
the public as a whole. *Morales v. City of San Rafeal*, 96 F.3d 359, 365 (9th
Cir. 1996) (holding that in determining reasonableness of amount of award,
courts should consider benefit to both plaintiff and general public).
Accordingly, the Coalition respectfully requests that the Court award it an
attorney's fee award of $131,086.00 for this appeal.

///

///

6

## CONCLUSION

For the foregoing reasons, the Coalition respectfully requests that this

Court award it $131,086.00 in fees associated with this appeal.

DATED this 8th day of January, 2009

K&L GATES


s/Michael K. Ryan
Michael K. Ryan
Ryan Drew Redekopp
925 Fourth Ave., Suite 2900
Seattle, WA 98104
Phone: (206) 623-7580
Fax:   (206) 623-7022
michael.ryan@klgates.com
ryan.redekopp@klgates.com

On Behalf of the American Civil
Liberties Union of Washington

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
By: Sarah Dunne
705 Second Avenue, Suite 300
Seattle, WA 98104
Phone: (206) 624-2184
Fax: (206) 624-2190
dunne@aclu-wa.org

Attorneys for Plaintiff/Appellant the
Seattle Affiliate of the October 22nd
Coalition to Stop Police Brutality,
Repression and the Criminalization of
a Generation

7

## Certificate of Service When <u>Not</u> All Case Participants are CM/ECF Participants

I hereby certify that on January 8, 2009, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have served the foregoing document by legal messenger to the following non-CM/ECF participants:

    Carlton Seu
    On behalf of Tom Carr
    Seattle City Attorney
    600 Fourth Ave., 4th Floor
    Seattle, Washington  98124

s/Joani Radenich
Joani Radenich

8

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE SEATTLE AFFILIATE OF THE OCTOBER 22ND COALITION TO STOP POLICE BRUTALITY, REPRESSION AND THE CRIMINALIZATION OF A GENERATION, an unincorporated association,<br><br>               Plaintiff-Appellant,<br><br>   v.<br><br>CITY OF SEATTLE, ET AL.,<br><br>            Defendants-Appellees. | **No. 06-35597**<br><br>D.C. No. CV-04-00860-RSL<br><br>**AFFIDAVIT OF MICHAEL K. RYAN IN SUPPORT OF THE COALITION'S APPLICATION FOR AN ATTORNEY'S FEE** |

MICHAEL K. RYAN declares as follows:

1.    I am over the age of 18 years, and I am competent to testify to the information contained herein based on my personal knowledge. I am an attorney for Plaintiff-Appellant, The October 22nd Coalition to Stop Police Brutality, Repression and the Criminalization of a Generation ("Coalition") and have personal knowledge of this case.

///

///

///

K:\2999959\01981\20919_MR\20919P21ND

2.     The undersigned and Ryan Drew Redekopp of K&L Gates LLP
(formerly, Preston, Gates & Ellis LLP) (both K&L Gates LLP and Preston,
Gates & Ellis hereafter referred to collectively as "K&L Gates"), represented
the Coalition in this litigation, and specifically on this appeal.  K&L Gates
was assisted on this appeal by Aaron Caplan, formerly a staff attorney with
the ACLU of Washington.  Additional limited assistance was provided by
the following K&L Gates attorneys:  Alex Wagner, Haley Krug, James H.
Curtis, Suzanne Thomas, Cabrelle Abel, Matthew J. Segal, and Samuel R.
Castic.  Additional support was provided Jeff VerHoef, a paralegal, and
members of K&L Gates' library staff.

3.     **Timeliness of Request.**  Pursuant Ninth Circuit Rule 39-
1.6(b)(3), the undersigned attests that this attorney's fee request is timely.

4.     **Attorney's Fee.**  Attached hereto as **Exhibit A** and **Exhibit B**
are true and correct copies of time records of K&L Gates and the ACLU of
Washington pertaining to this appeal, describing in detail the work
performed by each individual attorney or legal staff member with respect to
this appeal.  These billing records also indicate work done on this appeal by
attorneys for whom no fees are sought.  Also, given that a Settlement
Agreement requires that the Coalition only seek fees that are directly related
to this appeal for work done after April 22, 2006, but work was performed

2

on other matters related to this case after that date.  Consequently, I have placed an "X" next to all time entries on **Exhibit A** for which the Coalition is not seeking an attorney's fee.

5.      The total amount of the requested attorney's fee sought in this application is $131,086.00 from April 22, 2006 through the present.  The fees sought in this motion were necessarily incurred and are reasonable, in my judgment.  The rates reflected are those that would normally be charged to K&L Gates' clients at the time the specific work was performed by each individual attorney or legal staff member.

6.      Based on my previous experience (which is explained in greater detail below) with cases involving complex constitutional issues, the rates charged by all attorneys and staff in this matter are consistent with prevailing rates in the Seattle area for similar cases.  Indeed, the issues presented on appeal involved complex issues regarding the First Amendment, required the review and understanding of numerous cases that are often long and complex, and involved an extensive factual record.

7.      The standard hourly rates charged by K&L Gates changed over the course of this appeal.  Ryan D. Redekopp and I worked the majority of the hours for which an award of fees is sought.  Our rates are reflected in the chart below:

3

| Attorney Name | April 2006 until January 1, 2007 | January 1, 2007 until May 2007 | July 2007 until January 1, 2008 | January 1, 2008 to January 1, 2009. | January 1, 2009 to present |
|---|---|---|---|---|---|
| Michael K. Ryan | $235 | $270 | $305 | $315 | $330 |
| Ryan D. Redekopp | $180 | $215 | $225 | $245 | $270 |

8.      As reflected in **Exhibits A and B**, the following K&L Gates and ACLU of Washington attorneys also provided legal assistance and the rates stated below are there standard rates during the times for which they assisted on this appeal:

a)      Attorney Alex Wagner, an associate, billed at $180 per hour until January 1, 2007 and then billed at $215 per hour.

b)      Attorney Haley Krug, a summer associate, billed at $115 per hour for all of her work on this appeal, but because she was a summer associate at the time her work was completed, we do not seek recovery of her fees, as I do not customarily bill my clients for work performed by summer associates.  I have placed an "X" next to all work performed by Ms. Krug.

c)      Attorney James Curtis, an associate, billed at $195 per hour for all of his work on this appeal.

4

    d)     Attorney Suzanne Thomas, a partner, billed at $355 per hour

for her limited work on this appeal. Due to the limited nature of the work

performed, we do not seek recovery of her fees. I have placed an "X" next

to all work performed by Ms. Thomas.

    e)     Attorney Cabrelle Abel billed at $235 per hour until January 1,

2007 and $255 per hour for the remainder of her work on this matter.

    f)     Attorney Matthew J. Segal, a partner, billed at $355 per hour

for all of his work on this matter. Due to the limited nature of the work

performed, we do not seek recovery of his fees. I have placed an "X" next

to all work performed by Mr. Segal.

    g)     Attorney Samuel R. Castic, an associate, billed at $215 per hour

for all of his work on this matter. Due to the limited nature of the work

performed, we do not seek recovery of his fees. I have placed an "X" next

to all work performed by Mr. Castic.

    h)     Attorney Aaron Caplan of the ACLU of Washington, billed at

$350 per hour for all his work on this matter. This rate is consistent with

what similarly situated "partners" or attorneys with similar experience at

K&L Gates would bill for such matters.

    9.     The following K&L Gates staff and/or legal assistants also

provided assistance on this matter. Legal assistant Jeff VerHoef billed at

5

$140 per hour until January 1, 2007 and $145 per hour thereafter. Library

staff billed between $145 and $160 per hour. We do not seek fees for the

work performed by the library staff and I have placed an "X" next to all

work performed by library staff.

     10.   **Qualifications.** I am a senior associate (currently an eighth

year) at K&L Gates, and practice appellate, constitutional, and governmental

litigation. I graduated from Rutgers College in 1996, with highest honors. I

earned a JD, *magna cum laude*, from Georgetown University Law Center in

2001, and received induction into the Order of the Coif and the Meritorious

Service Award from the Georgetown Law Journal. Before joining Preston

Gates, I served as law clerk to the Honorable Frank J. Magill of the United

States Court of Appeals for the Eighth Circuit. During my time at K&L

Gates I have represented various clients in constitutional and commercial

matters, including First Amendment matters, and its related provision under

the Washington State Constitution. I have assisted in several cases in

involving constitutional issues, including: *Card v. City of Everett*, 520 F.3d

1009 (9th Cir. 2008) (involving constitutionality of Ten Commandments

monument on public property); *United States v. Manning*, 527 F.3d 828 (9th

Cir. 2008) (involving constitutional claims under the Supremacy, Dormant

Commerce and Contracts Clauses); *Washington State Farm Bureau*

6

*Federation v. Reed*, 154 Wn.2d 668, 115 P.3d 301 (2005) (involving

exceptions to the constitutional right of referendum under the Washington

Constitution); and, *City of Seattle v. Mighty Movers*, 152 Wn.2d 343 (2004)

(involving free speech challenge under provisions of Washington State

Constitution). I am a member of K&L Gates' Constitutional, Governmental

and Appellate Practice Group, and have recently been recognized as a

"Rising Star" in the area of First Amendment/Media/Advertising by

Washington Law & Politics. At the Firm, I am considered a specialist in

state and federal constitutional issues as well as appellate litigation and I

have given several presentations to municipal organizations on matters

concerning the First Amendment's free speech clause and the Establishment

Clause.

11.     Ryan Redekopp is an associate in the Seattle office of K&L

Gates and is in his fourth year of practice. His practice focuses primarily on

labor and employment law, including employment litigation. Ryan

graduated from the University of Washington *magna cum laude* in 2002 and

graduated from Harvard Law School in 2005. Ryan has assisted in litigating

and, in most cases, settling, several employment-related cases in Washington

state and federal court. He recently obtained summary judgment for

defendants Brent Beabout and Amazon.com, Inc. in *Lebaron v. Beabout,*

7

No. 05-2-39089-1 SEA (King County Sup. Court, Feb. 16, 2007) and

dismissal with prejudice of all claims against our client, Amazon Global

Resources, Inc., in *Zhang v. China Gate, Inc.*, No. 2:07-cv-00964-RSM

(W.D. Wash. Sept. 7, 2007). His writing and research skills are highly

regarded by senior attorneys at the Firm.

12.    Aaron Caplan is currently an associate professor of law at

Loyola Law School Los Angeles, where he teaches courses in constitutional

law and the First Amendment. At all times relevant to this fee petition, he

was a staff attorney at the ACLU of Washington, a position held since June

1998. He has extensive experience in free speech law, including as

counsel/advisor for parties in important free speech cases in this Court,

including *Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) and

*Cogswell v. City of Seattle*, 347 F.3d 809 (9th Cir. 2003), and in other

federal and state courts. He has published law review articles and given

CLE presentations on free speech topics. He if frequently sought out for

consultation by attorneys litigating free speech cases. He earned his

bachelor's degree *summa cum laude* from the University of Pennsylvania in

1986 and his JD *magna cum laude* from the University of Michigan Law

School in 1991. He served as a law clerk to the Honorable Betty Binns

Fletcher of this Court in 1991-92.

8

13.   Alex Wagner was an associate at K&L Gates and assisted in
preparing briefs and researching the law.  James Curtis, a former associate at
K&L Gates, assisted in researching case law and preparing the briefs.
Cabrelle Abel, a former associate, reviewed and commented on drafts of the
briefs.

14.   **Reasonableness of Rates and Fees Charged.**  The billing rates
that are reflected above are, I believe, appropriate in the state of Washington,
and Seattle in particular, and in the Ninth Circuit for attorneys of our level of
experience whose practices also emphasize complex constitutional litigation.
It was appropriate in my view, to employ the number of attorneys utilized
from our Firm to handle the primary responsibilities in this case, particularly
given the duration and complexity of proceedings.  In fact, given that Ryan
and myself had primary responsibility for this matter, and our rates are less
than those of partners within the Firm, the total amount is reasonable and
could have been more had a partner or partners been more intimately
involved in this case.

15.   I have created the following chart which tracks the numbers of
hours spent performing various tasks by each of the above-referenced
timekeepers.  While not all the time spent is sought in this request, I have
included a complete list of all time spent on this appeal by members of the

9

K&L Gates Firm. The numbers reflected in this chart are consistent with

those reflected in K&L Gates and the ACLU of Washington's billing records

**(Exhibits A and B):**

| Attorney | Conferences | Records Review and Excerpts | Legal Research and 28(j) Letters | Preparing Briefs | Oral Argument Preparation and Attendance | Post Opinion Work | Total Amount Actually Requested |
|---|---|---|---|---|---|---|---|
| Michael K. Ryan | 7.4 hours | X | 36.1 hours | 85.6 hours | 60.4 hours | 25.5 hours | $60,981.50 |
| Ryan D. Redekopp | 12.1 (hours) | 8 hours | 41.2 hours | 132.2 hours | 13.8 hours | 10.2 hours | $43,187.50 |
| Aaron Caplan | 1.2 hours | X | X | 5.6 hours | 4.5 hours | X | $3,955.00 |
| Alex Wagner | 3.2 hours | 4.4 hours | 15.9 hours | 41.1 hours | X | X | $11,743.50 |
| Haley Krug | X | X | 25 hours | X | X | X | X |
| James Curtis | X | X | 31.1 hours | X | X | X | $6064.50 |
| Cabrelle Abel | X | X | X | 12.5 hours | X | X | $3037.50 |
| Susan Thomas | X | X | X | 4.9 hours | X | X | X |
| Matthew J. Segal | X | X | X | X | 4.7 hours | X | X |
| Samuel Castic | X | X | 3.8 hours | X | X | X | X |
| Jeff VerHoef | X | 14.9 hours | X | X | X | X | $2116.50 |
| Library Staff | X | X | X | X | 1.8 hours | X | X |
| **TOTAL HOURS** | 23.9 | 27.3 | 153.1 | 281.9 | 85.2 | 37.2 | **$131,086.00** |

///

///

10

16.    Attached to hereto as **Exhibit C** is an Application for

Attorney's Fee, which contains substantially the same information that is

contained on Form 9.

I declare under penalty of perjury that the foregoing is true, accurate

and correct.

EXECUTED this 8th day of January 2009 at Seattle, Washington.

s/Michael K. Ryan
Michael K. Ryan

11

**Certificate of Service When <u>Not</u> All Case Participants are CM/ECF
Participants**

I hereby certify that on January 8, 2009, I electronically filed the foregoing
with the Clerk of the Court for the United States Court of Appeals for the
Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by
the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered
CM/ECF users.  I have served the foregoing document by legal messenger to
the following non-CM/ECF participants:

        Carlton Seu
        On behalf of Tom Carr
        Seattle City Attorney
        600 Fourth Ave., 4th Floor
        Seattle, Washington  98124


<u>s/Joani Radenich</u>
Joani Radenich

12

**EXHIBIT C**

# APPLICATION FOR ATTORNEYS FEES

| DESCRIPTION OF SERVICES FOR WHICH FEES ARE SOUGHT | HOURS |
|---|---|
| Interviews & Conferences | 23.9 |
| Obtaining & Reviewing Records | 27.3 |
| Legal Research | 124.3 |
| Preparing Briefs | 277 |
| Preparing for & Attending Argument | 78.7 |
| Other: Post-Opinion Work (Fees Request, Review of Decision, Cost Bill Request, Conferences) | 37.2 |
| TOTAL Hours Claimed | 568.4 |

*TOTAL COMPENSATION REQUESTED*:  $131,086.00

DATED this 8th day of January, 2009

K&L GATES

s/Michael K. Ryan
Michael K. Ryan
Ryan Drew Redekopp
925 Fourth Ave., Suite 2900
Seattle, WA 98104
Phone:  (206) 623-7580
Fax:     (206) 623-7022
michael.ryan@klgates.com
ryan.redekopp@klgates.com

On Behalf of the American Civil Liberties Union of Washington

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
By: Sarah Dunne,
705 Second Avenue, Suite 300
Seattle, WA 98104
Phone:  (206) 624-2184
Fax:  (206) 624-2190
dunne@aclu-wa.org

Attorneys for Plaintiff/Appellant the Seattle
Affiliate of the October 22nd Coalition to Stop
Police Brutality, Repression and the
Criminalization of a Generation

**EXHIBIT 10**

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 158 of 232 Page ID
Case 2:04-cv-07131-SVW-RC Document 343-2 Filed 01/09/2009 Page 2 of 25
#:585

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF DELAWARE

In re:         :    Chapter 11

THREE A'S HOLDINGS, L.L.C., a    :    Case No. 06-10886 (BLS)
Delaware limited liability company,
et al.,[1]                  :    Jointly Administered

          Debtors.     :    Objection Deadline: December 20, 2006

CERTIFIED:
AS A TRUE COPY:
ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
Deputy Clerk
BY:

| | |
|---|---|
| Name of Applicant: | O'Melveny & Myers LLP |
| Authorized to Provide Professional Services to: | The above-captioned debtors and debtors-in-possession |
| Date of Retention: | September 14, 2006 (*nunc pro tunc* to the date of commencement of these chapter 11 cases) |
| Period for which compensation and reimbursement are sought: | October 1, 2006 through October 31, 2006 |
| Amount of Compensation sought as actual, reasonable, and necessary: | $308,928.40 (80% of $386,160.50) |
| Amount of Expense Reimbursement sought as actual, reasonable and necessary: | $6,349.08 |

This is a(n): __X__ Monthly _____ Interim _____ Final Application

The total time expended for fee application preparation is approximately 12 hours.[2]

Prior Applications Filed:             Two

---

[1] The Debtors are the following entities: Three A's Holdings, L.L.C., Jeremy's Holdings, LLC, Tower Direct LLC, 33rd Street Records, Incorporated, Pipernick Corp., M T S, Incorporated (d/b/a Tower Records), Columbus & Bay, Inc. and R.T. Records, Incorporated.

[2] This time was expended by attorneys and paraprofessionals, and compensation for this time will be calculated and requested as part of the next monthly fee application.
LA3:1125300 1



Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 159 of 232   Page ID
#:5843
Case 2:04-cv-07131-SVW-RC   Document 343-2   Filed 01/09/2009   Page 3 of 23

This is a(n):   _X_ monthly          _____ interim          _____ final application

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| David Krinsky | Partner in the Transactions Department. Joined firm in 1994. Member of the CA State Bar since 1973. | 950 | 15.8 | $15,010.00 |
| Robert Rizzi | Partner in the Transactions Department. Joined firm in 1994. Member of the CA State Bar since 1978. | 950 | 3.5 | $3,325.00 |
| Ben Logan | Partner in the Restructuring and Finance Department. Joined firm in 1976. Member of the CA State Bar since 1976. | 860 | 170.9 | $142,681.65 |
| Gordon Krischer | Partner in the Adversarial Department. Joined firm in 1971. Member of the CA State Bar since 1972 and NY State Bar since 1991. | 860 | 1.3 | $1,118.00 |
| Kathryn Sanders | Partner in the Transactions Department. Joined firm in 1985. Member of the CA State Bar since 1985 | 820 | 0.7 | $574.00 |
| Suzzanne Uhland | Partner in the Restructuring and Finance Department. Joined firm in 1988. Member of the CA State Bar since 1988. | 820 | 190.4 | $151,489.62 |
| Alejandro Mayorkas | Partner in the Adversarial Department. Joined firm in 2001. Member of the CA State Bar since 1986. | 770 | 12.2 | $9,394.00 |
| Shannon Lowry Nagle | Partner in the Transactions Department. Joined firm in 2007. Member of the NY State Bar since 2007. Member of VA State Bar since 1991. Member of NC State Bar since 1993. Member of State GA Bar since 1996. | 710 | 68.8 | $48,848.00 |
| Gary Tell | Partner in the Transactions Department. Joined firm in 1999. Member of the DC Bar since 1993. | 700 | 0.5 | $350.00 |

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 160 of 232   Page ID
Case 2:04-cv-07131-SVW-RC   Document 343-2   Filed 01/09/2009   Page 4 of 25
#:585

| Professional | Position, Year Assumed Position, Prior Relevant Experience, Year of Obtaining Relevant License to Practice | Hourly Billing Rate | Hours Billed | Compensation |
|---|---|---|---|---|
| Thomas M. Riordan | Partner in the Adversarial Department. Joined firm in 1995. Member of the CA State Bar since 1995. | 675 | 31.0 | $20,925.00 |
| C. Brophy Christensen | Partner in the Transactions Department. Joined firm in 1997. Member of the CA State Bar since 1997. | 675 | 3.4 | $2,295.00 |
| Jorge DeNeve | Counsel in the Adversarial Department. Rejoined firm in 2007. Member of the CA State Bar since 1998. | 620 | 31.2 | $19,344.00 |
| Summer Conley | Counsel in the Transactions Department. Joined firm in 1997. Member of the CA State Bar since 1997. | 600 | 1.7 | $1,020.00 |
| Victoria Newmark | Counsel in the Restructuring and Finance Department. Joined firm in 1995. Member of the CA State Bar since 1995. | 595 | 0.2 | $119.00 |
| Christopher Campbell | Counsel in the Tax Department. Joined firm in 1999. Member of the CA State Bar since 1999. | 590 | 59.7 | $35,223.00 |
| Allan Johnson | Counsel in the Adversarial Department. Joined firm in 2002. Member of the CA State Bar since 2001. | 565 | 49.0 | $27,685.00 |
| Natausha Wilson | Counsel in the Transactions Department. Joined the firm in 2007. Member of the NY and NJ State Bars since 2002 and the CA State Bar since 2003. | 565 | 121.7 | $68,760.50 |
| Arthur (Schan) Duff | Counsel in the Adversarial Department. Joined firm in 2004. Member of the DC Bar since 2003. | 540 | 8.8 | $4,752.00 |
| Justin Laubach | Counsel in the Transactions Department. Joined firm in 2003. Member of the CA State Bar since 2002. | 540 | 54.9 | $29,646.00 |
| Emily Culler | Associate in the Restructuring and Finance Department. Joined firm in 2002. Member of the CA State Bar since 2002. | 540 | 1.9 | $1,026.00 |

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 161 of 232   Page ID
#:386
Case 2:04-cv-07131-SVW-RC   Document 243-2   Filed 01/09/2009   Page 5 of 28

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Laine Mervis | Associate in the Transactions Department. Joined firm in 2007. Member of the CA State Bar since 2003. | 520 | 8.6 | $4,472.00 |
| Andrew Parlen | Associate in the Transactions Department. Joined firm in 2007. Member of the CA State Bar since 2004. | 520 | 297.8 | $151,222.48 |
| Scott Sugino | Associate in the Transactions Department. Joined firm in 2006. Member of the IL State Bar since 2003 and member of the CA State Bar since 2004. | 520 | 2.0 | $1,040.00 |
| Joshua Weisser | Associate in the Transactions Department. Joined the firm in 2007. Member of the NY State Bar since 2006. | 490 | 2.2 | $1,078.00 |
| Jennifer Halvas | Associate in the Transactions Department. Joined firm in 2004. Member of the CA State Bar since 2004. | 480 | 2.1 | $1,008.00 |
| Mike Symons | Associate in the Transactions Department. Joined firm in 2004. Member of the CA State Bar since 2004. | 480 | 28.1 | $13,488.00 |
| Nima Amini | Associate in the Transactions Department. Joined firm in 2006. Member of the CA, MN and DC Bars since 2005, 2006 and 2007, respectively. | 450 | 9.3 | $4,185.00 |
| Abby Schwartz | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2007. | 450 | 4.8 | $2,160.00 |
| Ana Acevedo | Associate in the Transactions Department. Joined firm in 2006. Not currently a member of the CA State Bar. | 395 | 108.0 | $42,660.00 |
| Danielle Oakley | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 58.2 | $22,337.25 |

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 162 of 232   Page ID
#:587
Case 2:04-cv-07131-SVW-RC    Document 343-2   Filed 01/09/2009   Page 6 of 23

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Adrian Pollner | Associate in the Adversarial Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 25.0 | $9,875.00 |
| Michael Scheppele | Associate in the Transactions Department. Joined firm in 2006. Member of the CA State Bar since 2006. | 395 | 0.2 | $79.00 |
| Angela Wang | Associate in the Transactions Department. Joined firm in 2006. Member of the NY State Bar since 2007. | 395 | 151.5 | $59,842.50 |
| Melanie McLaughlin | Associate in the Transactions Department. Joined the firm in 2007. Member of the NY State Bar since 2008. | 365 | 0.6 | $219.00 |
| Ryan Austin | Associate in the Transactions Department. Joined the firm in 2007. Member of the CA Bar since 2007. | 330 | 24.9 | $8,217.00 |
| Timothy P. Caballero | Associate in the Adversarial Department. Joined firm in 2007. Member of the CA State Bar since 2007. | 330 | 2.4 | $792.00 |
| Lynn Talab | Adversarial Paralegal since 1992. | 310 | 64.8 | $20,088.00 |
| Gregory Trotter | Transactions Paralegal since 1989. | 310 | 0.5 | $155.00 |
| Timothy Sheehan | Adversarial Paralegal since 2004. | 225 | 1.9 | $427.50 |
| Michael Donovan | Litigation Support Specialist since 2005. | 260 | 66.3 | $17,238.00 |
| James McCarthy | Adversarial Paralegal since 1997. | 245 | 17.0 | $4,165.00 |
| Debra Fisher | Librarian since 1980. | 225 | 0.7 | $157.50 |
| Denise Lieu | Practice Support Analyst since 2006. | 220 | 0.6 | $132.00 |
| Catherine Mirhady | Litigation Support Specialist since 2007. | 220 | 41.5 | $9,130.00 |
| Karen Nguyen | Litigation Support Specialist since 2004. | 220 | 2.2 | $484.00 |
| Ryan Lopez | Litigation Support Specialist since 2007. | 220 | 0.4 | $88.00 |

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 163 of 232  Page ID
Case 2:04-cv-07131-SVW-RC  Document 343-2  Filed 01/09/2009  Page 7 of 23
#:388

| PROFESSIONAL | POSITION, YEAR ASSUMED POSITION, PRIOR RELEVANT EXPERIENCE, YEAR OF OBTAINING RELEVANT LICENSE TO PRACTICE | HOURLY BILLING RATE | HOURS BILLED | COMPENSATION |
|---|---|---|---|---|
| Stella Kim | Transactions Project Assistant since 2007. | 190 | 4.4 | $836.00 |
| Brian Osimiri | Transactions Project Assistant since 2006. | 190 | 15.6 | $2,964.00 |
| Elizabeth Ene | Litigation Support Specialist since 2007. | 110 | 16.1 | $1,771.00 |
| TOTAL | | | 1785.3 | $963,897.00 |

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 164 of 232   Page ID
Case 2:04-cv-07131-SVW-RC   Document 363-2   Filed 01/09/2009   Page 21 of 23
#:389

WHEREFORE, OMM respectfully requests that the Court enter an order providing

that, for the Compensation Period, an allowance be made to OMM with respect to the sum of

$771,117.60 (80% of $963,897.00) as compensation for necessary professional services rendered,

and the sum of $19,291.86 for reimbursement of actual necessary costs and expenses, for a total of

$790,409.46, and that such sums be authorized for payment less any sums that have been

previously paid to OMM pursuant to the Administrative Order, and for such other and further

relief as the Court may deem just and proper.

Dated: July 8, 2008                              Respectfully submitted,
Wilmington, Delaware


                                        /s/ Andrew M. Parlen
                                        Suzzanne Uhland
                                        Ben H. Logan
                                        Andrew M. Parlen
                                        O'MELVENY & MYERS LLP
                                        275 Battery Street
                                        San Francisco, California  94111
                                        (415) 984-8700

                                        ATTORNEYS FOR DEBTORS AND
                                        DEBTORS IN POSSESSION

LA3:1148107.1
RLF1-3300247-1                                   12

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 165 of 232   Page ID
Case 2:04-cv-07131-SVW-RC   Document 343-2   Filed 01/09/2009   Page 22 of 23
#:590

## **VERIFICATION**

STATE OF CALIFORNIA)
COUNTY OF ORANGE )

       Suzzanne Uhland, after being duly sworn according to law, deposes and says:

       a) I am counsel with the applicant firm, O'Melveny & Myers LLP, co-counsel to the

Debtors in the above-captioned matter.

       b) I have performed and am familiar with the work performed on behalf of the Debtors

by O'Melveny & Myers LLP.

       c) I have reviewed the foregoing Application and the facts set forth therein are true and

correct to the best of my knowledge, information and belief. Moreover, I have reviewed Del.

Bankr. L.R. 2016-2 and submit that the Application substantially complies with such Rule.

                     Suzzanne Uhland

SWORN AND SUBSCRIBED before me this ___th day of _____, 2008

_____

       Notary Public

**EXHIBIT 11**

| DATE | BILLER | TASK | TIME |
|---|---|---|---|
| | | DISTRICT COURT TRO/PRELIM INJUNCTION | |
| 12/31/2004 | CAS | dft/file proposed order re perm inj | 0.7 |
| 12/20/2004 | CAS | scheduling conf; tvl t/fm court | 3.1 |
| 12/17/2004 | CAS | rvu order denying stip to continue | 0.1 |
| 12/9/2004 | CAS | dft stip re continuing scheduling conf | 0.4 |
| 11/30/2004 | CAS | rvu order re scheduling conf; send notice of same to RF | 0.5 |
| 11/15/2004 | CAS | review court order on prelim inj; call clients re same [.3] | 0.5 |
| 11/8/2004 | CAS | hrg on motion for injunction; prep re same; trvl t/fm | 3.9 |
| 11/7/2004 | CAS | prep re argument on injunction | 2.8 |
| 11/1/2004 | CAS | dft Sobel dec re LB fee waiver evidence | 0.3 |
| 11/1/2004 | CAS | dft/edit reply | 7.8 |
| 10/30/2004 | CAS | dft/edit reply | 9.2 |
| 10/29/2004 | CAS | rvu City opp; outline reply/bgn dftg same | 5.1 |
| 10/25/2004 | CAS | serve standing order | 0.2 |
| 10/23/2004 | CAS | review standing order | 0.3 |
| 10/14/2004 | CAS | finalize complaint; tro; supporting docs | 4.2 |
| 10/13/2004 | CAS | dft/edit tro p and a; edits to complaint | 7.3 |
| 10/13/2004 | CAS | edits to dft Mann dec; Ruyle dec; email and tc w/ clients re dec edits; revu exhibits re dec prep | 3.8 |
| 10/12/2004 | CAS | dft/edit complaint; dft/edit p and a; dft statement of facts | 10.7 |
| 10/11/2004 | CAS | rvu RFT dft pleadings; bgn edits to samel; rvu RFT ordinance analysis | 5.2 |
| 10/6/2004 | CAS | mtg w/ Ruyle/RFT; rvu notes post[.4] | 3.1 |
| | | | 69.2 |

| | A | B | C | D |
|---|---|---|---|---|
| 1 | LBAPN V. CITY OF LONG BEACH - CAROL SOBEL | | | |
| 2 | | | | |
| 3 | Date | Biller | Task | Time |
| 4 | 1/22/2005 | CAS | Rvu City Notice of Appeal; docketing statement | 0.2 |
| 5 | 1/23/2005 | CAS | rvu/calendar briefing schedule | 0.1 |
| 6 | 2/17/2005 | CAS | rvu/calendar court order re mediation | 0.1 |
| 7 | 3/9/2005 | CAS | tc w/ mediator and City; notes re same | 0.4 |
| 8 | 6/30/2005 | CAS | rvu City RJN | 0.2 |
| 9 | 7/2/2005 | CAS | rvu City AOB; rvu dft response by Rebecca; notes re edits to same | 4.3 |
| 10 | 7/25/2005 | CAS | rvu dft motion for extension of time;finalize | 0.2 |
| 11 | 8/9/2005 | CAS | rvu dft appellee's brief, notes to Rebecca re revisions | 3.2 |
| 12 | 8/15/2005 | CAS | rvu revised dft appellee's brief; comments to Rebecca re further revisions | 2.4 |
| 13 | 8/23/2005 | CAS | rvu "spontaneous" cases; dft/edit | 3.7 |
| 14 | 8/24/2005 | CAS | resarch/edit brief re indemnification argument; tc w/ MVH/CM re same | 6.9 |
| 15 | 8/25/2005 | CAS | edit brief | 13.7 |
| 16 | 8/27/2005 | CAS | further edits to brief | 6.1 |
| 17 | 9/1/2005 | CAS | final edits to brief; rvu docs for Excerpt of Record [.7] | 7.4 |
| 18 | 9/27/2005 | CAS | dft statement of related cases | 0.1 |
| 19 | 10/2/2005 | CAS | read/analyze City reply brief | 1.1 |
| 20 | 11/19/2006 | CAS | rvu City supp brief; analyze City cf w/ SM FNB; create parallel chart | 4.9 |
| 21 | 1/26/2007 | CAS | rvu court order re filing supp brief | 0.1 |
| 22 | 1/30/2007 | CAS | bgn dft response to supp brief; reread city supp brief; notes re same | 4.6 |
| 23 | 1/31/2007 | CAS | dft/edit appellees' supp brief | 7.6 |
| 24 | 2/1/2007 | CAS | dft appellees' supp brief | 6.9 |
| 25 | 2/2/2007 | CAS | motion to file one-day late | 0.5 |
| 26 | 2/11/2007 | CAS | rvu City reply on supp brief | 0.8 |
| 27 | 2/12/2007 | CAS | prep re oral argument | 3.1 |
| 28 | 2/13/2007 | CAS | prep re oral argument; research/rvu all 9th Cir First Amend opinions by panel;shep all Circuit First Amend opinionw | 8.6 |
| 29 | 2/14/2007 | CAS | prep re oral argument; reread all briefs; reread SMFNB, Thomas, et al; draft argument | 13.9 |
| 30 | 2/15/2007 | CAS | prep re oral arg; dft/edit arg; reread cases | 10.7 |
| 31 | 2/16/2007 | CAS | revise oral arg; tvl to/fm Pasadena; argument; conf w/ clients post | 7.8 |
| 32 | 4/23/2008 | CAS | read panel opinion | 1.3 |
| 33 | 4/23/2008 | CAS | dft motion to transfer fees | 0.6 |
| 34 | 4/28/2008 | CAS | tc w/ R. Fudge re rehearing | 0.1 |
| 35 | 5/10/2008 | CAS | rvu Order re response to pet for rehearing | 0.1 |
| 36 | 5/25/2008 | CAS | rvu City petition for rehearing; notes re same; bgn dft Response | 4.7 |
| 37 | 5/26/2008 | CAS | dft/edit Response to Petition for Rehearing | 5.3 |
| 38 | 5/27/2008 | CAS | dft/edit Response to Petition for Rehearing | 10.5 |
| 39 | 5/28/2008 | CAS | final edits to Response to Petition for Rehearing | 6.4 |
| 40 | 7/24/2009 | CAS | rvu opinion; email clients re same | 0.8 |

|    | A | B | C | D |
|----|---|---|---|---|
| 41 | 8/2/2009 | CAS | draft memo re fees; rvu Rutter Guide re same; read cases | 6.2 |
| 42 | 8/3/2009 | CAS | further research re fee mmo; rvu RFT hours; billing judgment re same; finalize fee app; dft fee dec | 8.5 |
| 43 |  |  |  |  |
| 44 |  |  |  | 164.1 |

| DATE | BILLER | TASK | TIME | |
|------|--------|------|------|--|
| | | LBAPN CERT PETITION | | |
| | | | | |
| 2/22/2010 | CAS | review SCOTUS orders re cert; email RF re same; email court re same | 0.2 | |
| 1/6/2010 | CAS | read LB reply re cert | 0.5 | |
| 12/28/2009 | CAS | rvu dft opp cert frm Cockle re final edits [.7]; tc Cockle re same | 1.2 | |
| 12/24/2009 | CAS | dft/edt opp cert; review TOC/TOA; tc w/ Cockle re edits to final brief | 3.7 | |
| 12/23/2009 | CAS | dft/edit opp cert; dft arg re "spontaneous" speech [4.7] | 11.3 | |
| 12/22/2009 | CBG | shepardize all cases cited by def/read same re possible additional authorities | | 6.7 |
| 12/22/2009 | CAS | dft/edit opp cert/read cases re mootness/edit argument re same | 14.9 | |
| 12/21/2009 | CBG | shep opp cert/cite check | | 7.8 |
| 12/21/2009 | CAS | dft/edit opp cert | 15.7 | |
| 12/20/2009 | CAS | reread 9th Cir opinion; reread SMFNB; dft/edit opp cert | 15.2 | |
| 12/19/2009 | CAS | dft/edit opp cert | 9.1 | |
| 12/17/2009 | CAS | rvu City "Questions;" dft opp cert "Questions" | 1.1 | |
| 12/16/2009 | CAS | reread City cert pet; rvu dft brief by MCG; read Berger/shep same; reread LBAPN; outline notes | 5.8 | |
| 12/1/2009 | CAS | rvu MCG dft brief; outline changes for redraft | 2.1 | |
| 11/13/2009 | CAS | rvu SCOTUS rules re extension; lm for RF re extension; dft extension app; tc w/ PCJ re filing at SCOTUS | 0.7 | |
| 10/29/2009 | CAS | read dft opp cert by MCG; notes and edits re same; conf w/ MCG re same | 1.9 | |
| | | | 83.4 | 14.5 |

LBAPN SEVERABILITY AND POST CERT
PETITION ISSUES

| DATE | BILLER | TASK | TIME |
|------|--------|------|------|
| 9/14/2009 | cas | rvu 9th Cir order; email V Cruz re same/tc RF re same and briefing schedule on severability | 0.3 |
| 9/15/2009 | cas | emails w/ opp counsel/V Cruz re briefing schedule on severability | 0.2 |
| 9/23/2009 | cas | dft/edit brief re severability; rvu MCG dfts re same and edit | 4.2 |
| 9/30/2009 | cas | rvu dft reply on severability dfted by MCG; mark comments re same and conf w/ MCG | 0.4 |
| 10/1/2009 | cas | rvu rvsd dft reply on severability dfted by MCG; mark comments re same and conf w/ MCG | 0.5 |
| 11/30/2009 | cas | tc w/ RF re stay in Dist Ct pending cert; dft stip and email RF re same | 0.4 |
| 12/21/2009 | cas | hrg on severability motion | 1.9 |
| 12/22/2009 | cas | rvu order continuing hrg on severability motion | 0.1 |
| 3/11/2010 | cas | tc w/ Randall Fudge re case status | 0.1 |
| 3/14/2010 | cas | rvu all pleadings re motion | 1.1 |
| 3/15/2010 | cas | court re hearing on severability; trv t/fm; rvu pleadings re arg prep | 3.5 |
| 4/1/2010 | cas | rvu order re severability | 0.2 |
| 4/4/2010 | cas | rvu time all personnel; billing judgment re same; prep meet-and-confer letter to RF re fees/costs | 1.2 |
| 4/13/2010 | cas | draft fee dec | 3.1 |
| 4/14/2010 | cas | draft mmo; rvu cases; prep chart of fees | 5.8 |
| 4/15/2010 | cas | draft mmo; edit to fee dec; draft order | 7.8 |
| | | | 30.8 |

**EXHIBIT 12**

*Time Sheet for REBECCA F. THORNTON in LBAPN v. City of Long Beach (Trial Court)*

| DATE | NAME | ACTIVITY | DESCRIPTION | TIME | POSITION |
|------|------|----------|-------------|------|----------|
| 9/30/2004 | RFT | Review/analyze | review/analyze ordinance (Chapter 5.60) | 0.4 | ATTORNEY |
| 10/4/2004 | RFT | Research | research re: affirmative challenge to Chapter 5.60 | 6.0 | ATTORNEY |
| 10/5/2004 | RFT | Research | research re: affirmative challenge to Chapter 5.60 | 5.0 | ATTORNEY |
| 10/5/2004 | RFT | Review/analyze | Review declarations of Eugene Ruyle | 0.6 | ATTORNEY |
| 10/6/2004 | RFT | Appear for/attend | Attend meeting with Eugene Ruyle | 2.7 | ATTORNEY |
| 10/6/2004 | RFT | Draft/revise | Draft memo re affirmative challenge to chapter 5.60 | 1.5 | ATTORNEY |
| 10/6/2004 | RFT | Draft/revise | Draft Complaint | 0.5 | ATTORNEY |
| 10/7/2004 | RFT | Draft/revise | Draft Complaint | 2.2 | ATTORNEY |
| 10/7/2004 | RFT | Draft/revise | Draft Points & Authorities in support of Preliminary Injunction | 2.3 | ATTORNEY |
| 10/8/2004 | RFT | Draft/revise | Draft Points & Authorities in support of | 5.7 | ATTORNEY |
| 10/9/2004 | RFT | Draft/revise | Draft Complaint | 2.0 | ATTORNEY |
| 10/11/2004 | RFT | Research | Research re P & A Pre. Inj. | 5.0 | ATTORNEY |
| 10/12/2004 | RFT | Research | Research re P & A Pre. Inj. | 2.2 | ATTORNEY |
| 10/12/2004 | RFT | Draft/revise | Draft Notice of Interested Parties | 0.2 | ATTORNEY |
| 10/12/2004 | RFT | Draft/revise | Draft Proposed Order | 0.4 | ATTORNEY |
| 10/12/2004 | RFT | Draft/revise | Draft Notice of Motion & Motion | 1.4 | ATTORNEY |
| 10/12/2004 | RFT | Draft/revise | Draft Complaint | 4.0 | ATTORNEY |
| 10/12/2004 | RFT | Draft/revise | Draft P & A re Pre. Inj. | 0.6 | ATTORNEY |
| 10/14/2004 | RFT | Draft/revise | Draft P & A re Pre. Inj. | 0.8 | ATTORNEY |
| 10/14/2004 | RFT | Draft/revise | Draft Trial Brief - Superior Court | 3.6 | ATTORNEY |
| 10/19/2004 | RFT | Draft/revise | Draft Trial Brief - Superior Court | 9.5 | ATTORNEY |
| 10/27/2004 | RFT | Review/analyze | Review Def Opp. to Pre. Inj. | 0.8 | ATTORNEY |
| 11/5/2004 | RFT | Review/analyze | Review Pl. Reply Brief | 1.8 | ATTORNEY |
| 11/9/2004 | RFT | Review/analyze | Review Pl. Reply Brief | 1.0 | ATTORNEY |
| | | | Total hours claimed | 60.2 | |

*Time Sheet for REBECCA F. THORNTON in LBAPN v. City of Long Beach*

| DATE | NAME | ACTIVITY | DESCRIPTION | TIME | POSITION |
|---|---|---|---|---|---|
| 7/25/2005 | RFT | Draft | Motion for extension of time | 1.0 | ATTORNEY |
| 7/26/2005 | RFT | Review/analyze | Appellant's Brief | 2.1 | ATTORNEY |
| 7/26/2005 | RFT | Research | case law re prior restraints on speech; conditions and prerequisites for permits | 4.0 | ATTORNEY |
| 7/27/2005 | RFT | Draft/revise | preliminary portions of Appellee's Brief (Statement of Facts, Statement of the Case, Standard of Review) | 4.4 | ATTORNEY |
| 8/5/2005 | RFT | Draft/revise | Appellee's Brief | 0.6 | ATTORNEY |
| 8/6/2005 | RFT | Research | case law re discretionary acts by govt officials involving content-based determinations, standards required | 1.1 | ATTORNEY |
| 8/7/2005 | RFT | Review/analyze | Thomas v. Chicago Park District, 534 U.S. 316 (2002); analyze/distinguish same; review LBMC 5.60 | 0.6 | ATTORNEY |
| 8/8/2005 | RFT | Review/analyze | Thomas v. Chicago Park District, 534 U.S. 316 (2002); analyze/distinguish same; review LBMC 5.60 | 3.3 | ATTORNEY |
| 8/8/2005 | RFT | Research | case law re overbreadth; conditions | 2.7 | ATTORNEY |
| 8/8/2005 | RFT | Draft | Appellee's Brief; review record | 8.0 | ATTORNEY |
| 8/8/2005 | RFT | Review/analyze | Appellant's Brief | 0.7 | ATTORNEY |
| 8/9/2005 | RFT | Research | case law re insurance requirements for permits for "expressive activity" | 2.3 | ATTORNEY |
| 8/9/2005 | RFT | Draft/revise | Appellee's Brief | 2.2 | ATTORNEY |
| 8/11/2005 | RFT | Research | case law re deposits, charges, fees, "departmental service charges" as overbroad discretion | 3.2 | ATTORNEY |
| 8/11/2005 | RFT | Draft/revise | Appellee's Brief | 2.1 | ATTORNEY |
| 8/12/2005 | RFT | Review/analyze | Appellant's cases | 3.0 | ATTORNEY |
| 8/12/2005 | RFT | Draft/revise | Appellee's Brief; review record | 3.5 | ATTORNEY |
| 8/15/2005 | RFT | Research | case law re indemnification | 2.3 | ATTORNEY |
| 8/15/2005 | RFT | Draft/revise | Appellee's Brief | 2.7 | ATTORNEY |
| 8/16/2005 | RFT | Research | case law re content-based determinations | 4.1 | ATTORNEY |
| 8/18/2005 | RFT | Draft/revise | Appellee's Brief | 6.5 | ATTORNEY |
| 8/21/2005 | RFT | Draft/revise | Appellee's Brief; check cites; review record; | 10.3 | ATTORNEY |
| 8/23/2005 | RFT | Draft/revise | Appellee's Brief | 2.9 | ATTORNEY |
| 9/1/2005 | RFT | Draft/revise | Appellee's Brief; review Excerpts of Record | 5.2 | ATTORNEY |
| 2/2/2007 | RFT | Review | supplemental brief and reply | 6.1 | ATTORNEY |
| | | | Total hours claimed | 84.9 | |

**DECLARATION OF BARRETT LITT**

**EXHIBIT 1**

## DECLARATION OF BARRETT S. LITT

I, Barrett S. Litt, declare as follows:

1.     This declaration is submitted in support of the Motion for Fees and Costs by plaintiffs  in the civil case pending before this Court in *Long Beach Area Peace Network v. City of Long Beach.*

2.     I am an attorney duly licensed to practice in the State of California. Since 1984, I have been the principal or senior partner in firms that operate for the specific purpose of developing and maintaining a civil rights and public interest law practice that operates in the private sector on the basis of self-generated fee awards and other recoveries.  Since July 2004, I have been a partner in the law firm of Litt, Estuar, Harrison and Kitson.  From 1998 to July 2004, I was a principal in the law firm of Litt & Associates, Inc., in which the partners in my current firm were trained. From September 1, 1991 to May 1, 1997, when my then partner left the law firm to become Deputy General Counsel for Civil Rights at the Federal Department of Housing and Urban Development, I was a partner at the firm of Litt & Marquez.  For the seven years prior to that, I was a partner in the firm of Litt & Stormer, Inc.

3.     I graduated from the University of California at Berkeley in 1966 and from UCLA Law School in 1969.  For the first approximately ten years of my practice, I focused primarily in the area of criminal defense at the trial and appellate levels, mostly in the federal courts.  In that capacity, I handled hundreds of matters, tried many cases ranging from immigration offenses to murders, and handled numerous appeals.  Since 1981, I have focused primarily on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation, and complex multi-party litigation.

4.     My former firm, Litt & Stormer, received the Pro Bono Firm of the Year Award from Public Counsel in 1987 in recognition of its public interest and civil rights work.  Litt & Marquez received an award from the NAACP Legal Defense

1

Fund in July 1992, as civil rights firm of the year in recognition of its civil rights work. I received an award from UCLA School of Law as its public interest alumnus of the year in 1995. I have both spoken and written on the subject of civil rights training. A few years ago, I published an article entitled *Class Certification in Police/ Law Enforcement Cases* in Civil Rights Litigation and Attorney's Fee Annual Handbook, Vol. 18, Ch. 3 (West Publishing 2002). I recently published an article in the Los Angeles Lawyer regarding the use of minimum statutory damages under the Unruh Act, particularly actions brought under Civil Code §52.1, to enhance the prospects for certifying class actions. See *Rights for Wrongs*, Los Angeles Lawyer, December 2005. I also recently published a lengthy article on substantive legal issues for class action treatment which was distributed to plaintiffs' police abuse lawyers nationwide. I have also lectured and written on the standards for obtaining class counsel attorneys' fee awards at the Bridgeport Class Action Seminars in 2008 and 2009. My curriculum vitae is attached as Exhibit "A" to this declaration.

5.     I am considered an expert on, among other things, attorney's fees in civil rights cases. I have filed declarations on numerous occasions expressing expert opinions on the appropriate standards for awards of attorneys' fees in civil rights cases, which have been accepted by the courts.

a.     In the State Bar proceeding *In re Yagman*, I was qualified as an expert in attorneys' fees under 42 U.S.C. §1988, and testified in person on whether or not Mr. Yagman's fee arrangement in a police shooting case was or was not unconscionable, as the State Bar contended in that case.

b.     In 2007, I testified as an attorney's fee expert in a civil rights case on behalf of plaintiffs represented by a major law firm in Los Angeles. The case had a confidential settlement, with the fees to be arbitrated by a former superior court judge now at JAMS. Because the settlement and arbitration were confidential, I am not at liberty to identify the issues, parties, firms or retired

2

1    judge involved.  However, there was a defense fee expert in that case who

2    described me as "a prominent Los Angeles civil rights litigator experienced in

3    fee issues arising from public interest litigation", and the arbitrator described

4    my testimony as "credible and reliable", and described me as having "had a

5    wide exposure to fees at a number of major firms in Los Angeles doing

6    complex civil litigation."

7        c.    I have submitted declarations as an expert witness on attorney fees

8    for civil rights plaintiffs' counsel to United States District Court on numerous

9    occasions, which declarations have been accepted, and at times cited by, the

10   Court. See, e.g., 1/11/10 Order Re: Attorneys Fees and Costs in *Lauderdale v.*

11   *City of Long Beach*, CV 08-979 ABC (JWJx), pg. 11.

12       6.    I have, on occasion, represented other attorneys in their fee litigation

13   seeking statutory attorney's fees.

14       7.    I litigate a wide range of civil rights cases, including housing,

15   employment and other discrimination, police and jail abuse, and violations of a wide

16   range of constitutional rights.  My current emphasis is civil rights class actions, but I

17   also do large, individual civil rights cases.  I am currently lead or co-lead counsel in

18   pending civil rights class actions in both the Los Angeles area and other jurisdictions,

19   including Washington  D.C., Maryland and Georgia.  I am also presently litigating a

20   wrongful conviction claim of a man who spent 24 years in prison before being

21   released on a writ of habeas corpus.

22       8.    As I mentioned, my full curriculum vitae is attached.  To give some sense

23   of my experience, I mention here the largest civil rights cases, in monetary terms, in

24   which I have been the, or one of the, lead counsel:

25       a.    *Williams v. Block*, Case No. CV-97-03826-CW (C.D. Cal.) and

26   related cases (a series of county jail overdetention and strip search cases, settled

27   for $27 million and a complete revamp of jail procedures).

3

b.    *McClure v. City of Long Beach*, a fair housing case against City of Long Beach for preventing six group homes for the handicapped from opening, where, on August 4, 2004, I obtained a jury verdict before remittitur of $22.5 million (exclusive of attorney's fees). The case ultimately settled for $20 Million).

c.    *Bynum v. District of Columbia*, Case No. 02-956 (RCL) (D.D.C.), a certified class action against the District of Columbia for over detentions and strip searches of persons ordered released from custody, which settled for $12 million.

d.    *Craft v. County of San Bernardino*, EDCV05-0359 SGL (C.D. Cal.), a certified class action against the Sheriff of San Bernardino County for blanket strip searches of detainees, arrestees, and persons ordered released from custody. A partial summary judgment was entered for plaintiffs, who received a $25.5 Million settlement plus injunctive relief;

e.    *MIWON v. City of Los Angeles*, Case No.: CV 07-3072 AHM (FMMx), a class action on behalf of demonstrators attacked by LAPD in MacArthur Park on May 1, 2007, which settled for $12,750,000 plus injunctive relief.

9.    I am rated AV by Martindale-Hubbell. I am listed in Super Lawyers Southern California in the fields of civil rights and class actions.

10.    As my case list demonstrates, I have been involved with, and successful in, a wide range of complex civil rights cases, and have regularly brought fee motions under numerous federal and state fee shifting provisions.

11.    I am familiar with the lead counsel seeking fees in this motion, Carol A. Sobel. I have known Ms. Sobel, and her reputation for litigating civil rights cases, for many years. Since approximately 1993, I have co-counseled several complex civil rights cases with Ms. Sobel, and can say from personal experience that she is an

4

outstanding attorney and an exceptional litigator. Although she has long enjoyed an excellent reputation in the legal community as a litigator, since leaving the ACLU 13 years ago, she has become known as someone who takes on complex civil rights litigation, often on behalf of individuals who have suffered serious legal wrongs, but whose cases do not attract private counsel because of the economics of the practice of law in Southern California. Ms. Sobel is known as a skilled litigator who obtains excellent results for her clients, as the results in this case bear out, and would be considered among the finest civil rights litigators in the country.

12. I have also worked with Rebecca Thornton, who worked with both me and Ms. Sobel on the MIWON case cited earlier. Ms. Thornton is an outstanding attorney, who, in the MIWON case, was one of the attorneys with primary responsibility to assess the individual clients' cases (of which there were nearly 200) for mediation, a task she performed in an exemplary fashion.

13. During my more than forty years of law practice, I have become familiar with the kinds of fees that are prevalent in successful civil rights and public interest cases in Southern California. I review decisions in this area on a regular basis, and often receive e-mails from civil rights lawyers advising of their fee awards. In addition, I have relationships at both small boutique firms and large firms, in which I canvas the range of rates used in complex trial court and appellate litigation. I consider civil rights litigation to be a form of complex litigation, and thus use as a standard the complex litigation rates charged by top firms handling complex litigation. It has been my experience that the rates charged do not differ significantly between large and small firms when the work is complex trial court or appellate litigation.

14. I have reviewed selected billing rate information from numerous law firms in Southern California including Robins Kaplan, Miller & Ciresi, LLP; Munger, Tolles & Olson LLP; Paul, Hastings, Janofsky & Walker LLP; O'Melveny & Myers; Quinn, Emanuel, Urqhart, Oliver & Hedges LLP; Gibson, Dunn & Crutcher LLP;

5

1  Foley & Lardner LLP; Kirkland & Ellis LLP; Heller Ehrman, LLP; Latham &

2  Watkins, the American Civil Liberties Union, and the Disability Rights Legal Center,

3  among others. Through my experience and review of relevant documents, I am

4  generally familiar with the prevailing hourly rates for legal services in Southern

5  California.

6      15.    Compensation for public interest and civil rights representation should be

7  commensurate with compensation in for-profit litigation. Unless it is, firms such as

8  my own or Ms. Sobel's, which has special expertise in litigating civil rights and public

9  interest cases, will be unable to handle such matters on an extensive basis.

10     16.    In *Craft v. County of San Bernardino*, 624 F.Supp.2d 1113 (C.D.Cal.

11 2008), District Judge Stephen Larson found reasonable our then current rates, in

12 conducting a lodestar cross-check in a class action. This was in 2008, based on our

13 rates in 2007. In that case, Judge Larson found that "rates ranging from a high of

14 $725 per hour for Mr. Litt (then an attorney with 38 years experience) to a low of

15 $275 for 2006 graduates, as well as law clerk rates of $200 per hour and paralegal

16 rates from a low of $110 to a high of $225 per hour were supported by numerous

17 declarations establish[ing] that the hourly rates set are similar to those for attorneys of

18 comparable skill and experience at the rates paid for complex federal litigation, and

19 that the rates sought are reasonable and reflect the market for attorneys of comparable

20 skill, experience and expertise in complex federal litigation." 624 F.Supp.2d at 1122.

21 Judge Larson also noted that it "was Congress' intent for civil rights cases" to use the

22 standard of "complex federal litigation" in setting civil rights fee rates. The Court

23 cited "*City of Riverside v. Rivera*, 477 U.S. 561, 575-576 (1986) (quoting Senate

24 Report, at 6, U.S. Code Cong. & Admin. News 1976, p.5913, supra, (Congress

25 intended civil rights fees to be comparable to that for other types of equally complex

26 Federal litigation, such as antitrust cases)." 624 F.Supp.2d at 1123. A copy of the

27 *Craft* Fee Order approving these rates is attached as Exhibit "B".

28

6

17. As noted, Congress considered, and rightly so, civil rights cases to qualify as complex litigation. As I understand it, the claims here are claims under the First Amendment. I also understand that this case resulted in a very lengthy opinion from the Ninth Circuit dealing with multiple, nuanced constitutional questions. Thus, this case qualifies as complex, and the appropriate rates should be determined based on the market for complex litigation.

18. I provide below a chart reflecting rates for complex litigation in bankruptcy court charged by O'Melveny & Myers (OMM) in 2008 for certain select years of graduation. This information was taken from the declaration of an OMM partner filed in support of Plaintiff's fee motion in *Kim v. Shin*, Los Angeles Superior Court, Case No. BC373632.

| Year of Graduation | Position | OMM Rate |
|---|---|---|
| 1985 | Partner | $820 |
| 1994 | Partner | $675 |
| 2005 | Associate | $450 |
| 2007 | Associate | $330 |

19. Other information of which I am aware for attorneys of comparable experience to those here is that:

a. Lieff Cabraser, a well known Plaintiffs' class action firm based in San Francisco, charged, in 2009, $650 per hour for a 1991 graduate, $575 for a 1995 graduate, and $350 for a 2006 graduate;

b. In 2005, Skadden Arps charged $320 per hour for a new admittee to the bar;

c. In 2008, Dewey & Le Boeuf charged $505 for a 2000 graduate, and $395 for a 2005 graduate;

d. In 2007, Kirkland & Ellis charged $485 for a 2000 graduate;

e. The 2009 standard hourly rate for a Morrison & Forrester litigation

7

1    partner who graduated in 1985 was $750 per hour;

2         f.     In 2009, Loeb & Loeb charged $475 for a 2001 graduate, $425 for

3    a 2004 graduate and $350 for a 2006 graduate.

4      20.    Specific matters in which the Court approved attorney fees at the level

5    sought in this fee motion include:

6         a.     *Gamino v. County of Ventura*, Case No. CV-02-9785 CBM (Ex)

7    (strip search class action), where Judge Marshall approved rates for me at $750

8    per hour and $600 per hour for Ernest Bell, a 1988 law graduate. This was

9    based on 2008 rates although the award was in 2009. In doing so, Judge

10    Marshall noted that I was considered a leading civil rights attorney in Southern

11    California and in the country. See Exhibit "C".

12         b.     *MIWON v. City of Los Angeles* (class action and multi-plaintiff

13    claim against the City of Los Angeles for attacking the MacArthur Park

14    immigration rally on May 1, 2007), supra, where Judge Matz approved rates for

15    me of $800 per hour, based on 2009 rates. Paul Hoffman was another of the

16    appointed class counsel in that case, and Judge Matz approved his requested

17    rate of $750. Mr. Hoffman is a 1975 law school graduate. See Exhibit "D".

18         c.     *Rogel v. Redevelopment Agency of the City of Lynwood*, Los

19    Angeles Superior Court, Case No. BS106592, where Judge Kevin Brazile

20    approved Gibson, Dunn & Crutcher's rates, including an hourly rate of $905 for

21    a 1983 graduate, $525 for a 2004 graduate, and $495 for a 2004 graduate.

22    Declaration of Wayne Barsky in Support of Plaintiff's Motion for Order

23    Awarding Attorneys' Fees in Redevelopment Agency of the City of Lynwood,

24    BS106592 (L.A. Superior Court) (requesting rates); Order Awarding Fees in

25    *Rogel* (approving rates). The rates Gibson attorneys sought in *Rogel* were the

26    same as their actual 2009 billing rates for the Gibson lawyers. Although the fee

27    award was reduced for other reasons in *Rogel*, the Court found the requested

28

8

1    rates (up to $905 for lead counsel, a 1983 law graduate and a partner at Gibson,

2    Dunn & Crutcher) had not been shown to be above the community norm for

3    similar work.  Notably, Ms. Thornton was also counsel in *Rogel*, in which the

4    Court approved her rate of $425 an hour.

5        d.    *Lauderdale v. City of Long Beach*, CV 08-979 ABC (JWJx), where

6    Judge Collins recently awarded rates of $525 for a 1999 graduate, $475 for a

7    2001 graduate, $400 for a 2004 graduate, $375 and $395 for 2005 graduates,

8    and $350 for a 2006 graduate.

9        21.   The National Law Journal 2008 Billing Survey reflects comparable rates

10   for national and international with offices in Los Angeles (although the survey does

11   not separate rates for litigation attorneys). For instance, at Manatt, Phelps & Phillips,

12   LLP, the 2008 hourly rate for partners was between $495 and $850, with an average

13   of $626 and a median of $620. Manatt Phelps associates' hourly rates ranged from

14   $290 to $505, including $410 for attorneys with four years' experience and $485 for

15   attorneys with six years' experience. Hughes Hubbard & Reed's rates ranges from

16   $270 to $600 per hour for associates and from $625 to $875 per hour for partners.

17   Sheppard, Mullin, Richter & Hampton's rates ranged from $275 to $455 per hour for

18   associates and from $475 to $795 per hour for partners.

19       22.   In 2010, law firms will be increasing their billing rates by an average of

20   3.2 percent, according to a study cited in the Daily Journal.  A copy of the December

21   2, 2009 Daily Journal article citing this study is attached as Exhibit "E".

22       23.   I understand that Ms. Sobel is requesting fees in this matter at the

23   following rates:

24

25

26

| ATTORNEY | RATE |
|---|---|
| Carol A. Sobel | $725 per hour |
| Rebecca F. Thornton | $450 per hour |

27

28

9

| ATTORNEY | RATE |
|---|---|
| Mary Gordon (attorney) | $275 per hour |
| Mary Gordon (law clerk) | $200 per hour |
| Paralegal | $100 per hour |

24.    The rates requested by plaintiff's counsel in this matter are well within the rates charged by attorneys of comparable experience and reputation in the Southern California area for complex civil rights litigation, and are commensurate with the rates charged by my firm.

25.    Because of my firm's experience and specialization in public interest and civil rights litigation, I am especially familiar with the availability of attorneys in the Southern California area to handle public interest litigation. Very few lawyers are available or willing to undertake such matters. Thus, it is particularly important, where counsel have successfully handled a civil rights matter, as here, that counsel recover their full fees for time spent.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 13[h] day of April, 2010, at Los Angeles, California

_____
Barrett S. Litt

10

**EXHIBIT 2**

**Barrett S. Litt**
Litt, Estuar, Harrison & Kitson, LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017

## Education

1966  B.A. University of California at Berkley
1969  J.D. UCLA School of Law

## Honors and Awards

1987  Pro Bono Firm of the Year Award from Public Counsel (Litt & Stormer)
1992  Civil Rights Firm of the Year Award from the NAACP Legal Defense Fund (Litt & Marquez)
1995  Public Interest Alumnus of the Year Award from UCLA School of Law

## Recent Contributions to Professional Publications

"Class Certification in Police/Law Enforcement Cases", *Civil Rights Litigation and Attorney's Fee Annual Handbook*, Vol.18, Ch.3, West Publishing 2002

"Rights for Wrong*s"*, *Los Angeles Lawyer Magazine*, December 2005

"Select Substantive Issues Regarding Class Action Litigation In The Jail/Prison Setting", *National Police Accountability Project,* October 2006

"Obtaining Class Attorney's Fee*s*" presented at the *Bridgestone CLE Class Action Conference* on April 30, 2009, in  Los Angeles

## Professional

| | |
|---|---|
| 2004 to the present | Litt, Estuar, Harrison & Kitson, LLP |
| 1997 to 2004 | Litt & Associates |
| 1991 to 1997 | Litt & Marquez |
| 1984 to 1991 | Litt & Stormer |

1

Licensed to practice in:

> State of California
> U.S. District Court, Central District of California
> U.S. District Court, Eastern District of California
> U.S. District Court, Northern District of California
> Ninth Circuit Court of Appeals
> Fifth Circuit Court of Appeals
> Eleventh Circuit Court of Appeals
> United States Supreme Court

Admitted Pro Haec Vice in:

> U.S. District of Columbia
> U.S. District Court, Northern District of Georgia
> U.S. District Court, District of Maryland

Rated "AV" by Martindale-Hubbell

Listed in *Southern California Super Lawyers* in the field of civil rights and
class actions for the years 2005, 2006, 2007, 2008, 2009 and 2010.

**Civil Rights Class Actions – Classes Certified:**

*Lopez v. Youngblood*, No. CV07-00474 LJO (DLBx) (E.D. Calif.) (class
action against Kern County, California, for unlawful pre-arraignment and
post-release strip searches and strip searches not conducted in private; class
certification and summary judgment on liability granted);

*Jones v. Murphy*, Case No. CCB 05 CV 1287 (D. Maryland)(class action
challenging overdetentions and illegal strip searches in Central Booking in
Baltimore, MD; class certification granted in part and denied in part);

*Craft v. County of San Bernardino,* 468 F.Supp.2d 1172 (C.D.Cal. 2006)
(certified class action against the Sheriff of San Bernardino County for
blanket strip searches of detainees, arrestees, and persons ordered released

from custody; partial summary judgment decided for plaintiffs; $25.5 Million settlement approved April 1, 2008);

*MIWON v. City of Los Angeles*, Case No.: CV 07-3072 AHM (C.D. Calif.) (class action against City of Los Angeles and others for use of police force and related conduct at MacArthur Park on May 1, 2007; final approval of class settlement for $12,800,000 settlement granted June 24, 2009, the largest class action protest settlement in the Nation)

*Williams v. Block*, Case No.: CV-97-03826-CW (Central District of California) and related cases (a series of county jail overdetention and strip search cases, settled for $27 Million and a complete revamp of jail procedures);

*Bynum v. District of Columbia*, Case No.: 02-956 (RCL) (D.D.C.)(class action against the District of Columbia for overdetentions and blanket strip searches of persons ordered released from custody; final approval of $12,000,000 settlement occurred January 2006);

*Johnson v. District of Columbia*, Case No. 02-2364 (RMC) (D.D.C.) (class action against the District of Columbia and United States Marshals for blanket strip searches of arrestees without reasonable suspicion and not involved in drug or violent activity; partial summary judgment motions pending);

*Barnes v. District of Columbia*, Civil Action No: 06-315 (RCL) (D.D.C.) (class action against District of Columbia for continuing to both over-detain and strip search post-release inmates despite settlement in *Bynum, supra*; class certification granted).

*Gail Marie Harrington-Wisely, et al. v. State of California, et al.*, Superior Court Case No.: BC 227373 (a case involving searches of visitors to California prisons utilizing backscatter x-ray methods without reasonable suspicion; stipulated injunction entered; case currently pending to sort out procedural issues preliminary to appeal or settlement);

*Ofoma v. Biggers*, Case No.: 715400 (Complex Litigation Panel) (Orange County Superior Court)(family discrimination class action settled in 1996 for damages for the individual plaintiffs and the class of residents, a consent decree and an award of attorney's fees);

*People of the State of California v. Highland Federal Savings and Loan*, Case No.: CA 718 828 (Los Angeles Superior Court)(class action filed on behalf of the People of the State of California and a class of tenants residing in several slum buildings located in Los Angeles for financing practices encouraging and perpetuating slum conditions, settled for $3.165 million after decision in *People v. Highland*, 14 Cal.App.4th 1692, 19 Cal. Rptr. 555 (1993) established potential liability for lenders);

*Hernandez v. Lee*, No. BC 084 011 (Los Angeles Superior Court)(a class action on behalf of tenants of numerous buildings for slum conditions settled in 1998 for $1,090,000);

*Mould v. Investments Concept, Inc.*, Case No.: CA 001 201 (Los Angeles Superior Court)(race discrimination class action on behalf of a class of applicants and potential housing applicants, settled in 1992 for a total of $850,000 for the class and a comprehensive consent decree regarding the defendants' discriminatory policies and practices);

*California Federation of Daycare Association v. Mission Insurance Co.*, Case No.: CA 000 945 (Los Angeles Superior Court)(class action on behalf of several thousand family daycare providers whose daycare insurance policies were canceled mid-term or were not renewed by Mission Insurance Company, settled in 1980's for reinstatement of policies and attorney's fees; brought at request of Public Counsel);

## Pending Civil Rights Class Actions – Class Certification Not Yet Ruled On:

*Powell v. Barrett*, Civil Case No. 1:04-cv-1100 (N.D. Ga.)(RWS)(pending class action against the Sheriff of Fulton County, Fulton County, and the City of Atlanta, Georgia, for overdetentions and blanket strip searches of arrestees and persons ordered released from custody; qualified immunity denied to Fulton County Sheriff in *Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 8/23/07)); rehearing en banc granted and decided, 541 F.3D 1298 (11th Cir. Sep 04, 2008; case now remanded to district court for further proceedings on overdetention and post-release strip search issues);

*Amador v. Baca,* No. 10-1649 SVW (RC) (C.D. Calif) (pending class action for group strip searches of women arrestees without probable cause or individualized suspicion);

4

*Davis v. County of Los Angeles*, No. CV 04-8251 AHM (MANx) (C.D. Calif.) (pending class action for failure to adequately address spread of MRSA in the Los Angeles County jail);

*Solis v. County of Los Angeles*, No. CV06-1135 SVW (CTx) (C.D. Calif.) (pending class action for strip searches of persons arrested on warrant without individualized suspicion and strip searches in groups; mediation pending);

*Nozzi v. Housing Authority of the City of Los Angeles*, CV 07-00380 GW (C.D. Calif.) (pending class action against the Housing Authority for violations of due process and federal regulations by failing to provide proper notice of Section 8 rent increase affecting approximately 22,000 tenants; summary judgment granted defendants on liability; case pending on appeal);

*Miranda v. Bonner*, No. CV 08-03178 SJO (PJWx) (C.D. Calif.) (pending class action to certify statewide plaintiffs' and defendants' classes to enjoin, and provide restitution or damages for, seizing and impounding vehicles pursuant to California Vehicle Code §14602.6 without meeting Fourth Amendment or due process standards; case stayed while companion individual case ruling against plaintiffs is appealed).

## Multi-party Civil Rights Cases:

*Hospital and Service Employees Union, SEIU Local 399, AFL-CIO v. City of Los Angeles* (Los Angeles Superior Court) (a settlement in 1993 of $2.35 million against the Los Angeles Police Department for injuries to 148 demonstrators at Century City organized by the Justice for Janitors campaign of SEIU);

*Rainey v. County of Ventura*, Case No.: 96 4492 LGB (C.D. Calif.)(action against County of Ventura for race discrimination on behalf of 12 police officers, settled for damages, structural relief and attorney's fees);

*Lawson v. City of Los Angeles*, Case No.: BC 031 232 (Los Angeles Superior Court)(lawsuit filed in 1991 on behalf of individuals who had been subjected to what plaintiffs alleged were unlawful use of force practices by the Los Angeles Police Department's Canine Unit, settled in 1995 for $3.6 million and comprehensive structural relief);

5

*Tipton-Whittingham v. City of Los Angeles*, Case No.: CV-94-3240 (TH)(C.D. Cal.)(sex discrimination and harassment suit against the Los Angeles Police Department, involving over 25 individual officers, as a result of which the Department has already completely revamped its anti-discrimination policies and procedures; damages claims settled for $4.85 Million in 2004 in addition to separate fee award of nearly $2 Million in 2000 for injunctive relief, resulting in decision in *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, in which the California Supreme Court upheld catalyst fees under California law);

*Hampton v. NRG* (racial harassment in employment claim; jury verdict of $1,000,000 for two former employees, plus award of attorney's fees and costs; settled in mid-'90's while on appeal);

*Zuniga v. Los Angeles Housing Authority,* 41 Cal.App.4th 2 (1995) (holding that the Housing Authority could be held responsible for injuries to tenants after the Housing Authority was put on notice that tenants were being victimized on the premises and took no reasonable measures to prevent the injury; case settled for $1,040,000);

*PIN v. HACLA*, Case No: CV-96-2810 RAP (RNBx)(action against the Housing Authority of the City of Los Angeles on behalf of several hundred present or former tenants for discrimination by failing to provide adequate security for isolated minorities in housing developments, settled in 1998 for $1.3 Million plus a comprehensive structural relief settlement agreement);

*Heidy v. United States Customs Serv.,* 681 F.Supp. 1445 (C.D.Cal. 1988) (injunction against U.S. Customs Service for policies and practices of seizing materials from persons traveling from Nicaragua in violation of the First Amendment);

*Castaneda v. Avol* (Los Angeles Superior Court) (1985) (action on behalf of approximately 350 slum housing residents, settled in 1988 for a comprehensive injunction and $2.5 Million damages, plus a separate award of attorneys' fees).

## Individual Civil Rights Cases:

*Thomas Goldstein v. City of Long Beach et al.*, Case No. 04-CV-9692 AHM (Ex) (C.D. Cal.) (pending case for wrongful murder conviction; plaintiff

6

spent 24 years in prison before his habeas petition was granted, and he was not re-tried; trial scheduled for Summer, 2010);

*McClure v. City of Los Angeles,* No. CV-92-2776-E (C.D. Cal.)(fair housing and equal protection case against City of Long Beach and its agents for preventing six group homes for Alzheimer's victims from opening; jury verdict of $22.5 Million (reduced on remittitur to $13,826,832) plus approximately $10,000,000 in attorney's fees and costs; settled while on appeal for $20 Million);

*U.S. v. Hovsepian,* 359 F.3d 1144, 1147 (9th Cir. 2004)(en banc) (successful action to naturalize individuals previously convicted of conspiracy to bomb Turkish consulate in Philadelphia), aff'd en banc after remand, 422 F.3d 883 (9/6/05);

*Walker v. City of Lakewood,* 263 F.3d 1005 (9th Cir. 2001) (reversing district court decision dismissing fair housing organization's claim against city for retaliation for supporting tenants suing landlord; case subsequently settled for structural relief, damages and attorney's fees);

*Tavelman v. City of Huntington Park* (individual employment discrimination case against the City on behalf of a Jewish police officer who had been subjected to a campaign of religious harassment which was settled in mi-'90's for $350,000);

*Ware v. Brotman Medical Center* (Los Angeles Superior Court) (1993 $2.5 million jury verdict against hospital for removal of hospital privileges of black doctor; settled for $1.75 million);

*Mathis v. PG&E* (1991 $2 million verdict against PG&E for barring contract employee from Diablo Canyon Nuclear Power Plant; reversed by the Ninth Circuit);

*Macias v. State of California* (Los Angeles Superior Court) (action against the State of California and others for blinding of young man as a result of exposure to malathion spray, a portion of which was decided in *Macias v. State of California,* 10 Cal.4th 844 (1994));

7

*Melgar v. Klee* (Los Angeles Superior Court) (1988) ($1.5 million jury
verdict against Los Angeles Police Department for police shooting; settled
for $1.45 million).

**Published Civil Rights Decisions (from 1995 forward):**

*Bynum v. District of Columbia*, 412 F.Supp.2d 73 (D.D.C. 2006);

*Craft v. County of San Bernardino,* 468 F.Supp.2d 1172 (C.D.Cal. 2006);

*Craft v. County of San Bernardino,* 2008 WL 916965 (C.D.Cal., April 1, 2008)
(NO. EDCV05-00359 SGL)

*Bynum v. Dist. of Columbia*, 384 F.Supp.2d 342 (D.D.C. 2005);

*Jones v. Murphy*, 470 F.Supp.2d 537 (D.Md. 2007);

*Powell v. Barrett*, 376 F.Supp.2d 1340 (N.D.Ga. 2005);

*Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 8/23/07)

*Powell v. Barrett,* 541 F.3D 1298 (11th Cir. 2008) (en banc) [this opinion
overruled a portion of the preceding panel decision; after remand to the
panel, it remanded the remaining issues to the District Court];

*U.S. v. Hovsepian*, 422 F.3d 883 (9th Cir. 2005) (en banc);

*U.S. v. Hovsepian*, 359 F.3d 1144 (9th Cir. 2004) (en banc);

*Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004);

*Tipton-Whittingham v. City of Los Angeles*, 316 F.3d 1058 (9th Cir. 2003);

*Walker v. City of Lakewood*, 272 F.3d 1114 (9th Cir. 2001);

*Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001);

*Haynie v. Superior Court*, 26 Cal.4th 1061 (Cal. S. Ct. 2001);

*Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999);

*Mathis v. Pacific Gas and Elec. Co.,* 75 F.3d 498 (9th Cir. 1996);

*Silva v. Block*, 49 Cal.App.4th 345 (1996);

*Zuniga v. Housing Authority,* 41 Cal.App.4th 82 (1995);

*Macias v. State of California*, 10 Cal.4th 844 (Cal. S. Ct. 1995).

**EXHIBIT 3**

Westlaw.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

☞

United States District Court,
C.D. California.
Karen CRAFT, et al., Plaintiffs,
v.
COUNTY OF SAN BERNARDINO, et al., Defendants.
**Case No.: EDCV05-00359 SGL.**

April 1, 2008.

**Background:** County jail inmates brought class action alleging that county's practice of routinely strip-searching inmates without probable cause or reasonable suspicion that inmates were in possession of weapons or drugs violated the Fourth Amendment. After court granted inmate's motion for partial summary judgment, parties entered into private mediation and reached settlement agreement providing for, inter alia, class fund award of $25,648,204. Inmates moved for award of attorney's fees and costs.

**Holding:** The District Court, Stephen G. Larson, J., held that class counsel were entitled to attorney's fees award in amount of 25% of settlement fund.

Ordered accordingly.

West Headnotes

**[1] Attorney and Client 45 ⟜155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases
In a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating an attorney fee award, but the primary basis of the fee award remains the percentage method.

**[2] Attorney and Client 45 ⟜155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases
In a common fund case, 25% of the common fund is the benchmark award for attorney fees.

**[3] Attorney and Client 45 ⟜155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

When awarding attorney fees in a common fund case, a court may consider the following factors when determining the benchmark percentage of the common fund to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's lodestar.

**[4] Attorney and Client 45 ⬢155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases
County jail inmates' class counsel were entitled to attorney's fees award in amount of 25% of $25,648,204 settlement fund, plus costs, in class action alleging that county's practice of routinely strip-searching inmates without probable cause or reasonable suspicion of weapon or drug possession violated the Fourth Amendment; counsel obtained excellent pecuniary and nonpecuniary results in complex and risky case involving 150,000 class members, 20,000 claims, and five certified classes, each of which presented unsettled legal issues, tens or hundreds of thousands of future inmates benefited from policy changes brought about by suit, counsel were highly experienced and highly regarded civil rights lawyers with extensive class action experience, counsel expended extensive effort litigating case to eve of trial, opt-outs of less than 1/30th of 1% of class and only a handful of objections indicated overwhelmingly strong support for settlement, and while 25% of fund represented multiplier of 5.2 times the $1.2 million lodestar, it was the norm settlement funds of size involved. U.S.C.A. Const.Amend. 4.

**[5] Federal Civil Procedure 170A ⬢2737.13**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorney Fees
            170Ak2737.13 k. Class Actions; Settlements. Most Cited Cases
Attorney fees in class action cases may be awarded even though the benefit conferred is purely non-pecuniary in nature.

**[6] Attorney and Client 45 ⬢155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases
In determining award of attorney fees from settlement fund in class action, a lodestar cross-check is not required.

**[7] Attorney and Client 45 ⬢155**

45 Attorney and Client
    45IV Compensation
        45k155 k. Allowance and Payment from Funds in Court. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

Class counsel who negotiated settlement of approximately $25 million established attorney fees lodestar of approximately $1.2 million in county jail inmates' class action alleging that county's practice of routinely strip-searching inmates without probable cause or reasonable suspicion of weapon or drug possession violated the Fourth Amendment; rates submitted in support of lodestar cross-check were reasonable and reflected the market for attorneys of comparable skill, experience, and expertise in complex federal litigation, and other counsel would likely have had to spend considerably more time to accomplish same result. U.S.C.A. Const.Amend. 4.

**\*1114** Barrett S. Litt, Paul J. Estuar, Litt, Estuar, Harrison & Kitson, LLP, Los Angeles, CA, Robert Mann, Donald W. Cook, Attorneys at Law, Los Angeles, CA, for Plaintiffs.

## ORDER AWARDING ATTORNEY'S FEES AND COSTS.

STEPHEN G. LARSON, District Judge.

## I. INTRODUCTION

This case is a class action on behalf of various classes of inmates who were in San Bernardino County Jail. This action was filed on May 3, 2005. There are five classes certified by the Court. Plaintiffs filed a class certification motion, which was granted by the Court on October 11, 2006. Subsequently, in the context of the settlement**\*1115** of the case, the Court approved a refined and expanded class definition. The classes are now defined as follows.

a. *Pre-Arraignment Strip Search Class.* San Bernardino County Jail arrestees booked on offenses not involving weapons, violence or drugs who were transferred from a local Type 1 jail (a Type 1 jail is a local detention facility used for the detention of persons for not more than 96 hours excluding holidays after booking) to a Type 2 jail (a Type 2 jail is a local detention facility used for the detention of persons pending arraignment, during trial, and upon a sentence or commitment) prior to arraignment and were, at the time of admission to the Type 2 jail, subjected to a strip search or visual body cavity search without reasonable suspicion or probable cause to believe they were in possession of weapons or drugs, pursuant to a blanket policy, practice or custom of Defendants of strip searching all such arrestees. The class period is May 3, 2003-December 11, 2006.

b. *US Marshal [aka USM] Strip Search Class.* San Bernardino County Jail inmates who were in federal custody and who, pursuant to agreement between the United States and San Bernardino County, were housed in a San Bernardino jail facility, and who, upon being taken from federal to San Bernardino custody, were strip searched by the San Bernardino County Sheriff's Office without reasonable suspicion or probable cause to believe that they were in the possession of weapons or drugs, pursuant to a blanket policy, practice of custom of Defendants of strip searching all such transferees. The class period is May 3, 2003-December 11, 2006.

c. *Transport Strip Search Class.* San Bernardino County Jail inmates who were in the cus-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

tody of another law enforcement agency, and who were transferred to San Bernardino
County custody to be arraigned on charges in San Bernardino County, and who, upon being
taken into San Bernardino County custody, were strip searched by the San Bernardino
County Sheriff's Office without reasonable suspicion or probable cause to believe that they
were in the possession of weapons or drugs, pursuant to a blanket policy, practice of custom
of Defendants of strip searching all such transferees. The class period is May 3,
2003-December 11, 2006.

d. *Post-Release Strip Search Class.* San Bernardino County Jail inmates who appeared in
court, and, at the conclusion of their court appearance, were entitled to release and, prior to
release, were subjected to a strip search or visual body cavity search without reasonable sus-
picion or probable cause to believe they were in possession of weapons or drugs, pursuant to
a blanket policy, practice or custom of Defendants of strip searching all such inmates. The
class period is May 3, 2003-December 11, 2006.

e. *Group Strip Search Class.* County jail inmates who are not members of either the Pre-
Arraignment, USM, Transfer or Post-Release Strip Search Classes who were subjected to a
strip search or visual body cavity search in a group pursuant to the blanket policy, custom or
practice of the San Bernardino County Jail of strip searching inmates in a group. The class
period is May 3, 2003-March 7, 2007.

The Plaintiffs filed a motion for partial summary judgment, which was opposed by Defend-
ants. On December 7, 2006, the Court granted Plaintiffs' motion, finding that 1) the County's
practice of routinely strip searching pre-arraignment arrestees who were placed in a local
County facility and then transferred to its main detention centers at either Central Detention
Center *1116 or West Valley Detention Center violated the Fourth Amendment, and 2) the
County's practice of routinely strip searching inmates who appeared in court and were ordered
or became entitled to release from custody before releasing them violated the Fourth Amend-
ment. The Court's order considered the fact that strip searches occurred in groups as a factor
weighing against their constitutionality but did not decide whether group strip searches inde-
pendently violated the Fourth Amendment. *See Craft v. County of San Bernardino,* 468
F.Supp.2d 1172 (C.D.Cal.2006).

Subsequently, the parties entered into mediation before an agreed upon private mediator. After
several sessions, the parties agreed to the basic terms of the settlement, which include: 1) an
estimated class fund of $25,500,000 (the exact amount of which is $25,648,204; 2) a point
system based upon the records of the San Bernardino County Jail to determine how many
points are awarded to the Plaintiffs; 3) a special allocation of $200,000 to the seven Named
Plaintiffs, to be allocated as agreed to by them and their counsel; 4) a reserve to the class fund
of $648,204 that may be used to pay half of any opt-out fees and awards, any remainder of
which then goes to the remaining class fund for distribution to class members, and 5) the
Plaintiffs' right to seek an award not to exceed 25% of the class fund, now determine to be
$25,648,204. The Court has approved that settlement in a separate order. See Final Order of
Approval and Settlement, concurrently filed herewith.

Plaintiffs filed a motion for attorneys' fees seeking 25% of the fund as a class fund award. For

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

the reasons stated below, the Court awards Plaintiffs' counsel $6,375,000 (25% of the class fund) as attorneys' fees, plus $70,564.64 in costs.

## II. THE STANDARDS FOR AWARDING CLASS FUND ATTORNEYS' FEES.

[1] It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.,* 307 F.3d 997, 1006 (9th Cir.2002); *see also, e.g., Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir.1989); *In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1295 (9th Cir.1994)). While the court has discretion to use either method, "the primary basis of the fee award remains the percentage method." *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir.2002). *See also Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990) ("benchmark percentage [of 25% of the fund] should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"); *In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 307 (3rd Cir.2005)) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method").

[2][3] The Ninth Circuit has "established 25% of the common fund as the 'benchmark' award for attorney fees." E.g., *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993); *see also Six Mexican Workers v. Arizona Citrus Growers, supra.* Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's *1117 experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403, *18 (C.D.Cal.2005) (exercising discretion to award 1/3 of the class fund as a fee). The Court will address each factor below.

### A. The Complexity Of The Issues, Counsel's Skill and the Degree of Risk Assumed By Counsel.

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. § 1988) was passed in 1976. *See* S.Rep.No. 94-1011, *1976 U.S.Code Cong. & Admin. News* at 5908, 5913 (civil rights fees should "be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases"). The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials, as this Court recognized in the partial summary decision in this case. *See Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal.2006) ("As the Ninth Circuit has noted: 'We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security.' *Way v. County of Ventura,* 445 F.3d 1157, 1161

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

(9th Cir.2006).")

[4] The settlement in this case ultimately encompassed five categories of class members. At the time this lawsuit was filed, the law was not settled in the areas encompassed by the suit, and in some areas the law was very uncertain. All Ninth Circuit decisions to date finding strip searches unconstitutional involved pre-arraignment strip searches in the context of people not being placed in the general population. *See, e.g., Way v. County of Ventura,* 445 F.3d 1157, 1159 (9th Cir.2006) (pre-arraignment arrestees charged with being under the influence of drugs); *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam) (pre-arraignment arrestee charged with traffic violation), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1040 n. 1 (9th Cir.1999) (en banc); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as amended) (pre-arraignment arrest for felony grand theft), *implied overruling on other grounds recognized by Act Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992); *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991) (same).

The issues presented by this case did not fit into this well established area of the law. The first class certified in the list of classes finally certified in this action (Class "a", above, Pre-Arraignment Strip Search Class) were not direct pre-arraignment arrestees but pre-arraignment transferees from another jail. In fact, the summary judgment decision in this case regarding the constitutionality of these strip searches entailed a complex and subtle analysis of the factors involved in determining the unconstitutionality of the strip/visual body cavity search policy, and there were no cases directly on point. *See Craft v. County of San Bernardino,* 468 F.Supp.2d 1172 (C.D.Cal.2006). The issues of federal transferees (Class "b", above, U.S. Marshal Strip Search Class), and transferees from a non-San Bernardino jail (Class "c", above, Transport Strip Search Class) posed potentially more difficult problems. These two issues were agreed to during settlement negotiations and were never ruled on by the Court.

**\*1118** The fourth class finally certified by this Court involved the policy of strip/visual body cavity searches of post-release inmates. (See Class "d", above, Post-Release Strip Search Class.) At the time the complaint was filed, there was one district court decision that had ruled factually, as opposed to denying a motion to dismiss on the issue, that such a policy was unconstitutional (as distinct from cases finding a particular search incident unconstitutional). *Gary v. Sheahan,* 1998 WL 547116 (N.D.Ill.). Subsequently, there has been a district court decision finding such a policy unconstitutional. *Calvin v. Sheriff of Will County,* 405 F.Supp.2d 933, 946 (N.D.Ill.2005). There has also been a Circuit Court decision to that effect- *Powell v. Barrett,* 496 F.3d 1288 (11th Cir.2007) (finding no qualified immunity for the policy)-but the Eleventh Circuit has since granted re-hearing en banc.

The fifth class finally certified by the Court was the policy of conducting strip/visual body cavity searches in a group. (See Class "e", above, Group Strip Search Class.) This class was not separately briefed on summary judgment, but was considered on that motion only as it was a factor in the pre-arraignment and post-release searches. While there is ample law on the fact that privacy is a factor in the overall assessment of the constitutionality of a strip search (*see, e.g., Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal.2006) (citing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

cases for fact that group nature of strip searches of pre-arraignment arrestees is a factor in de-
termining that the searches violated the Fourth Amendment)), there is very little stating that a
strip search in a group setting is in and of itself a constitutional violation. Plaintiffs have
called only two cases to the Court's attention finding a policy of group strip searches unconsti-
tutional, despite language in many others implying that conclusion. One is a 22 year old case
granting an injunction, and the other is a case after this action was filed on a motion to dismiss
(in which Mr. Litt is also counsel). Neither is a court of appeals decision. *See Smith v. Mont-
gomery County, Md.,* 547 F.Supp. 592, 599 (D.Md.1982) (*Smith I*) (enjoining, *inter alia,* any
policy that permitted conducting visual searches other than in private; "with respect to con-
ducting a strip search in private, even if all defendants' arguments were accepted, there is no
reason why the initial search of incoming detainees cannot be done in private"); *Smith v.
Montgomery County, Md.,* 607 F.Supp. 1303 (D.C.Md.1985) (*Smith II*) (emphasis supplied)
(new judge in the same case affirmed the injunction previously entered; no qualified im-
munity); *Jones v. Murphy,* 470 F.Supp.2d 537, 548 (D.Md.2007) (arrestees subject to policy
of "being strip searched in a non-private setting also violates what appears to be a clearly es-
tablished right in the Fourth Circuit").

As a general proposition, "the case law in this area [jail strip searches] is far from stable." *Mc-
Bean v. City of New York,* 233 F.R.D. 377, 387 (S.D.N.Y.2006) (approving class settlement,
and noting that the leading case in the Second Circuit on the issue had been from a divided
panel, with one judge dissenting and one concurring based on established precedent). *See also
Evans v. Stephens,* 407 F.3d 1272 (11th Cir.2005) (en banc) (suggesting in dicta that entry in-
to the general population may be a per se justification for a strip/visual body cavity search but
not deciding the issue in that case). The instability of the case law in this area is clearly illus-
trated by the history of *Powell v. Barrett, supra,* 496 F.3d 1288 (11th Cir.2007) (finding no
qualified immunity for policies of routinely strip searching pre-arraignment and post-release
inmates). The Eleventh Circuit granted rehearing en banc in the case on February 1, 2008, al-
though no motion for rehearing was filed. The Circuit's grant **\*1119** of en banc review in such
circumstances suggests the possibility that the Eleventh Circuit will adopt a markedly differ-
ent analysis from that of the Ninth and other Circuits in this complex and difficult area of the
law. This evidences the risk for Plaintiffs' counsel inherent in litigation of this type.

Declarations filed in support of Plaintiffs' motion for attorneys' fees from experienced class
and civil rights lawyers noted several particular difficulties in litigation of this kind, including
1) particular challenges and expertise required to establish a policy or custom under *Monell v.
Dept. Soc. Serv.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), 2) great deference
is given to jails in addressing security issues, 3) the law often differs from circuit to circuit,
and 4) there is a greater risk than normal that the whole legal landscape could change by vir-
tue of a change in the law, particularly if the Supreme Court addresses the issue (which it has
not done in the area of strip searches of pre-trial detainees since *Bell v. Wolfish,* 441 U.S. 520,
99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), almost 30 years ago. The Court agrees that all of these
reflect risks for Plaintiffs' counsel in pursuing litigation of this type.

In addition to the risk of establishing liability, class certification carries risks and requires ex-
perienced class counsel. Whether to certify a class rests within the sound discretion of the
court. *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir.2003). *Armstrong v. Davis,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

275 F.3d 849, 867 (9th Cir.2001) (district court's decision to certify a class is subject to "very limited" review and will be reversed "only upon a strong showing that the district court's decision was a clear abuse of discretion") (citation omitted); *Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir.2005) ( "[a]buse of discretion is 'a highly deferential standard'; review 'is limited to assuring that the district court's determination has a basis in reason' ") (citation omitted). Courts have declined class certification in strip search cases. *See, e.g., Noon v. Sailor*, 2000 WL 684219, *1 (S.D.Ind.2000) (denying motion to reconsider denial of class certification, citing manageability and broad district court discretion). Certifying damages classes where the damages are not susceptible of mathematical calculation, as here, is also a challenge for plaintiffs' counsel. *See, e.g., Allison v. Citgo*, 151 F.3d 402, 415 (5th Cir.1998) (damages in Title VII case are too individualized to be incidental to injunctive relief; suggesting, in upholding denial of certification of 23(b)(3) class, that individualized damages determinations make it difficult if not impossible to meet the superiority and manageability requirements of Rule 23(b)(3)).

Aside from the complexity of the legal issues, there are other complexities. Data analysis in a case such as this is complex, requiring a high degree of sophistication and background in such analyses. Analysis of the Defendant's data is the basis of determining class membership and entails writing specialized code to determine who belongs in each class, based on the particular facts and issues of each case. Mediation requires reaching a mutual agreement on analyzing the data, as well as issue involving the structure of the class fund, its administration and the like.

All these considerations are factors in determining both the complexity of the case and the degree of risk involved in the litigation. Even with the body of law in areas clearer than most involved here, substantial uncertainty and risk exists in pursuing any strip search claims against jails and in obtaining class certification, and the quality of the representation makes a large difference. For the reasons stated, plaintiffs' counsel brought to bear substantial expertise, addressed and obtained favorable**1120** rulings on several complex issues, and faced substantial risk of non-payment. The risk lay in establishing liability, in obtaining class certification-both of which were vigorously contested-and in reaching a favorable settlement.

Class counsel declined substantial other work to pursue this case. Mr. Litt and Mr. Estuar, who concentrate more or less exclusively on civil rights class actions, handle only about 10-12 cases at a time, for each of which it is anticipated that in the range of 1500-5000 hours or more will be required to see the case to completion. In this case, by the conclusion of the case, well over 2000 hours will have been expended on the case.

### B. Counsel's Experience

Class counsel are highly experienced and highly regarded civil rights lawyers, with extensive class action experience. Mr. Litt is a well known and highly regarded civil rights lawyer specializing in civil rights class actions, especially law enforcement class actions. He has been lead counsel in two other eight figure strip search settlements aside from this one, and is lead counsel in several other pending strip search class actions in California, Washington D.C.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

Maryland and Georgia. He has several seven figure, and one eight figure, civil rights trial ver-
dicts. With this case, he will have been lead counsel in three of the four largest strip search
cases, measured in terms of monetary recovery, in the United States. Mr. Estuar has worked
with Mr. Litt for many years and also specializes in complex civil rights litigation, and has
worked with him on the strip search cases described above. The other class counsel in this
case-Mr. Mann and Mr. Cook-have long histories of working on law enforcement civil rights
cases in general, including several law enforcement civil rights class actions. They specialize
in police misconduct cases and have handled hundreds of such cases.

### C. The Effort Expended By Counsel.

Counsel litigated this case to the eve of trial. This entailed the following efforts by Class
Counsel: 1) extensive investigation of the underlying circumstances, including obtaining ques-
tionnaires and interviews with many class members; 2) preparation of the complaint; 3) the
Rule 26 conference and report; 4) 2 requests for production of documents; 5) extensive ana-
lysis of hard copy documents produced 6) 1 set of interrogatories, 7) 14 depositions, 8) a stip-
ulated protective order, 9) a discovery motion, 10) extensive analysis of computerized jail
data; 11) successful motions for class certification and partial summary judgment, 12) extens-
ive mediation efforts (including multiple mediation sessions), 13) preparation of complex set-
tlement documents, and 14) handling class administration issues and class inquiries from the
Preliminary Approval to the Final Approval of the settlement. In summary, Class Counsel's
efforts were extensive, and involved all that occurs in a case that is litigated up to the eve of
trial.

### D. The Result Obtained For The Class

This case was hard fought. Only after plaintiffs obtained partial summary judgment on two of
the key issues in the case did defendants change their practices and open settlement discus-
sions. The class members were paupers or low income persons, and unable to pay Class Coun-
sel for their time. The settlement was the result of arm's length negotiations entered only after
plaintiffs obtained class certification and partial summary judgment. The settlement negoti-
ations were conducted with the assistance of an independent mediator. Due exclusively to
Class Counsel's efforts, the class fund was created in the estimated amount of $25,500,000.

**\*1121** There were approximately 150,000 class members in the various classes based on the
County's data, and over 20,000 claims filed. Unlike most class actions, plaintiffs were persons
charged with crimes and, thus, not people generally considered sympathetic or desirable by
the public at large. *See, e.g., Battle v. Anderson* 564 F.2d 388, 398 (10th Cir.1977) (in prisoner
civil rights class action, "plaintiffs' class are generally a feared and despised class"); *Morales
Feliciano v. Hernandez Colon,* 697 F.Supp. 51, 60 (D.Puerto Rico 1988) ("The general popu-
lation's attitude toward those who commit or are accused of committing crimes is understand-
ably one bordering in despise. Many Puerto Ricans believe that since plaintiffs are criminals,
they deserve the conditions under which they live in the prisons.").

According to Class Counsel, this settlement represents the second largest total monetary set-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

tlement ever reached for strip searches in the United States. There are two other comparable cases in terms of size. One is *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.), a case settled several years ago for an amount ranging from $19.5 Million to approximately $51 Million, depending on the extent of the claims made. That case, unlike this one, addressed only cases involving settled law, i.e., traditional pre-arraignment strip searches conducted without reasonable suspicion.

In this case, there were five groups ultimately settled, as discussed previously. One involved pre-arraignment strip searches of those transferred from other San Bernardino County jails; this class covered only a few thousand of the approximately 150,000 class members. Unlike the New York case, even the law on this issue was not settled because these were transferees, rather than direct arrestees, as was the case in New York. The other issues in this case involve considerably less settled law than in *Tyson.*

The second comparable case, also handled by the same counsel as here, is *Williams v. Block, supra,* Case No. CV 97-03826-CW (C.D.Cal.2001). That case involved a $27 Million settlement, covering two classes-a class of inmates overdetained after they became entitled to release, and a class of inmates strip searched after they became entitled to release. The parties estimated for settlement purposes that the two classes had approximately equal value, thus valuing the strip search class at approximately $13.5 Million. In addition, in the LA case, the time period covered was longer, the LA County jail is larger, and the number of potential strip search class members was greater than here. See Declaration of Barrett S. Litt. Thus, by contrast, the settlement here was both more substantial and addressed several issues not involved in *Williams.*

[5] Nor can the results in this case be judged solely by the monetary component of the settlement. Due to the litigation, the County has stopped all of the strip search practices addressed in this settlement. See Preliminary Approval Order, ¶ 14. That is a major accomplishment, independently of the monetary settlement. "Attorneys' fees [in class action cases] may be awarded even though the benefit conferred is purely non-pecuniary in nature." *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 169-70 (3d Cir.1975) (citing *Mills v. Elec. Auto-Lite,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)); *see also Hall v. Cole,* 412 U.S. 1, 7 n. 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) ("the rationale of ... [the class fund doctrine] must logically extend, not only to litigation that confers a monetary benefit on others, but also to litigation 'which corrects or prevents an abuse which would be prejudicial to the rights and interests' of those others.") *1122 (Citations omitted.). As a result of counsel's efforts, hundreds of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip search necessarily entails. *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

### E. The Reaction Of The Class

Claim forms were mailed to 150,084 class members. There were 20,350 timely claim forms, and 781 late claims. There were 48 timely opt-outs, eight people who timely filed opt-out notices and claims, and up to 13 timely objections. The objections were addressed in the Order

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

of Final Approval and Settlement; two are likely not objections at all, and none raised any substantive issues regarding the fairness of the settlement from a class perspective. This is a highly favorable reaction by the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,* 2001 WL 34089697, *8 (W.D.Wash.2001) (court found that the "class members overwhelmingly support[ed] the settlement" where there were over 37,000 notices sent out, 2,745 class members participated in the settlement, "only nine objections were submitted", and there were 86 timely opt-outs and over 20 additional defective or untimely opt-outs; "these indicia of the approval of the class of the terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections and appeal by objectors, "fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"; court did not abuse its discretion in approving settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977) (approximately 1% of 31,000 class members opted out; "the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"). Here, the opt-outs were less than 1/30th of 1% of the class, and there was only a handful of objections, indicating overwhelmingly strong support by the class for the settlement.

### F. Comparison With Counsel's Lodestar.

[6] A lodestar cross-check is not required in this circuit, and in some cases is not a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.,* 2007 WL 221862, *16 (N.D.Cal.2007) (no lodestar cross check conducted in an early settlement of the case, although 8 class members (out of 13,176) and the New York attorney general objected to the settlement, 280 class members opted out, and the New York attorney general and at least two of the class members objected to the 25% of the fund request as excessive; court awarded fees of $11,250,000 despite the fact that the $45 Million fund was subject to a reversion for unclaimed funds). Nonetheless, plaintiffs, without request by the Court, presented their lodestar to allow it to do a lodestar check if it so wished.

[7] The Court has conducted a lodestar cross-check. Plaintiffs provided detailed documentation of their time. Plaintiffs established a lodestar of approximately $1.2 Million (including post-approval projected time). They submitted rates ranging from a high of $725 per hour for Mr. Litt (an attorney with 38 years experience) to a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and paralegal rates from a low of $110 to a high of $225 per hour. In addition, they submitted documentation showing costs in the case amounted to $70,564.64, the largest component\*1123 of which was payment to their data consultants.

Plaintiffs' counsel are experienced civil rights litigators who are at the top of their field of expertise-civil rights litigation with special expertise in civil rights class actions. Plaintiffs' counsel's hourly rates are addressed and supported by numerous declarations filed with this motion. These declarations establish that the hourly rates set are similar to those for attorneys of comparable skill and experience at the rates paid for complex federal litigation, which was Congress' intent for civil rights cases. *See City of Riverside v. Rivera,* 477 U.S. 561, 575-576,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
(Cite as: 624 F.Supp.2d 1113)

106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) (quoting Senate Report, at 6, U.S.Code Cong. & Admin. News 1976, p. 5913, *supra,* (Congress intended civil rights fees to be comparable to that for "other types of equally complex Federal litigation, such as antitrust cases"). Counsel established that the rates requested were their normal hourly rate for civil rights litigation, that these are the rates they charge private clients on the rare occasions that they do retained work, and that they have frequently been awarded their current rates in civil rights cases in attorney fee motions. The Court finds that the rates sought are reasonable and reflect the market for attorneys of comparable skill, experience and expertise in complex federal litigation.

The Court further notes that plaintiffs' counsel's time in this case is likely as low as it is due to plaintiffs' counsel exceptional experience in litigation of this type. Without such expertise, it is likely that the hours would have been significantly higher to achieve the same result. Other counsel, even those experienced in civil rights litigation, would likely have had to expend considerably more time to accomplish the same result.

The plaintiffs' request in this case for 25% of the class fund would result in a fee of $6,375,000, which is a multiplier of approximately 5.2 times the $1.2 Million lodestar in this case. The Court has concluded that it will award Class Counsel 25% of the class fund, and addresses the reasons for doing so below.

## III. THE COURT AWARDS CLASS COUNSEL 25% OF THE CLASS FUND.

Although, as noted previously, it is well settled in the Ninth Circuit that a court has discretion to award either a percentage of the class fund or a lodestar award in a class fund attorney's fee, the "the primary basis of the fee award remains the percentage method," *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir.2002), a reflection of the general trend towards the percentage of the fund method to award class attorneys' fees. *See, e.g., Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ( "percentage of the fund approach is the better reasoned in a common fund case"); *In Re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 307 (3rd Cir.2005)) ("the lodestar cross-check does not trump the primary reliance on the percentage of common fund method"). This method aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund. *See Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn. 3, 1271 (D.C.Cir.1993) (noting that the lodestar approach "encourages significant elements of inefficiency", by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage of the fund approach "more accurately reflects the economics of litigation practice", and "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the *1124 Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Gaskill v. Gordon,* 160 F.3d 361, 363 (7th Cir.1998) (in "defining a reasonable fee in representative actions, the law should 'mimic the market'"); *accord, Lealao v. Beneficial Cal., Inc.,* 82 Cal.App.4th 19, 47, 97 Cal.Rptr.2d 797) (2000) (quoting *Gaskill, supra);* *Ketchum v. Moses,* 24 Cal.4th 1122, 1132, 104 Cal.Rptr.2d 377, 17 P.3d 735 (2001) ("purpose of a fee enhancement or so-called multiplier for contingent risk is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

to bring the financial incentives for attorneys enforcing important constitutional rights ... into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis"). *See also* Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 Rev.Litig. 525, 534 (1998) (the percentage of the fund approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class. Hence, under the percentage approach, the class members and the class counsel have the same interest-maximizing the recovery of the class"); *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, *16 (D.N.J.2005) (citing cases) (attorneys "regularly contract for contingent fees between 30% and 40%").

Silber and Goodrich, *supra,* advocate that class fund fees should not diminish on a percentage basis, as some courts have done, because that undermines the full alignment between class counsel and the class. This is because, if the percentage of fees go down as the size of the fund goes up, a substantial increase in the size of the fund may be only marginally beneficial to the class counsel while it may be extremely beneficial to the class, with the result being that the economic interests of the class and counsel become mis-aligned. They reviewed two studies of fee awards in common fund cases. One study, done of four districts in 1996 by the Federal Judicial Center, found that most fee awards in common fund class actions were between 20% and 40% of the gross monetary settlement, with little variation between districts. The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. *Id.* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id.* at 546-549.

Several courts have noted the limitations of the lodestar method in class cases. *See e.g., Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 (9th Cir.2002) ("it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee"); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 689-91 (M.D.Ala.1988) (cataloguing criticisms of the lodestar approach to fee calculation); *see also Manual for Complex Litigation* 4th Ed. § 14.121 (2004) ("in practice, the lodestar method is difficult to apply, time consuming to administer, inconsistent in result, ... capable of manipulation, ... [and] creates inherent incentive to prolong the litigation").

In this case, plaintiffs are seeking a 25% of the fund award. This 25% reflects the Ninth Circuit's benchmark in class fund cases. *E.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993); *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir.1990). **\*1125** Higher awards are available when they are warranted under the circumstances. *E.g., In re Pacific Enterprises Securities Litigation,* 47 F.3d 373, 378-379 (9th Cir.1995). The 25% is substantially below the average class fund fee nationally and below what Mr. Litt has received in two other strip search cases. See Litt Declaration (noting award of 1/3 of the class fund in *Bynum v. District of Columbia,* 412 F.Supp.2d 73 (D.D.C.2006) and 35.47% of the class fund in *Williams v. Block, supra* ).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

A 25% of the fund award will result in a multiplier of approximately 5.2. While this is a high end multiplier, there is ample authority for such awards resulting in multipliers in this range or higher. *See, e.g., In re Merry-Go-Round Enterprises, Inc.,* 244 B.R. 327 (Bankr.D.Md.2000) (40% award for $71 million fund awarded, resulting in a cross-check multiplier of 19.6); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* 2005 WL 1213926 (E.D.Pa.) ($100 Million class fund in antitrust case, with an award of 20% of the fund, which amounted to a multiplier of 15.6); *In re Rite Aid Corp. Sec. Litig.,* 146 F.Supp.2d 706 (E.D.Pa.2001) (in $193 Million fund, class counsel awarded fee of 25% of fund, which amounted to $48 Million and represented a multiplier of 4.5-8.5, which the court described as "handsome but unquestionably reasonable"); *In re Cendant Corp. PRIDES Litigation,* 243 F.3d 722, 732 (3rd Cir.2001) (5.7% of $341,500,000 settlement awarded, resulting in multiplier of 7); *In re Rite Aid Corp. Sec. Litig.,* 362 F.Supp.2d 587 (E.D.Pa.2005) (25% of $126,800,000 fund awarded; multiplier of 6.96); *In re IDB Communication Group, Inc.,* Sec. Litig., No. 94-3618 (C.D.Cal. Jan. 17, 1997) (Hupp, J.), cited at 19 Class Action Reports 472-73 (1996) (16.5% of $83 Million fund awarded; multiplier of 6.2); *In re RJR Nabisco,* 1992 WL 210138 (25% of $72.5 Million fee awarded; multiplier of 6); *In re Charter Communications, Inc., Securities Litigation,* 2005 WL 4045741, *18 (E.D.Mo.2005) (20% of fund awarded in recovery of $146,250,000, multiplier of 5.61); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 197 (S.D.N.Y.1997) (fee award of approximately 16.7% of the fund, plus fund set aside to compensate for post-settlement work); *Di Giacomo v. Plains All Am. Pipeline,* Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at *31, 2001 WL 3463337 at *10 (S.D.Tex. Dec.18, 2001) (awarding 30% of $29.5 Million fund; multiplier of 5.3); *In re Beverly Hills Fire Litigation,* 639 F.Supp. 915 (E.D.Ky.1986) (fee of $4,121,926 in settlement of $14 Million; multiplier of 5 for lead counsel); *Kuhnlein v. Department of Revenue,* 662 So.2d 309, 315 (Fla.1995) (class fund award of 10% of $188,100,000, resulting in multiplier of approximately 15, reduced by Fla. Supreme Court to multiplier of 5 times lodestar, because lodestar was proper method under Florida law); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.,* 364 F.Supp.2d 980 (D.Minn.2005) (25% of $80M settlement; multiplier of 4.7); *Wilson v. Bank of Am. Natl. Trust & Savs. Assn.,* No. 643872 (Cal.Sup.Ct.9/16/82) (multiplier of 10 times then hourly rate of $150), cited in *Newberg,* 14:6, p. 578, F3d 373, 378-379. The 25% is substantially below the average class fund fee fn.87; *Cosgrove v. Sullivan,* 759 F.Supp. 166, 167 n. 1 (S.D.N.Y.1991) (1% of $100 Million right to Medicare reimbursement awarded, resulting in multiplier of 8.74). *See also* Declaration of Stuart J. Logan, the editor of the *Class Action Attorney Fee Digest,* submitted by Class Counsel (providing a list of 8 unreported cases from the past two years with a multiplier of more than five, with three having a multiplier of 6-7.46 and three with multipliers of 7.47-10.26).

In *Bynum v. District of Columbia,* 412 F.Supp.2d 73 (D.D.C.2006), which was an over-detention and strip search case, the **\*1126** Court awarded a fee of 1/3 of the $12 Million fund, plus costs. Mr. Litt was counsel in that case. Judge Lamberth observed that 1) plaintiffs "engaged in protracted efforts over a period of four years to obtain this settlement, which the court considers to be an outstanding settlement both in its monetary and in its non-monetary terms," leading to an "exceptional" result. The result here certainly was comparable to or better than in *Bynum.* The litigation was "complex ..., involving novel issues, and the effort that went into the results reflects that fact," and "[e]xtraordinary effort went into the resolution of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

these cases, not only through litigation, but through many hours of mediation." Those state-ments are equally applicable here. Similarly, the issues in both *Bynum* and *Craft,* were "hotly contested both on their merits and on whether a class would be certified" and the "outcome ... was unclear and subject to serious risk of lack of success at the time the cases were filed and during the course of the litigation. The court is aware that cases of this nature are extremely risky and burdensome for plaintiffs' counsel." In both cases, "[c]lass counsel did an outstand-ing job and obtained exceptional results for the class", and "substantial benefits were con-ferred on the class beyond the monetary recovery for the class, in the form of ... significant policy changes" which is a "substantial factor in the court's determination of the appropriate fee." Finally, "[t]he attorneys involved in this litigation on behalf of the class are experienced and capable civil rights attorneys."

This settlement compares favorably with that one in several respects. The per capita recovery by class members here (based on the total class size) is significantly larger than in *Bynum,* and the changes to jail administration here to conform to the new policies were funded completely separately from the class fund, unlike in *Bynum* where the changes were partly funded by the class fund.

This settlement also compares favorably with *Williams v. Block, supra,* settled for $27 Million total, including a statutory fee of $5.5 Million negotiated in connection with a related state court taxpayer's suit for injunctive relief. The trial court awarded an additional 20% of the re-maining class fund ($21.5 Million) in attorney's fees, which meant that the total percentage of the $27 Million fund that went to fees was 35.47%, plus expenses, substantially more than what the Court has awarded here.

As in *Williams,* "Class counsel did an outstanding job and obtained exceptional results, ... sub-stantial benefits were conferred on the class beyond the monetary recovery for the class, in the form of the significant policy changes in the operation of the County Jail, ... class counsel are among the leading civil rights litigators in the state, ... Barry Litt is considered one of the out-standing civil rights litigators in California, with special expertise in class actions, [and] the other attorneys involved in this litigation on behalf of the class are highly regarded, experi-enced and capable civil rights attorneys...."

The 25% figure requested here compares favorably with the general percentage of recovery awarded in cases around the country, where the percentage of the fund award is generally higher. *See* Silber and Goodrich, *supra; In re Rite Aid Corp. Securities Litigation,* 396 F.3d 294, 303 (3rd Cir.2005), citing three studies ("[O]ne study of securities class action settle-ments over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settle-ments between $100 million and $200 million ... **\*1127** found recoveries in the 25-30% range were 'fairly standard.' ") (citation omitted).

In awarding percentages of the class fund, courts frequently take into account the size of the fund. Often, but not always, fees of less than 25% will be awarded in megafund cases (cases of $50 Million or more). *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052 (9th Cir.2002)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

624 F.Supp.2d 1113
**(Cite as: 624 F.Supp.2d 1113)**

(Appendix lists percentage of fund fee awards in cases with class fund of $50-$200 Million from 1996-2001, showing approximately 1/2 above 25% and 1/2 below 25%). Cases of under $10 Million will often result in result in fees above 25%. *See Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 297-98 (N.D.Cal.1995) ("[m]ost of the cases Class Counsel have cited in which high percentages such as 30-50 percent of the fund were awarded involved relatively smaller funds of less than $10 million", citing cases). For cases of the size of this fund, 25% is very much the norm.

This case is neither a megafund case in which fees more commonly will be under the 25% benchmark, or an under $10 Million case in which they are often more than 25%. Thus, 25% of the fund is the appropriate percentage absent some strong reason to make an upward or downward departure. To the extent there are such factors, they would militate in favor of an upward departure. However, the lodestar cross-check indicates that there is no reason for an upward departure in this case.

## IV. CONCLUSION.

The Court finds that Plaintiffs' counsel obtained an excellent result in a complex and risky case. The size of the fund is large but not in the mega-fund category. The damages class numbers approximately 150,000, over 20,000 claims were filed, and tens or hundreds of thousands of future inmates have benefited from the policy changes brought about by this suit. The wide spread pecuniary and non-pecuniary benefit created supports an attorneys' fee award which provides counsel with an incentive for undertaking future complex and risky litigation. The Court recognizes the skill and experience brought to bear by class counsel throughout the approximately three years they spent litigating and settling this case, and the economy with which they were able to achieve a noteworthy settlement. Having also considered the time invested in this case by counsel, which resulted in a lodestar of approximately $1,200,000, and the awards in comparable cases, the Court finds that 25% percent of the Settlement Fund results in a fair and reasonable award of attorneys' fees and costs in this action. The Court further finds that this award is justified by the high caliber of Plaintiffs' counsels' work in this case. Although the percentage of recovery represented by the fee in this case represents a larger than average enhancement above lodestar, it represents an average of below average percentage of the fund award for comparable cases.

Class counsel are awarded an attorney's fee $6,375,000 (25% of the class fund) as attorney's fees, plus $70,564.64 in costs.

IT IS SO ORDERED.

C.D.Cal.,2008.
Craft v. County of San Bernardino
624 F.Supp.2d 1113

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT 3**

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 214 of 232   Page ID
Case 2:02-cv-09785-CBM-E    Document 485    Filed 02/05/2009    Page 1 of 14
#:1139

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13

14

JUAN GAMINO, individually and as
class representative; KATHY
CONLEY, individually and as class
representative; ED FERREL,
individually and as class representative,

CASE NO. CV-02-9785 CBM (Ex)

**ORDER AWARDING CLASS
COUNSEL ATTORNEYS' FEES
AND COSTS**

15

16

Plaintiffs,

17

v.

18

19

20

21

COUNTY OF VENTURA;
VENTURA COUNTY SHERIFF BOB
BROOKS, individually and in his
capacity as Sheriff of Ventura County;
DOES 1-10,

22

23

Defendants.

24

25

26

27

28

The matter before the Court is Plaintiffs' Motion for Attorneys' Fees (the

"Motion"). Upon consideration of the papers and arguments presented, the Court

GRANTS Plaintiffs' Motion.

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BACKGROUND**

This case is a class action on behalf of new arrestees booked into in the Ventura County Jail charged with violations of California Health and Safety ("H&S") Code §11550, who were strip searched pursuant to the then policy of the Ventura County Jail to do so without individualized suspicion. The case was settled on terms enumerated in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

The custom and practice that was the basis of this lawsuit was ceased as a result of the litigation in the related action, *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) (hereafter *Way*) and this case. *Way* was an individual plaintiff case, also before this Court. *Gamino* was filed separately after *Way*, as a class action. After favorable decisions in this Court and the Ninth Circuit, granting summary judgment to plaintiff *Way* on liability, *Way* was settled for a total of $575,000. Of that amount, $500,000 was for fees and costs, and the remainder was for the plaintiff.

This case subsequently settled, after extensive mediation efforts. The Court approved the settlement at a hearing held on February 2, 2009. [Doc. No. 182.] Under the settlement, defendants would pay sums to class representatives, and various sums to class members who file claims, and would pay for the cost of class administration. In addition, defendants would pay $1,400,000 in attorneys' fees and costs, subject to the approval of this Court.

Plaintiffs filed a motion for attorneys' fees seeking the $1,400,000 award agreed to, based on both a class fund theory and a lodestar with a multiplier theory. For the reasons stated below, the Court awards Plaintiffs' counsel $1,400,000 in attorneys' fees and costs.

2

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 216 of 232   Page ID
Case 2:02-cv-09785-CBM-E    Document 185    Filed 02/05/2009    Page 3 of 14
#:447

**LEGAL STANDARD**

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007. To calculate an award of reasonable attorney's fees, courts use the lodestar formulation set forth in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), which instructs the court to take the number of hours reasonably expended on the litigation and multiply it by a reasonable hourly rate. In determining the "lodestar figure," courts must consider the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

**DISCUSSION**

**A.    The Time and Labor Expended By Counsel**

Counsel efforts in litigating this case were substantial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) three requests for production of documents; 5) extensive analysis of documents produced; 6) three set of interrogatories; 7) 12 depositions; 8) three discovery motions; 9) a motion to compel Sheriff Brooks' deposition; 10) three summary judgment motions; 11) two published appeals in *Way* (one remanding because appealed order was not final for purposes of appeal, and the second upholding this Court's grant of summary judgment to Plaintiff

3

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 217 of 232   Page ID
Case 2:02-cv-09785-CBM-E   Document 185   Filed 02/05/2009   Page 4 of 14
#:442

Way); 12) preparation and mailing of first class notice (pre-settlement); 13) handling of hundreds of class members' calls after mailing of first class notice; 14) retention of data consultants and extensive analysis of computerized jail data; 15) list of charges qualifying as charges of violence, weapons or drugs for purposes of the different levels of class claims; 16) three days of unsuccessful mediation efforts with Ret. Magistrate Judge Edward Infante (including multiple mediation sessions); 17) four mediation sessions with Magistrate Judge Charles Eick; 18) preparation of a 14-page mediation letter in anticipation of mediation with Ret. United States District Judge Raul Ramirez; 19) two days of mediation sessions with Judge Ramirez; 20) and negotiation and preparation of settlement documents, including settlement agreement, preliminary and final approval orders, class notice and claim forms.

In summary, the time and efforts expended by Class Counsel were extensive and involved all that occurs in a case that is being prepared for trial.

**B.     The Novelty and Difficulty of the Issues and Counsel's Skill**

The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials, as the Ninth Circuit recognized in the partial summary decision in this case. *See Way v. County of Ventura, supra,* 445 F.3d at 1161 (9th Cir.2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security."); *see also Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (quoting *Way*).

The *Way* case, which provided the legal foundation for the settlement here (as the parties stipulated that the outcome of *Way* would govern liability here), involved difficult questions of constitutional law. A good snapshot of the state of

4

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 218 of 232   Page ID
Case 2:02-cv-09785-CBM-E   Document 185   Filed 02/05/2009   Page 5 of 14
#:443

1    the law at the time is contained in *Way v. County of Ventura,* 445 F.3d 1157, 1159

2    (9th Cir.2006), where the Court provided the following summary:

3
4          Way brought this civil rights action ... alleging that they violated her
           civil rights under the Fourth and Fourteenth Amendments by
5          subjecting her to a body cavity search following her arrest. The parties
           both filed motions for summary judgment. The district court held that
6          the search violated *Way's* constitutional rights because individualized
           suspicion is required for arrestees who are not admitted to the general
7          jail population. It denied qualified immunity to Brooks and Hanson on
           the basis of *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984)
8          (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la
           Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc); *Kennedy v.
9          Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as
           amended), *implied overruling on other grounds recognized by Act
10         Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992); and *Fuller
           v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991), holding that a
11         reasonable officer reviewing Ventura's policy and the established law
           would have recognized that the Sheriff Department's policy was
12         unconstitutional because it did not further any legitimate penological
           interests. That ruling is the subject of this appeal.

13   What was distinct about this case and the *Way* case was that it involved strip

14   searches of arrestees charged with a drug offense. The Ninth Circuit had ruled long

15   before that the involvement of drugs supplied reasonable suspicion for a strip

16   search. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir.

17   1989) (reasonable suspicion may be supplied by the nature of the charge).

18        Thus, the plaintiff in *Way* had to prevail on the argument that being under

19   the influence of drugs was fundamentally different in kind from possession or

20   trafficking in drugs and did not provide reasonable suspicion for a strip search.

21   Plaintiff succeeded in that contention, paving the way for the current settlement.

22   *See Way,* 445 F.3d at 1162 ("We cannot see how the charge of being under the

23   influence of a drug necessarily poses a threat of concealing (and thereby using or

24   trafficking) additional drugs in jail during the limited time between booking and

25   bail, or booking and placement in the general population. If not, it was

26   unreasonable to assume that *Way* harbored drugs in some cavity or other.").

27   Plaintiff ultimately prevailed before the Ninth Circuit, which acknowledged it had

28   never directly addressed the issue in deciding that the Sheriff was entitled to

5

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 219 of 232 Page ID
Case 2:02-cv-09785-CBM-E Document 185 Filed 02/05/2009 Page 6 of 14
#:444

qualified immunity. *Id*. ("we had never previously addressed the constitutionality of a body cavity search policy premised on the nature of this or any other drug offense. More importantly, we had held that the nature of the offense alone may provide reasonable suspicion [citation omitted], and twice pointed to charges involving drugs, contraband and violence as the kind of offense that might give rise to reasonable suspicion.").

In addition, properly handling the data in cases of this type requires a high degree of sophistication. In cases like this, proper use of the data is the factual key to the case (along with establishing the policies or customs being challenged, which occurred during the *Way* case). It is through the data that members of the class are identified. This is usually a sophisticated process, requiring counsel familiar with both the facts of the case and how to use the data. Jail data is not configured to straightforwardly answer the questions for which answers are needed to determine class composition. Code has to be written to take all of those factors into account. Then the analysis has to be discussed between Plaintiffs and Defendants, in order to work out agreement on the data issues. All of this occurred here.

There are relatively few attorneys qualified to handle the data issues in a case such as this to the maximum degree of effectiveness. When Mr. Barrett Litt came into the case, Plaintiffs had not yet undertaken an independent data analysis. After Mr. Litt's entry, data consultants he had used previously analyzed all the data. As a result, the class list changed. In addition, an entire group of individuals were identified for whom no determination could be made based on the available data as to whether they were strip searched. This is because, for the earlier part of the class period, the data only captured the lead charge, but there may have been a secondary §11550 charge on the basis of which the arrestee was strip searched.

6

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 220 of 232   Page ID
Case 2:02-cv-09785-CBM-E   Document 185   Filed 02/05/2009   Page 7 of 14
#:445

The solution to this problem was developed through the use of the Possible Class Member mailing.

### C.    The Risks Of Non-Payment Assumed By Counsel and Preclusion of Other Employment

Plaintiffs' counsel faced a substantial risk of non-payment, in part because counsel took this case on a contingency fee basis. Obviously, the County had the resources to pay a judgment. However, the risk lay in establishing that the County's policies were illegal. As discussed previously, strip search litigation in general is inherently risky because of the deference given jail officials, and because there is a split in circuits developing. Seeking large amounts of money from government entities always carries risks of politics entering into the equation.

Declarations filed in support of Plaintiffs' motion for attorneys' fees from experienced class and civil rights lawyers noted several particular difficulties in litigation of this kind, including 1) particular challenges and expertise exist to establish a policy or custom under *Monell v. Dept. Soc. Serv.*, 436 U.S. 658, 690 (1978); 2) great deference is given to jails in addressing security issues; 3) the law often differs from circuit to circuit; and 4) there is a greater risk than normal that the whole legal landscape could change by virtue of a change in the law, particularly if the Supreme Court addresses the issue (which it has not done in the area of strip searches of pre-trial detainees since *Bell v. Wolfish*, 441 U.S. 520 (1979), almost 30 years ago. The Court agrees that all of these reflect risks for Plaintiffs' counsel in pursuing litigation of this type.

Class counsel, particularly Mr. Earnest Bell, declined substantial other work to pursue this case. These two cases combined (*Way* and *Gamino*) spanned many years when the outcome was uncertain. Over 2000 hours were devoted to the combined *Way* and *Gamino* cases.

7

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 221 of 232   Page ID
Case 2:02-cv-09785-CBM-E    Document 185   Filed 02/05/2009   Page 8 of 14
#:446

**D.    The Result Obtained For The Class**

This case was hard fought. The *Way* case, in which the key merits issues were fought out, went through extensive briefing in this Court and the Ninth Circuit. The Plaintiffs were individuals of little means. All the work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered only after Plaintiff won the *Way* case. Even then it required over a year of settlement efforts, and the addition of Mr. Litt to Plaintiffs' attorney team, to reach a settlement.

The financial terms of the settlement are very favorable to class members. Those not charged with crimes of violence or involving other drug charges receive $2300 for a first offense and $700 for a second offense. This is considerably higher than the average recovery in other strip search class actions. (*See* B. Litt Dec. at ¶ 35, [Doc. No. 176], filed concurrently with Plaintiffs' Motion.) While this is partly explained by the scale of the other cases compared to this one, the fact remains that class members are receiving very favorable payments. In addition, even those charged with other drug charges or crimes of violence are participating in the settlement, even though the law in this Circuit is that such charges provide reasonable suspicion to strip search pre-arraignment arrestees. All of this is due exclusively to Class Counsel's efforts.

Nor can the results in this case be judged solely by the monetary component of the settlement. As a result of the combined *Way* and *Gamino* litigation, the County long ago ceased all of the strip search practices addressed in this settlement. That is a major accomplishment, particularly in light of the standing limitations imposed on such cases. Thus, as a result of Class Counsel's efforts, tens of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip

8

search, "regardless of how professionally and courteously conducted", necessarily entails. *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

### E.   Experience, Reputation and Ability of Class Counsel

Class Counsel are highly experience litigators in the fields of civil rights and class actions. Mr. Litt is widely known as one of the foremost civil rights attorneys in California, having a particular expertise in civil rights class actions and other complex multi-party civil rights cases, especially law enforcement class actions. He has both spoken and published on the issue of strip search and law enforcement class actions at some length, and is counsel in several other pending class actions, both in California, and in other parts of the country (Washington, D.C., Baltimore and Atlanta). In addition, he has several $1 Million plus civil rights trial verdicts, including a $22.5 Million verdict against the City of Long Beach, which is the largest Fair Housing verdict on record. He has settled three strip search class actions for eight figure sums, aside from this one. (*See* Dec. of B. Litt at ¶¶ 1-12, and his curriculum vitae attached as Exhibit 1.)

Mr. Bell is an experienced civil rights litigator, who has practiced primarily in Ventura County, and has been the most prominent plaintiffs' police abuse attorney in Ventura County for many years. He litigated the *Way* case through the Ninth Circuit and settlement. In addition, Mr. Bell litigated the first part of the *Gamino* case and brought in Mr. Litt when he determined that the settlement process would be aided by a civil rights lawyer experienced in class actions.

### F.   The Reaction Of The Class

The reaction of the class was very favorable. There were no objections to the settlement. There were only five opt-outs (which is approximately 1/10 of 1%). Over 1000 Claim Forms were timely filed.

9

Case 2:04-cv-08510-SJO-SS  Document 57  Filed 04/16/10  Page 223 of 232  Page ID
#:448
Case 2:02-cv-09785-CBM-E  Document 185  Filed 02/05/2009  Page 10 of 14

### G.    $1,400,000 Is A Reasonable Fee In This Case

In this case, Plaintiffs' counsel seek an award of $1.4 Million, in addition to the $500,000 received in the *Way* case. This encompasses both fees and costs. (Costs are relatively modest, totaling under $15,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.) The table below reflects the lodestar calculation for Plaintiffs' counsel's work in this case.

| Attorney | Hourly Rate | Hours | Total |
|---|---|---|---|
| Earnest Bell | $600 | 1,602.50 | $961,500.00 |
| Barrett S. Litt | $750 | 187 | $140,250.00 |
| Charla Gray | $275 | 5.3 | $1,457.50 |
| Julia White | $235 | 37 | $8,695.00 |
| **Total** | | | **$1,111,902.50** |

The rates used here are reasonable. Mr. Bell and Mr. Litt have been attorneys since 1988 and 1970, respectively. (Dec. of B. Litt at ¶ 3; Dec. of E. Bell at ¶ 2, attached as Exhibit 2 to Dec. of B. Litt.) Combined, they have 60 years' litigation experience. Mr. Bell, an attorney with 21 years' experience, is the leading plaintiffs' police practices civil rights attorney in Ventura County. (Dec. of E. Bell at ¶¶ 2, 5.) Over the last several years, police misconduct cases have comprised about 90% of his practice. (*Id.* at ¶ 5.) Mr. Litt has 38 years' experience and for the last 25-30 years has focused his practice on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation and complex multi-party litigation. (Dec. of B. Litt at ¶ 3.) In the area of class actions against jails for violation of civil rights involving strip searches, specifically, Mr. Litt is considered one of the leading plaintiffs' lawyers in the country. (*Id.* at ¶ 8.) The rates used by Mr. Bell and Mr. Litt are comparable to Los Angeles market rates for complex litigation. (*See id.* at ¶¶ 10-21; Dec. of E. Bell at ¶ 11.)

In addition, numerous declarations have been filed that were submitted in *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. April 01, 2008),

10

Case 2:04-cv-08510-SJO-SS Document 57 Filed 04/16/10 Page 224 of 232 Page ID
#:449
Case 2:02-cv-09785-CBM-E Document 185 Filed 02/05/2009 Page 11 of 14

1    establishing the reasonableness of these rates, and those declarations are a year out

2    of date. Mr. Litt also submitted a declaration establishing that his then current

3    rates have frequently been awarded by courts, and that the rates here reflect his

4    firm's current rates.

5        In *Craft*, District Judge Stephen Larson, using 2007 rates, found that "rates

6    ranging from a high of $725 per hour for Mr. Litt to a low of $275 for 2006

7    graduates, as well as law clerk rates of $200 per hour and paralegal rates from a

8    low of $110 to a high of $225 per hour" were "supported by numerous

9    declarations... establish[ing] that the hourly rates set are similar to those for

10   attorneys of comparable skill and experience at the rates paid for complex federal

11   litigation" and that "the rates sought are reasonable and reflect the market for

12   attorneys of comparable skill, experience and expertise in complex federal

13   litigation." *Craft*, 2008 WL 916965 at 9. Judge Larson also noted that it "was

14   Congress' intent for civil rights cases [to use the standard of complex litigation in

15   setting civil rights fee rates]. *See City of Riverside v. Rivera,* 477 U.S. 561, 575-

16   576 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976,

17   p. 5913, *supra,* (Congress intended civil rights fees to be comparable to that for

18   'other types of equally complex Federal litigation, such as antitrust cases')." *Id.*

19   Plaintiffs anticipate that the lodestar will increase by approximately

20   $100,000 plus in the course of the remaining work on the case, including work

21   between now and the settlement and work over the ensuing period through the final

22   distribution of the funds. (The post-settlement work is expected to be somewhat

23   extensive due to the process of deciding issues such as which possible class

24   members are in fact class members, lien issues and the like). Thus, the total

25   lodestar is approximately $1.2 Million. The total fee award, including the

26   $500,000 awarded in *Way*, is $1.9 Million, which would result in a multiplier of

27   approximately 1.6 ($1.2M x 1.6 = $1.9M).

28

11

Case 2:04-cv-08510-SJO-SS   Document 57   Filed 04/16/10   Page 225 of 232   Page ID
#:450
Case 2:02-cv-09785-CBM-E   Document 185   Filed 02/05/2009   Page 12 of 14

1    This is a modest multiplier. Many class action cases have authorized far

2    higher multipliers. *See, e.g., Craft v. County of San Bernardino*, 2008 WL 916965

3    (C.D.Cal. 2008) (multiplier of 5.2 in strip search class action); *In re Charter*

4    *Communications, Inc., Securities Litigation*, 2005 WL 4045741, 18 (E.D.Mo.

5    2005) (multiplier of 5.61); *In re Rite Aid Corp. Sec. Litig*, 362 FSupp.2d 587

6    (E.D.Pa. 2005) (multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline,* Nos.

7    H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at

8    10 (S.D.Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.,* 979

9    F.Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5, plus fund set aside for post-

10   settlement work); *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C.

11   2006) (multiplier of 2 in strip search class action); *Kuhnlein v. Department of*

12   *Revenue*, 662 So.2d 309, 315 (Fla. 1995) (class fund award of 10% of

13   $188,100,000, resulting in multiplier of approximately 15, reduced by Fla.

14   Supreme Court to multiplier of 5 times lodestar, because lodestar was proper

15   method under Florida law). See also cases cited in the Appendix in *Vizcaino v.*

16   *Microsoft Corp.,* 290 F3d 1043 (9th Cir. 2002) (containing several cases with

17   multipliers of three and higher).

18        In this case, Plaintiffs' counsel obtained a relatively expeditious and

19   "excellent result" in a "complex and risky case". *See Stop & Shop,* 2005 WL

20   1213926 (E.D.Pa.), *supra.* The *Way/Gamino* case, when initially filed in *Way*, was

21   a very risky case. The size of the recovery for class members is substantial. The

22   "skill and experience brought to bear by counsel throughout the year[s] they spent

23   actively litigating this case, and the economy with which they were able to achieve

24   such a noteworthy settlement" all speak to a substantial fee award. Further, "the

25   award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop*

26   *& Shop, supra.*

27

28

12

## H.    Awarding Fees and Costs Requested Advances the Purposes of Class Actions in the Context of This Settlement

Because of the structure of the settlement agreement, the $1,400,000 allocated to fees and costs is separate from the individual class members' recovery, *i.e.*, class members will not receive more if a lower fee is awarded. An important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g.*, Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims").

Through the deterrence prism, the defendants would receive an unjustified windfall if the requested fees were not granted in full. In addition, it is important to provide appropriate incentives for attorneys to undertake the risk of class litigation. To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism. As recent commentators have observed, if the economic interests of the class and counsel are misaligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of a larger recovery. *See, e.g.*, Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

### CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Attorneys' Fees. Defendants are ordered to pay Class Counsel attorneys' fees and

13

Case 2:04-cv-08510-SJO-SS Document 57-1 Filed 04/16/10 Page 227 of 232 Page ID
Case 2:02-cv-09785-CBM-E Document 185 Filed 02/05/2009 Page 14 of 14
#:452

1   costs in the amount of $1,400,000 pursuant to Paragraph ¶ 26 of the parties'

2   Settlement Agreement [Doc. No. 171].

3

4      IT IS SO ORDERED.

5

6   DATED:   February 5, 2009      By _____

7                                  CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

**EXHIBIT 4**

See Sobel Exhibit 5

**EXHIBIT 5**

Daily Journal Newswire Articles
www.dailyjournal.com
© 2010 The Daily Journal Corporation. All rights reserved.

- Dec. 02, 2009

# Firms to Hike Billing Rates in 2010

By Rebecca U. Cho

Daily Journal Staff Writer

Despite ongoing vocal pressure from law firm clients to hold the line or give discounts on legal pricing, many firms will ratchet up their billing rates in 2010, according to a survey from a top legal consulting firm.

On average, law firms plan to raise rates by 3.2 percent, according to Altman Weil, which released the survey results Tuesday. The projected rise is smaller than previous, profitable years during which firms increased rates 5 percent to 8 percent, said Thomas Clay, Altman Weil's leading principal on the survey.

The survey's results are sure to come as an unwelcome surprise to in-house lawyers. In an October survey by the Association of Corporate Counsel and Serengeti Law, in-house counsel predicted law firm hourly billing rates would remain flat in 2010, a first in the survey's nine-year history.

And the thought of upping any rates at all in the difficult economy are leading some law firm clients to bristle.

"I think given the current environment, I'm surprised firms are attempting to do any increases at all, frankly," said Teigue Thomas, general counsel of Acer Group, the nation's second-largest computer maker by market share.

Thomas said she has not received notices from law firms about rate increases for next year, which she would typically receive about this time. She said she does not plan to approve any rate increases from her outside counsel.

Only 8.5 percent of the 288 law firms surveyed said they would make no increases. Just 1 percent said they would decrease rates. Survey respondents included law firms ranging in size from 50 to more than 1,000 lawyers. About 12.5 percent of respondents were firms with 500 or more lawyers.

Unlike previous years when law firms made across-the-board increases in rates, firms are making adjustments on a client-by-client and industry-by-industry basis, Clay said. Roughly 13 percent of firms will continue to enact an across-the-board increase, the survey revealed. Most firms said increases would vary by timekeeper class, with the largest increases in rates occurring among associates. He said law firms acknowledge the pressure their clients are under

to cut legal costs. Law firms expressed a need to make up for a year or two years of rate freezes and to bring certain practices up to market prices.

Clay said his firm decided to conduct the survey, its first on projected billing rates, because of an unprecedented curiosity from its law firm clients in the past year on whether to increase rates and how to do so if they chose that route.

"We're asked every year by clients, 'What are other law firms going to do?' But this year, nobody knew. It was such a strange and different year," Clay said. "We had dozens and dozens of calls much earlier than normal about what people are going to do."

If law firms, as expected, continue to coordinate alternative fee arrangements with their clients, a rise in billing rates may become increasingly irrelevant, said Bernard Gaffaney, president of the Association of Corporate Counsel's Southern California chapter.

"I don't think [rate increases] will have as dramatic an effect as say two or three years ago. More in-house counsel are more vigorously pursuing alternative fee arrangements, so they are not as affected by hourly increases," Gaffaney said.

rebecca_cho@dailyjournal.com

**********

© 2010 Daily Journal Corporation. All rights reserved.

1    CERTIFICATIO N OF SERVICE

2         The undersigned hereby certifies that all counsel of record have been served in this

3    matter through the Court's ECF system.

4    Dated:  April 15, 2010                                    /s/
5                                                         CAROL A. SOBEL

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28